1                  IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF MASSACHUSETTS

3

4
   * * * * * * * * * * * *    *    14CR01284-NMG
5  UNITED STATES OF AMERICA   *
                              *
6  VS.                        *    APRIL 14, 2016
                              *    9:22 A.M.
7  DUSTIN J. DeNUNZIO,        *
   et al                      *
8                             *    BOSTON, MA
   * * * * * * * * * * * *    *
9

10

              BEFORE THE HONORABLE NATHANIEL M. GORTON
11
                          DISTRICT JUDGE
12
                        JURY TRIAL DAY 4
13

14

15  **APPEARANCES**:

16

17  FOR THE GOVERNMENT:        KRISTINA E. BARCLAY, AUSA
                              S. THEODORE MERRITT, AUSA
18                             United States Attorney's Office
                              One Courthouse Way
19                             Suite 9200
                              Boston, MA 02210
20
                              MATTHEW ELIO, FEDERAL BUREAU OF
21                             INVESTIGATION

22  FOR THE DEFENDANT
   DUSTIN J. DeNUNZIO:        JOSHUA S. LEVY, ESQ.
23                             TODD FOSTER, ESQ.
                              AARON M. KATZ
24                             Ropes & Gray LLP
                              Prudential Tower
25                             800 Boylston Street
                              Boston, MA 02199-3600

1

**APPEARANCES**  (Cont'd):

2

3  FOR THE DEFENDANT
   ANTHONY GATTINERI:        MICHAEL J. CONNOLLY, ESQ.
4                            Hinckley, Allen and Snyder, LLP
                             28 State Street
5                            Boston, MA  02109

6  FOR THE DEFENDANT
   CHARLES A. LIGHTBODY:     CHARLES W. RANKIN, ESQ.
7                            Rankin & Sultan
                             151 Merrimac Street
8                            Second Floor
                             Boston, MA  02114-4717
9

10 Court Reporters:          Kelly Mortellite, RPR, RMR, CRR
                             Debra D. Lajoie, RPR-FCRR-CRI-RMR
11                           Lee Marzilli, RPR, RMR, CRR
                             One Courthouse Way
12                           Boston, MA  02210

13            Proceeding reported and produced by
                  computer-aided stenography

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                              INDEX

2
     WITNESS                                          PAGE
3
     DANIEL GAQUIN
4       Direct Examination By Ms. Barclay               6
        Cross-Examination By Mr. Levy                  23
5       Cross-Examination By Mr. Connolly              71
        Redirect Examination By Ms. Barclay            75
6       Recross-Examination By Mr. Levy                78

7    GAYLE CAMERON
        Direct Examination by Ms. Barclay              81
8       Cross-Examination by Mr. Katz                  96
        Cross-Examination by Mr. Connolly             133
9       Cross-Examination by Mr. Rankin               136
        Redirect Examination by Ms. Barclay           148
10
     PAUL SIMMS
11      Direct Examination by Mr. Merritt             158
        Cross-Examination by Mr. Katz                 173
12      Cross-Examination by Mr. Rankin               184
        Redirect Examination by Mr. Merritt           191
13

14                        E X H I B I T S
     Exhibit No.                        Received
15
        37                                  12
16      39                                  20
        284                                 39
17      390                                 46
        326                                 68
18      358                                 69
        58                                  96
19      59                                 161
        60                                 163
20      61                                 165
        63                                 167
21      64                                 169
        65                                 169
22

23

24

25
</pre>

```
 1                  P R O C E E D I N G S

 2          THE CLERK:  Court is now in session.

 3          THE COURT:  Good morning, counsel.  I wanted to see

 4   counsel about the two pending motions before the Court.  Late

 5   yesterday afternoon the defendants submitted a motion for

 6   production of Jencks material.  I haven't gotten a response

 7   from the government.  Does the government wish to respond

 8   orally to that motion?

 9          MR. MERRITT:  Yes, Your Honor.  I would just simply

10   state there is no Jencks material, which we've informed them,

11   and that in a pretrial preparation session with Commissioner

12   Cameron, we were aware that she has prior statements in a

13   transcript at the Gaming Commission.  We understand the

14   defendants had minutes of the executive session meetings, and

15   basically our practice in that regard was simply, you know,

16   with the agents, say, Write a 302, if she says anything that's

17   inconsistent with any of her prior statements or says anything

18   exculpatory to the defendants -- favorable to the defendants.

19   And that's how it was handled.  And then last night, or after

20   court yesterday, we sent them an e-mail that laid out the

21   bullet points essentially of what her testimony is, so I don't

22   see the issue.

23          THE COURT:  All right.  Because the government has

24   reported to the Court and to defense counsel that no Jencks Act

25   statements with respect to its prospective witness, Gayle
```

1    Cameron, exist and because the Court agrees with the government

2    that any notes taken by attendees of a witness preparation

3    session are not statements as that term is defined in the

4    Jencks Act, Title 18 of the United States Code, Section

5    3500(e), the motion is denied.

6          There is also pending a motion for an in camera review

7    of the five notebook pages designated as privileged by

8    defendants.  Of course defendants have not had a chance to

9    respond to that, but I will await my decision on that case

10   until after I've received a response from the defendants.

11         Yes?  Anything else that needs to come to my attention

12   before we begin?  If not, call the jury.

13   (Jury enters.)

14         THE COURT:  Good morning, jurors.  Sometimes you will

15   notice that we don't start right on time.  It's not usually

16   because we're dawdling.  We have matters that need to be

17   resolved outside of your hearing, legal matters about which you

18   need not be concerned.  Today was one of those occasions.

19   Today we are now ready to resume with the testimony.  The

20   government will call its next witness.

21         MS. BARCLAY:  Thank you, Your Honor.  Daniel Gaquin.

22         (DANIEL GAQUIN, sworn)

23         THE CLERK:  Would you please state your name for the

24   record, spelling your last.

25         THE WITNESS:  Daniel Gaquin, G-a-q-u-i-n.

```
 1              MS. BARCLAY:  May I proceed?
 2    DIRECT EXAMINATION BY MS. BARCLAY:
 3    Q.    Good morning, Mr. Gaquin.
 4    A.    Good morning.
 5    Q.    Where do you work?
 6    A.    Mintz Levin.
 7    Q.    And what is Mintz Levin?
 8    A.    Mintz Levin is a law firm here in Boston.
 9              THE COURT:  Mr. Gaquin, will you pull that microphone
10    closer to you.  It's movable.  Yes, pull it right in.
11              THE WITNESS:  Okay.  That better?
12    Q.    What do you do at Mintz Levin?
13    A.    I'm a real estate attorney.
14    Q.    How long have you been at Mintz Levin?
15    A.    Since 1999.
16    Q.    And is Wynn Resorts one of your clients?
17    A.    It is.
18    Q.    Did you do any work for Wynn Resorts in connection with
19    its attempt to secure a site in Everett to locate a destination
20    casino?
21    A.    I did.
22    Q.    When did you become involved in that project?
23    A.    It was around November of 2012.
24    Q.    Where was Wynn Resorts in the process when you became
25    involved?
```

1   A.   They had either signed or substantially completed a letter
2   of intent, and then I became involved in connection with
3   completing the option agreement.
4   Q.   And what exactly is a letter of intent?
5   A.   A letter of intent is a document which lays out the basic
6   terms and conditions of a transaction between the parties.
7   Q.   And is it a binding agreement?
8   A.   No.  Typically a letter of intent would not be binding.
9   It contemplates a more formal document that will be the binding
10   agreement.  So it will set forth price terms, parties and any
11   other significant terms that will then be elaborated more in
12   the formal document.
13   Q.   And had Wynn Resorts already selected the land when you
14   became involved?
15   A.   Yes.
16   Q.   And so you had no involvement in selecting the land?
17   A.   I did not.
18   Q.   Could you just describe the proposed transaction according
19   to the letter of intent?
20   A.   Sure.  It was a -- so it was an option agreement, which is
21   typical in a development context where a developer wants to tie
22   up property for a period of time without committing to purchase
23   it.  So it's a right to purchase the property for a period of
24   time.  In this case, it was two years.  The option price, if
25   Wynn elected to purchase the property, was 75 million.  The

1    option payments were 100,000 a month.

2    Q.   And when you say -- so an option -- it's a letter of

3    intent and working towards an option agreement?

4    A.   Correct.

5    Q.   But the option agreement isn't an actual purchase of the

6    land.  Is that what --

7    A.   No.  It contemplates a purchase.  It gives, in this case,

8    Wynn the right to exercise the option and purchase the property

9    at some time in the future.  In this case, it was during a

10   period of two years where they could exercise that option.

11        The reason for the time period is because they don't know

12   if the development is feasible or not, so they need to do their

13   due diligence investigations concerning the property, and in

14   this case also to attempt to get a gaming license, which was

15   the purpose of buying the property.

16   Q.   And who were the parties to the letter of intent?

17   A.   FBT Realty, LLC was the seller, and I believe it was Wynn

18   Resorts.  It could have been Wynn Mass.  A Wynn entity was the

19   purchaser.

20   Q.   Okay.  And did you have any contact with -- let me just

21   back up.  What was your understanding of what FBT Everett

22   Realty, LLC was?

23   A.   It was an LLC, which is typical in real estate

24   transactions, is a property holding entity.  Other than that, I

25   didn't know much about it.

1   Q.   And it held the property, the title to the property?

2   A.   It held title to the property, yes, as represented to us,

3   yes.

4   Q.   Did you have any contact with any FBT representatives

5   before the letter of intent was executed?

6   A.   No.

7   Q.   After the letter of intent was finalized, what did you do

8   next for Wynn Resorts in connection with this land deal?

9   A.   So I was provided with the letter of intent and a form of

10  option agreement and then contact information for FBT's

11  counsel.  And we connected with each other to start the process

12  of formalizing the option agreement.

13  Q.   When was the option agreement finalized?

14  A.   The date on it is December 19.  I believe that was when it

15  was concluded.

16  Q.   That's 2012?

17  A.   Yes, December 19, 2012.

18  Q.   And you talked about the option agreement being just an

19  agreement to purchase.  And I think you said that the purchase

20  price as contemplated by the letter of intent, what was that?

21  A.   $75 million.

22  Q.   And were there option payments?

23  A.   There were.  Those option payments were, I believe,

24  monthly payments of $100,000.

25  Q.   To what?

1    A.    I'm sorry?

2    Q.    To what entity or person?

3    A.    They would go to the seller.

4    Q.    To FBT?

5    A.    To FBT, yes.

6    Q.    And what was the first step in negotiating the option

7    agreement?

8    A.    The first step was producing a draft of the option

9    agreement, which I did based on a form that was provided to me

10   by my client, by Wynn.  And I prepared that based on the letter

11   of intent and then would have sent it to Paul Feldman, who was

12   counsel for FBT.

13   Q.    And was Paul Feldman your primary contact with FBT during

14   the negotiation?

15   A.    Yes.

16   Q.    And did you know him before this transaction?

17   A.    No.

18   Q.    And was all your contact with FBT through Mr. Feldman

19   during the negotiation of the option agreement?

20   A.    Yes.

21   Q.    Did you have any contact with anyone who purported to be a

22   member or manager of FBT?

23   A.    Yes.  Dustin DeNunzio or his entity was the manager of

24   FBT, and he was the primary -- he was the primary owner

25   representative who was involved.

1    Q.    Did you have a main contact at Wynn Resorts in November

2    and December of 2012 while you were negotiating the option

3    agreement?

4    A.    I did.  It was primarily Kim Sinatra, the general counsel

5    for Wynn Resorts.

6    Q.    And your role was to do what in negotiating the option

7    agreement?

8    A.    So it was to produce the document initially, engage with

9    seller's counsel, identify issues that needed to be resolved,

10   narrow that field of issues down through negotiation and

11   ultimately come up with an agreement.  The idea was to get the

12   property under the option agreement.

13   Q.    During the negotiation of the option agreement, did you

14   make any efforts or have anyone make any efforts to determine

15   who -- what the ownership of the property was?

16   A.    The ownership -- the title -- no.  At that point in time

17   just with the option agreement we were told it was FBT Realty.

18   Other than that, the only thing I would have done and did do

19   was to check the Secretary of State's records for who had

20   authority to sign for FBT.

21   Q.    Because at the point of the option agreement, that's all

22   you needed to know is who had authority to sign; is that

23   accurate?

24         MR. LEVY:  Objection.

25         THE COURT:  Overruled.

1  A.   I'm sorry.  Can you repeat the question?

2  Q.   At the time the option agreement is being entered into, do

3  you need to know the owners, the members of the LLC?

4  A.   No.  That would be -- if the buyer, in this case Wynn,

5  exercised the option, it would be at a closing sometime in the

6  future.

7       MS. BARCLAY:  Your Honor --

8  Q.   Actually, Mr. Gaquin, if you could look at Exhibit 37 in

9  the folder in front of you.

10  A.   Yes.

11  Q.   And do you recognize that document?

12  A.   I do.

13  Q.   What is it?

14  A.   It's a draft of the option agreement.

15       MS. BARCLAY:  Your Honor, I'd move for the admission

16  of Exhibit 37 into evidence.

17       MR. LEVY:  No objection.

18       THE COURT:  It will be admitted.  Exhibit 37.

19       (Exhibit 37 received in evidence)

20  Q.   Taking a look at the first page of Exhibit 37, what is

21  that?

22  A.   This is an e-mail from me to Paul Feldman.  It's dated

23  Tuesday, December 4, 2012.

24  Q.   And what's the subject?

25  A.   I am conveying to him a draft option agreement for his

1    review.

2    Q.   And is this a first draft of the option agreement?

3    A.   I think so.  It doesn't specifically say the initial

4    draft, but that would fit with the timeframe.

5            MS. BARCLAY:  Okay.  Mr. Merritt, if you could scroll

6    down to page 24 of that.

7    Q.   Looking at -- it's actually page 22 of the attachment.  Do

8    you have that in front of you?

9    A.   I do.

10   Q.   And is that in fact the draft of the option agreement that

11   was attached to that e-mail?

12   A.   Yes, it is.

13   Q.   Okay.  And taking a look at paragraph 13.13, could you

14   read the title of that?

15   A.   Yes.  "Suitability For Licensure By Gaming Regulatory

16   Agency."

17   Q.   Okay.  And 13.13.1, could you please read that paragraph?

18   A.   The entire paragraph?

19   Q.   Why don't we start with -- yes, actually, the entire

20   paragraph.

21   A.   "As a holder of a privileged gaming license, purchaser

22   and/or certain of its affiliates are required to adhere to

23   strict laws and regulations regarding vendor and other business

24   relationships.  The parties therefore agree that, in the event

25   that purchaser and/or certain of its affiliates acting in its

1   or their sole and absolute discretion determine that seller or

2   any person associated with the seller is or might be engaged in

3   or is about to be engaged in any activity or activities which

4   could adversely affect the purchaser's and/or certain of its

5   affiliates' business or privileged gaming licenses, purchaser

6   shall provide seller with notice of the objectionable act,

7   affiliation or relationship, and, to the extent such objection

8   is capable of being cured, seller shall have the opportunity to

9   cure such objection within five days of the receipt of the

10  purchaser's notice, unless the cure period must be of a shorter

11  duration, a decision to be made in its sole but reasonable --

12  in the sole but reasonable determination of purchaser and its

13  affiliates."

14  Q.   If you could stop there, Mr. Gaquin.  Under this agreement

15  who was the purchaser and who was the seller?

16  A.   The purchaser was Wynn MA, LLC and the seller was FBT

17  Realty, LLC.

18  Q.   Is this something -- let me back up.  As a real estate

19  attorney at Mintz Levin, had you negotiated option agreements

20  before?

21  A.   I have -- I had.

22  Q.   Sorry?

23  A.   Yes, I had.

24  Q.   Had you seen this type of provision in other option

25  agreements?

1  A.    No.  This was new to me.

2  Q.    And why was it in this agreement?

3  A.    Well, it was in this agreement because the purpose of

4  entering into the option agreement to acquire this property was

5  specifically for a casino operation.  And in order to do that,

6  Wynn would have to obtain a gaming license from the Gaming

7  Commission.  This is not a provision that would typically be in

8  an option agreement.

9  Q.    And have you heard the term "suitability" in connection

10  with your representation of Wynn Resorts?

11  A.    This was the first time I had heard that.

12  Q.    Okay.  What's your understanding of what suitability is as

13  it relates to gaming?

14  A.    That the licensor, the license holder would be deemed

15  suitable, meaning it's appropriate that they hold a gaming

16  license.

17  Q.    And this particular provision of the contract, the option

18  agreement, that was in the original draft?

19  A.    It was, yes.

20  Q.    And if you could just read the last sentence of that

21  paragraph.  Sorry.  I'll try to pull it up a little better

22  here.  Starting with, "Should seller."

23  A.    "Should seller fail to cure the objection within the

24  required time period, purchaser shall have the right to

25  immediately," and then in parentheses, "(regardless as to any

1   other provision of this agreement requiring a certain amount of

2   notice)," close parentheses, "terminate this agreement upon

3   notice to seller at no cost to purchaser."

4   Q.   And then scrolling down to 13.13.5, that's still in that

5   suitability or licensure section, 13.13 of that; is that

6   accurate?

7   A.   That's correct.

8   Q.   Could you also read that paragraph?

9   A.   "Seller represents and warrants to purchaser that seller

10   and to the best of seller's knowledge, all persons associated

11   with seller are willing to file all necessary applications to

12   obtain whatever approvals from the gaming regulatory agencies

13   may be required of such persons in connection with this

14   agreement.  To the best of seller's knowledge, neither seller

15   nor any person associated with seller has ever engaged in any

16   conduct or practices which any of the foregoing persons should

17   reasonably believe would cause such person to be denied any

18   such approvals."

19   Q.   And again, that's something that was in this original

20   draft?

21   A.   That's correct.

22   Q.   Did you discuss section 13.13 of the option agreement with

23   Mr. Feldman during the negotiations?

24   A.   I believe we did, yes.

25   Q.   What if anything did Mr. Feldman say to you about it?

1        MR. LEVY:  Objection.  Hearsay.

2        THE COURT:  Sustained.

3        MS. BARCLAY:  Your Honor, Mr. Feldman was the attorney

4    representing the defendants at the time, so he's an agent.

5    They've also I believe embraced Mr. Feldman's statement.

6        MR. LEVY:  Your Honor, I object to the speaking

7    objection.  They have the opportunity to call Mr. Feldman if

8    they want.

9        THE COURT:  Well, under the rulings that were made

10   before the trial, I believe the government's counsel is

11   correct.  The objection is overruled.

12   A.    I'm sorry.  The question again?

13   Q.    What did Mr. Feldman, if anything, say to you about

14   section 13.13?

15   A.    I don't recall specific discussions about it.  I know that

16   part of the -- most of the negotiation over this was about --

17   let me start -- this option agreement was a little bit

18   different because in typical option agreements, the buyer can

19   just terminate and walk away and stop making the payments.

20        In this instance, the sellers had negotiated a provision

21   which required the payment of all of the option fee for the

22   full two-year period, which would be $2,400,000.  So part of

23   our discussion, the negotiation, was defining events which

24   would allow the purchaser, Wynn, to terminate the agreement and

25   not pay what we call a break fee, which was the balance of the

1    option payments that hadn't been paid.  So if it was terminated

2    for good reason halfway through, after a year, that would be

3    it.  They wouldn't have to pay the remaining million two that

4    would be due for the second year.

5        So this was a provision like others in the agreement that

6    would allow Wynn to terminate and not pay the break fee.  So

7    there was a back and forth between myself and Paul over those

8    provisions.  I wanted to make sure that there were plenty of

9    provisions that we could terminate, walk away from the deal

10   from and not have to pay the break fee, and Paul was focused on

11   those provisions for just the opposite reason.

12   Q.    Right.  Did Mr. Feldman say anything else to you about why

13   Wynn wanted to know or why --

14   A.    I think generally there was a discussion about why is this

15   relevant; why is it important for Wynn or in this instance the

16   Gaming Commission, because that would be the licensor, to know

17   about the sellers.

18   Q.    What did you tell him?

19   A.    Well, from my prospective this was a boilerplate

20   provision.  It was a provision that was given to me by my

21   client in the document, needed to be in the document.  I wasn't

22   familiar with -- the Gaming Act was new to all of us, so the

23   specific reasons of what would be important was not known to

24   me.

25   Q.    Before the option agreement was finalized, did you learn

1    who were the members of FBT?

2    A.   I'm sorry.  Could you repeat that question?

3    Q.   Before the option agreement was finalized, did you learn

4    who the members of FBT were?

5    A.   I don't recall that specifically.  I mean, it may have

6    come up in the context of this provision talking about

7    ownership, but I don't recall that.

8    Q.   But you did know that Mr. DeNunzio had authority to sign

9    the option agreement.  Is that what you --

10   A.   That's correct.

11   Q.   And why didn't you look into who owned the property at

12   that time?

13   A.   Well, it wasn't relevant at that time who the holders of

14   the LLC interests were.  It would be perhaps later when we were

15   closing -- really authority even at closing, the authority of

16   the LLC to act and transfer the property is what I would be

17   concerned with.

18   Q.   And ultimately was the option agreement finalized?

19   A.   It was, and signed on December 19 of 2012.

20   Q.   Okay.  If you could take a look at what's been marked as

21   Exhibit 39 in front of you in the folder.

22   A.   I have that.

23   Q.   Do you recognize that?

24   A.   I do.

25   Q.   And what is it?

1    A.   This is the signed option agreement dated December 19,

2    2012.

3            MS. BARCLAY:  Your Honor, I'd move this into evidence

4    as well.

5            MR. LEVY:  No objection.

6            THE COURT:  It will be admitted.  Exhibit 39.

7            (Exhibit 39 received in evidence)

8    Q.   Just taking a look at the front page of this document,

9    what's the title?

10   A.   The title is Option Agreement.

11   Q.   And the date?

12   A.   The date is December 19, 2012.

13   Q.   And the parties?

14   A.   FBT Everett Realty, LLC as the seller and Wynn MA, LLC as

15   the purchaser.

16   Q.   Did the basic terms of the agreement stay the same between

17   the letter of intent and the option agreement, the price

18   points?

19   A.   Yes.

20   Q.   So what was the price?

21   A.   The price, $75 million was the option price if Wynn

22   elected to exercise the option, and option payments were

23   $100,000 a month, and the basic term was two years, I believe.

24   Q.   Okay.  And Mr. Merritt, if you could scroll down to page

25   29.  Mr. Gaquin, if you could look at the signature pages.

1    Thank you.

2    A.    Mm-hmm.

3    Q.    And again, is that the signature page for the option

4    agreement?

5    A.    Yes, there's two signature pages.

6    Q.    Okay.  This one is executed by whom?

7    A.    This one is executed by Dustin DeNunzio as the manager of

8    the DeNunzio Group, LLC, which was the manager of FBT Realty,

9    LLC.

10   Q.    And what's the date?

11   A.    The date is the 17th of December 2012.

12   Q.    Okay.  The next page?

13   A.    Is the Wynn signature page, which is signed by Matt

14   Maddox, the chief financial officer of Wynn Resorts Limited as

15   the sole member of Wynn MA, LLC, and that's dated December 19,

16   2012.

17   Q.    And just flipping back to page 26 of this final option

18   agreement, that section 13.13.1 is still in there; is that

19   accurate?

20   A.    It is.

21   Q.    And is it substantially the same, or was there something

22   added to it?

23   A.    I think it's substantially the same.  There may have been

24   some revisions.

25   Q.    Okay.  What about the last sentence of 13.13.1, was that

1   in the original?

2   A.   No, I don't think so.  I think that was -- that might be

3   the only addition to that.

4   Q.   And can you read it?

5   A.   Yes.  "Seller's inability to cure purchaser objections

6   shall not be considered a breach by the seller of this

7   agreement."

8   Q.   Why was that added?

9   A.   Well, it would have been added at the request of

10  Mr. Feldman.  I think he just wanted to make sure that if there

11  was a problem with suitability that was related to his clients

12  that, although Wynn had the option to terminate, it wouldn't

13  have any other rights, wouldn't be deemed a breach of the

14  agreement, which might lead to other remedies.

15  Q.   And turning to the next page, page 27, 13.13.5.  Same

16  representations that were in the original letter of intent or

17  substantially the same?

18  A.   Yes, looks to be substantially the same.

19  Q.   Mr. Gaquin, before July of 2013, had you heard the name

20  Charlie Lightbody or Charles Lightbody?

21  A.   I don't believe so.

22  Q.   And before July of 2013, had you heard the name Jamie

23  Russo or James Russo?

24  A.   I don't believe so.

25          MS. BARCLAY:  If I could have just one minute, Your

1    Honor.

2              THE COURT:  Yes.

3              MS. BARCLAY:  Nothing further.

4              THE COURT:  Cross-examination, Mr. Levy?

5              MR. LEVY:  Thank you, Your Honor.

6    CROSS-EXAMINATION BY MR. LEVY:

7    Q.   Good morning, Mr. Gaquin.  My name is Joshua Levy.

8    A.   Good morning.

9    Q.   Let's just cover a little bit, if we could, Mr. Gaquin,

10   your background.  You've been at Mintz for about 16 years; is

11   that right?

12   A.   That's correct.

13   Q.   And Mintz Levin is one of the older firms in Boston; is

14   that fair to say?

15   A.   Fair to say.

16   Q.   Founded in the 1930s?

17   A.   I believe that's right.  I know we celebrated our 75th

18   anniversary recently.

19   Q.   And Mintz Levin has actually eight different offices,

20   correct?

21   A.   Yes, we have many offices.  I haven't counted them.

22   Q.   Several offices in the United States?

23   A.   Yes, that's accurate.

24   Q.   Also offices in London?

25   A.   Yes.

1   Q.    Okay.  And you're familiar with something called Chambers,

2   correct?

3   A.    I am.

4   Q.    And Chambers is a ranking of lawyers nationwide?

5   A.    It is.

6   Q.    And it's an outside service that people can attain

7   Chambers status, and that means they're at the top of their

8   legal profession; is that fair to say?

9   A.    It is fair to say, yes.

10  Q.    And Mintz Levin has a number of Chambers-ranked lawyers,

11  correct?

12  A.    That's correct.

13  Q.    In fact, over 50 Mintz Levin lawyers have achieved

14  Chambers status?

15  A.    I don't know that.

16  Q.    Does that sound about right to you?

17           MS. BARCLAY:  Objection.

18           THE COURT:  Overruled.

19  A.    I honestly don't know the number, but I wouldn't be

20  surprised.

21  Q.    Okay.  And are you also aware that U.S. News and World

22  Report issues rankings on law firms?

23  A.    I am.

24  Q.    Are you aware that 36 different practice groups at Mintz

25  have been recognized by U.S. World and News Report as being at

1    the top of their practice?

2    A.    I was not aware of that.

3    Q.    Okay.  Are you familiar with your website, Mr. Gaquin?

4    A.    Some, yes.

5    Q.    Have you looked at the website and been on the Mintz

6    website?

7    A.    I have, at times.

8            MR. LEVY:  Your Honor, may I approach?

9            THE COURT:  Yes.

10   Q.    Mr. Gaquin, do you recall in the section of the website

11   where you have an introduction to the firm, how Mintz is

12   described to the public on their website?

13   A.    No, I don't recall that.

14   Q.    All right.  Let me show you a document and see if it might

15   refresh your recollection.  Just read it yourself, please.

16   A.    Where am I reading?  I'm a little compromised.

17   Q.    Do you need glasses, sir?

18   A.    No.  I think I can do it.  I don't have my glasses with

19   me, so we'll do it.  "Our attorneys are" --

20   Q.    I just ask you to read it to yourself, sir.

21   A.    (Witness reviews document)  Okay.

22   Q.    Does that refresh your recollection of how Mintz has

23   described itself on its own website?

24   A.    Yes.

25   Q.    Is it fair to say that it describes the attorneys at Mintz

```
 1    as no-nonsense get-to-the-root-of-the-problems kind of people?
 2    A.   Yes.
 3    Q.   And is it fair to say also that it says, "We have a
 4    network of some of the sharpest business leaders and money
 5    people and legal minds on the planet."  Do you recall that
 6    statement in there?
 7    A.   Yes.
 8    Q.   And, "Our attorneys are always looking for ways to
 9    leverage our resources for our clients' benefit."  Is that a
10    fair description of how Mintz characterized itself on the
11    website?
12    A.   Yes.
13    Q.   Mr. Gaquin, are you familiar with ML Strategies?
14    A.   I am.
15    Q.   And ML Strategies, that's a wholly owned subsidiary of
16    Mintz, correct?
17    A.   Yes.
18    Q.   And ML Strategies is, fair to say, a lobbying arm of Mintz
19    Levin?
20    A.   Yes, government relations, yes.
21    Q.   Government relations.  They deal with matters on Beacon
22    Hill and state government matters?
23    A.   Yes.
24    Q.   And also Washington, D.C.?
25    A.   Yes.
```

1   Q.   And the head of ML Strategies, who is that?

2   A.   Steve Tocco.

3   Q.   Okay.  And former Governor Weld worked at ML Strategies?

4   A.   He does.

5   Q.   Okay.  And you, Mr. Gaquin, personally, you've been

6   ranked, you've received accolades for your legal practice,

7   correct?

8   A.   Yes.

9   Q.   Have you been ranked as a Super Lawyer in Massachusetts?

10  A.   I have.

11  Q.   In fact, you've gotten that distinction a couple of times,

12  right?

13  A.   Yes, I have.

14  Q.   And are you familiar with the fact that that goes to the

15  top five percent of people in a practice area in the state as

16  ranked by their peers?

17         MS. BARCLAY:  Your Honor, he's testifying for the

18  witness.

19         THE COURT:  Sustained.

20         MR. LEVY:  Your Honor, it's cross-examination.

21  Q.   Mr. Gaquin, are you familiar with the standards for Super

22  Lawyers?

23  A.   I wasn't -- I am not aware of that.

24  Q.   Are you aware it's something that you can purchase that

25  distinction, or it's voted by your peers?

```
 1              MS. BARCLAY:  Objection, Your Honor.
 2              THE COURT:  Sustained.
 3    Q.   Mr. Gaquin, are you co-head of your group, the Mintz Levin
 4    real estate group?
 5    A.   I am.
 6    Q.   And you've been involved in numerous real estate
 7    transactions over the years, correct?
 8    A.   Correct.
 9    Q.   And also a variety of other types of commercial
10    transactions?
11    A.   Yes.
12    Q.   Counseling clients in those matters?
13    A.   Yes.
14    Q.   And Mr. Gaquin, are you familiar with the practice where
15    parties can enter into an oral agreement and not necessarily
16    immediately reduce that agreement to writing?
17    A.   Yes.
18    Q.   Fair to say that's common in business practices?
19    A.   It happens.
20    Q.   Okay.  And under the law, many types of agreements can be
21    enforced, even if they're only agreed to orally, correct?
22              MS. BARCLAY:  Objection.  This is testimony about the
23    law, Your Honor.
24              THE COURT:  This is fair.  Overruled.
25    A.   Sorry.  The question again?
```

1  Q.   My question was, certain types of agreements can be

2  enforced legally even if they're not reduced to writing?

3  A.   That's correct.

4  Q.   And the purpose of a written document, Mr. Gaquin, is to

5  make it easier to enforce it if you need to go to court,

6  correct?

7  A.   Yes.

8  Q.   Okay.  And for small businesses, have you dealt with small

9  businesses in your career?

10  A.   I have.

11  Q.   Is it common for small businesses to reach agreements and

12  finalize paperwork at a later date?

13  A.   That can happen, yes.

14  Q.   Okay.  And maybe to give an example, if you were to lend

15  me a thousand dollars to pay my taxes on April 15, and we

16  agreed I was going to pay you interest, if we didn't get around

17  to finalizing that paperwork until later in May, would it be a

18  common practice to make the agreement effective as of the date

19  we agreed you were going to loan me the money?

20  A.   That could happen.  The common practice, I'm not sure, but

21  yes, that could happen.

22  Q.   So you have experience of people putting an effective date

23  in the agreement to reflect the date an agreement happened?

24  A.   Yes, I am.

25  Q.   And there's nothing improper about that, Mr. Gaquin, is

1    there?

2    A.    No.

3    Q.    Nothing illegal about that?

4    A.    No.  As long as the parties agree.

5    Q.    As long as the parties agree.  That's the important point,

6    that the parties had the agreement as of that date?

7    A.    Yes.

8    Q.    And it's something you've done in your career, correct?

9    A.    Yes.

10   Q.    Okay.  And there's been some discussion on your direct

11   about LLCs.  Those are limited liability companies?

12   A.    Yes.

13   Q.    And you're familiar with those, Mr. Gaquin?

14   A.    I am.

15   Q.    And just stepping back, the LLCs are used quite commonly

16   in real estate development, correct?

17   A.    They are.

18   Q.    And often property is held in the name of an LLC as

19   opposed to the individual people who might have an ownership

20   share?

21   A.    That's correct.

22   Q.    Is it fair to say it's common to put maybe an LLC with the

23   name of a business or the property address as the LLC name?

24   A.    That is common.

25   Q.    And the purpose of an LLC, Mr. Gaquin, is that to allow

1   individuals to gain some legal protection from potential

2   liabilities?  That's why people form LLCs?

3   A.   Right.  The name says it, limited liability.  That's an

4   important reason, yes.

5   Q.   So using another example, if you own a restaurant, you can

6   incorporate your restaurant as an LLC, correct?

7   A.   Yes, you could.

8   Q.   And if I own a restaurant and it's an LLC, if someone gets

9   hurt in my restaurant, the LLC means they can't sue me for my

10  home and all my personal savings, correct?

11  A.   Yes, that would be correct.

12  Q.   That's why LLCs are used?

13  A.   That's correct.

14  Q.   Is it also the case, Mr. Gaquin, you've had experience

15  with people who want to use an LLC to maintain confidentiality?

16  A.   Yes.

17  Q.   And that's fairly common as well, correct?

18  A.   It is.

19  Q.   And you made a reference, Mr. Gaquin, to the Secretary of

20  State's Office.  Are you referring to the Massachusetts

21  Secretary of State?

22  A.   I am.

23  Q.   And what is the requirement for an LLC with respect to the

24  Massachusetts Secretary of State, if they're a Massachusetts

25  LLC?

1   A.   I'm sorry.  I don't understand the question.

2   Q.   What involvement does the Secretary of State's Office have

3   with LLCs in Massachusetts?

4   A.   LLCs and other corporate entities are registered with the

5   Secretary of State's Office.  That's where you file to create

6   the entity and then you're required to make annual filings.

7   Q.   So in order to be an official LLC in Massachusetts, you

8   need to file something with the Secretary of State's?

9   A.   That's right.  You file a certificate of formation or

10  organization.

11  Q.   And that tells you what about an LLC?

12  A.   It would tell you the name of the LLC, its purpose and who

13  authorized -- its registered agent, address and who the

14  authorized signatories are for the entity.

15  Q.   Okay.  And Mr. Gaquin, would you go to the Secretary of

16  State's Office to find out the owners of an LLC?

17  A.   No, it wouldn't give you that information.

18  Q.   You know that that's not information that's at the

19  Secretary of State's Office, correct?

20  A.   I do.

21  Q.   Is that something that even new real estate lawyers know

22  about the basics of LLCs; you can't find out the owner from the

23  Secretary of State's Office?

24  A.   I would say probably, yes.

25  Q.   So if someone were to say that Wynn Resorts had no reason

1  to believe that the owners of FBT were anyone but those who

2  were listed in the Secretary of State filings, that would be an

3  inaccurate statement, correct?

4          MS. BARCLAY:  Objection.

5          THE COURT:  Sustained.

6  Q.   Mr. Gaquin, did you tell anyone from Wynn that they could

7  rely on the Secretary of State filings to determine who the

8  owners were of the LLC?

9          MS. BARCLAY:  Objection.

10          THE COURT:  You can say what he told him.

11          MS. BARCLAY:  Your Honor, this wouldn't -- I'm

12  concerned there might be a privilege issue here.

13          THE COURT:  Overruled.

14  A.   Sorry.  The question again?

15  Q.   Sure.  Did you ever tell anyone at Wynn, Wynn Resorts, the

16  people you were dealing with, that they could rely on the

17  Secretary of State filing to tell them who the owners were of

18  FBT?

19  A.   No.

20  Q.   And if you had been asked, Mr. Gaquin, Can I rely on the

21  Secretary of State filings to determine who the owners are,

22  what would your answer have been?

23  A.   No.

24  Q.   In fact, Mr. Gaquin, you were involved in creating an LLC

25  for Wynn, correct?

1    A.    Yes.

2    Q.    And they created two different LLCs for the Everett

3    parcel, right?

4    A.    One for the -- the parcel had land in both Everett and

5    Boston.  So one LLC was created to hold the Everett property,

6    and one LLC was created to hold the Boston property.

7    Q.    Okay.  And just to make sure we all follow along, that 35

8    acres in Everett, that's the total land, correct?

9    A.    That's correct, yeah.

10   Q.    And the bulk of that was land that's located in Everett,

11   right?

12   A.    That's correct.

13   Q.    But there's a small portion that was located in Boston?

14   A.    That's correct.

15   Q.    And so there was a separate LLC created for the Boston

16   piece?

17   A.    That's correct.

18   Q.    And you filed the paperwork with the Secretary of State?

19   A.    I did.

20   Q.    And your name is the name that appears on there?

21   A.    Yes, that's my memory, yes.

22   Q.    As the registered agent?

23   A.    Yes.

24   Q.    Okay.  You didn't own the own the land, did you,

25   Mr. Gaquin?

1    A.    I did not.

2    Q.    And no one's name from Wynn appeared on that document, did

3    it?

4    A.    I don't believe so.

5    Q.    Okay.  Mr. Gaquin, are you familiar with something called

6    an operating agreement for LLCs generally?

7    A.    I am, yes.

8    Q.    And it's fair to say an operating agreement is sort of a

9    basic foundational document for an LLC in terms of how it's

10   going to be managed?

11   A.    Yes, the agreement between the members of the LLC as to

12   how the LLC will be governed.

13   Q.    And it sets forth things like who's going to manage the

14   LLC?

15   A.    Correct.

16   Q.    And what the rights are of the members of the LLC?

17   A.    That's correct.

18   Q.    And have you seen operating agreements in your career?

19   A.    Yes, I have.

20   Q.    Have you created them?

21   A.    I have.

22   Q.    And one of the pieces of information in the LLC is who are

23   the members of the LLC, correct?

24   A.    That's correct.

25   Q.    And an operating agreement would specify in the back the

1    names of the members, right?

2    A.    Typically, yes.

3    Q.    And how much of the membership they own?

4    A.    That's correct.

5    Q.    And in terms of authority to act for an LLC, you need

6    typically a majority of the members to take action, right?

7    A.    That really depends.

8    Q.    Depends on the LLC?

9    A.    That's correct.

10   Q.    Okay.  And do the members typically sign the LLC as well?

11   A.    They do, yes.

12   Q.    Okay.  And if you wanted to know, Mr. Gaquin, who the

13   owners were of any LLC, fair to say you'd ask for the operating

14   agreement?

15   A.    Yes, or ask for a representation.

16   Q.    Either ask, Please tell me who they are, right, just ask

17   the person you're dealing with, or if you really wanted to

18   know, you could ask for the operating agreement, right?

19   A.    That's correct.

20   Q.    Okay.  Now, I'm going to turn to this Everett parcel and

21   your involvement, Mr. Gaquin.  You mentioned that you got

22   involved around November 2012 at the signing of the LOI,

23   correct, the letter of intent?

24   A.    That's correct.

25   Q.    You had been working for Wynn prior to that, correct?

1    A.    Yes.

2    Q.    In fact, Wynn has been a client of Mintz Levin for several

3    years, right?

4    A.    That's correct.

5    Q.    By the time in 2012, Mintz had been doing work for Wynn

6    already, correct?

7    A.    That's correct.

8    Q.    And ML Strategies did work for Wynn?

9    A.    Yes.

10   Q.    And you were familiar with the fact that Wynn tried

11   initially to get a site in Foxborough, right?

12   A.    That's correct.

13   Q.    And they were pairing up with Mr. Kraft, the owner of the

14   New England Patriots?

15   A.    Yeah, entities of Mr. Kraft, yes.

16   Q.    And they were thinking of putting a casino down near

17   Patriot Place, that development by Gillette Stadium, right?

18   A.    That's right.

19   Q.    And were you involved in that, Mr. Gaquin?

20   A.    Yes.  Not significantly, yes.

21   Q.    Are you familiar with the fact that that deal did not go

22   forward?

23   A.    I am, yes.

24   Q.    And are you familiar with the fact why it didn't go

25   forward?

A. Yes.
Q. What happened?
A. The town of Foxborough voted. I think -- I'm forgetting what the specific vote was, but basically the town rejected the notion of having a -- of hosting a gaming casino.
Q. Okay. That was the host community referendum that was defeated in Foxborough?
A. Yeah. I don't know if they actually had the referendum. I think it was a town council vote.
Q. And then you got back involved with Wynn around this Everett property, correct?
A. That's correct.
Q. And you recall that was in late November, 2012?
A. Yes, it was.
Q. I want to show you an exhibit.
MR. LEVY: Your Honor, may I approach?
THE COURT: Yes.
MR. LEVY: It's 284, Ms. Barclay.
Q. I show you what's been marked as Exhibit 284 and ask you, do you recognize that document, Mr. Gaquin?
A. I do.
Q. Okay. Is it fair to say this is an e-mail from you to several members at -- people at Wynn and at Mintz?
A. It is, yes.
MR. LEVY: Your Honor, I move the admission of Exhibit

```
 1   284.
 2              THE COURT:  It will be admitted.
 3              (Exhibit 284 received in evidence)
 4   Q.   Mr. Gaquin, these e-mails print out -- the earliest e-mail
 5   is the back.  If you flip to the second page, it starts off
 6   with an e-mail from George Atanasov?  I might be mispronouncing
 7   that.  If I did, I apologize.
 8   A.   Atanasov.
 9   Q.   How is it?
10   A.   Atanasov.
11   Q.   Atanasov.  It's from him to several other people at Mintz;
12   fair to say?
13   A.   Yes.
14   Q.   Providing your contact information?
15   A.   That's correct.
16   Q.   And who is George Atanasov?
17   A.   George Atanasov worked for ML Strategies.
18   Q.   Okay.  I'm focussing on the e-mail at the bottom.
19              MR. LEVY:  Preston, if you could blow that up, please.
20   Q.   What did he do at ML Strategies?
21   A.   George is a vice president.  He did government relations
22   work of a general nature.  I couldn't tell you about specifics.
23   Q.   He focused on issues on Beacon Hill, Massachusetts issues?
24   A.   He did.
25   Q.   And Matt Maddox and Kim Sinatra, they're Wynn executives,
```

 1    right?

 2    A.    Yes, they are.

 3    Q.    Okay.  Then we have Steve Tocco.  Steve Tocco is the head

 4    of ML Strategies?

 5    A.    Yes.

 6    Q.    And Bob Havern, he worked at ML Strategies, correct?

 7    A.    He did, yes.

 8    Q.    Mr. Havern, he's now deceased, but he was a former state

 9    senator from Massachusetts?

10    A.    That's correct.

11    Q.    He didn't work as a lawyer at Mintz Levin, did he?

12    A.    No.  He worked for ML Strategies.

13    Q.    He wasn't part of the Wynn legal team, right?

14    A.    No.

15    Q.    He was part of the ML Strategies team?

16    A.    Correct.

17    Q.    All right.  Then you have yourself and you have Jeff

18    Porter.  Jeff Porter is an environmental lawyer at Mintz Levin,

19    correct?

20    A.    That's correct.

21    Q.    That's his area of expertise?

22    A.    It is, yes.

23    Q.    All right.  And through this e-mail Ms. Maddox introduces

24    you to Dustin.  Do you see that in the e-mail above?

25    A.    I do, yeah.

1    Q.   And that's Dustin DeNunzio, correct?

2    A.   That's correct.

3    Q.   And you asked -- excuse me.  Mr. Maddox was asking Dustin

4    to get his attorney to call you at the number below right away,

5    it says, right?

6    A.   Yes, it does say that.

7    Q.   Okay.  And you were asking -- if you flip over, you e-mail

8    Mr. DeNunzio, you respond on November 19, and you ask him,

9    "Please provide contact for your legal counsel and have them

10   provide any copies of documentation that exists regarding

11   Monsanto indemnity or other obligations regarding the site,"

12   correct?

13   A.   That's correct.

14   Q.   And if you look in Mr. DeNunzio's reply, he replies

15   promptly, correct?  And he says, "I have a call scheduled with

16   our attorney, Paul Feldman, at 7 p.m.  He's out of the

17   country."  Do you see that?

18   A.   I do.

19   Q.   He says, "I will fill him in on the situation and have him

20   reach out to you directly, and he will be able to provide you

21   everything you're looking for, title policies, survey, Monsanto

22   judgment."  Those are the types of things you were looking for

23   at that stage?

24   A.   Yes, it is.

25   Q.   And these Mintz lawyers and ML Strategies, these are all

1    senior people at the firm that are on this, correct?

2    A.   Not everyone, but yeah, there are senior people listed,

3    yes.

4    Q.   Well, Mr. Porter is a partner?

5    A.   That's correct.

6    Q.   Mr. Havern is a former state senator, correct?

7    A.   Right.

8    Q.   Mr. Tocco is the head of ML Strategies?

9    A.   That's correct.

10   Q.   And Mr. Atanasov is also a principal at ML Strategies,

11   right?

12   A.   Not a principal, no.  He was a staff member, as was

13   Mr. Havern.

14   Q.   Okay.  And Mintz -- excuse me.  Wynn also had gaming

15   lawyers that they worked with, right?

16   A.   Yes, to my knowledge, yes.

17   Q.   And they were lawyers at Dwayne Morris?

18   A.   Yes.

19   Q.   Did you interact with them at all, Mr. Gaquin?

20   A.   At what timeframe?

21   Q.   In this timeframe, November/December 2012?

22   A.   No.

23   Q.   At this point, Mr. Gaquin, when you first spoke to

24   Mr. Feldman, did you make a request to ask him who the owners

25   were of FBT?

1    A.    No, I don't recall that.

2    Q.    Did you ask him for the operating agreement at that point

3    in the early stages?

4    A.    No, I don't recall that.

5    Q.    Have you ever seen the FBT operating agreement?

6    A.    I don't recall.

7    Q.    Do you recall asking for it at any point in November or

8    December of 2012?

9    A.    I do not.

10   Q.    And do you know what's in the operating agreement for FBT?

11   A.    No, I don't recall seeing it.

12   Q.    Do you know whether or not the owners of FBT are listed in

13   the operating agreement?

14         MS. BARCLAY:  Objection.  He said he's never seen it,

15   Your Honor.

16         THE COURT:  Sustained.

17   Q.    Has anyone ever described for you what's in the operating

18   agreement?

19   A.    No.

20   Q.    Are you aware that no one else from Mintz requested the

21   operating agreement in November/December 2012?

22         MS. BARCLAY:  Objection.  Testifying for the witness.

23         THE COURT:  He can answer as to what he knows.

24   Q.    You may answer, Mr. Gaquin.

25   A.    Would you ask the question again, please.

1    Q.   Are you aware of whether anyone else who was working on

2    this matter with you at Mintz requested the operating agreement

3    in November/December 2012?

4    A.   I'm not aware of that.

5    Q.   So as far as you know, between the time period you got

6    involved and when the option agreement is signed, no one at

7    Mintz, to your knowledge, asks for the operating agreement for

8    FBT?

9    A.   That's correct.

10   Q.   And that's a document, if you wanted to know who the

11   owners of FBT were, that you would ask for, right?

12   A.   That's correct.

13   Q.   Mr. Gaquin, did you -- you didn't believe in

14   November/December 2012 that the owners of FBT was going to be a

15   relevant issue to the Gaming Commission, did you?

16   A.   Yeah.  I didn't know.  Is that what your question was?

17   Q.   You didn't know whether that would be a relevant issue for

18   the Gaming Commission, did you?

19   A.   That's correct.

20   Q.   And you didn't communicate to Mr. Feldman that we need to

21   know the owners of FBT because of the Gaming Commission

22   process, licensing process?

23   A.   Well, we did talk about that in the context of the

24   suitability provision in the option agreement.

25   Q.   But did you ask Mr. Feldman to provide you the names?

1    A.    I did not.

2    Q.    Okay.  And you participated in a kickoff call as well with

3    Ms. Sinatra and others from Mintz and Wynn once the letter

4    agreement was signed?

5    A.    I don't recall that specifically.

6    Q.    Well --

7    A.    I mean, I wouldn't be surprised if that happened.  That

8    would be normal, but I just don't recall it.

9              MR. LEVY:  May I approach, Your Honor?

10             THE COURT:  Yes.

11             MR. LEVY:  Your Honor, I've marked this tentatively as

12   380.  May I approach the witness?

13   Q.    I've put in front of you an e-mail.  If you look at the

14   bottom, it's from Kim Sinatra on November 28, 2012.  The

15   subject is Call, and it copies several people, including Danny

16   Gaquin.  Do you see that?

17   A.    I do.

18   Q.    Do you recognize this document, Mr. Gaquin?

19   A.    I do.

20   Q.    And is this an e-mail that you received at Mintz Levin?

21   A.    It is.

22             MR. LEVY:  Your Honor, I move the admission of Exhibit

23   380.

24             THE COURT:  The next number in sequence would be 390.

25             MR. LEVY:  My apologies, Your Honor.  May I approach

1    again just to correct my handwriting?

2           THE COURT:  Yes.  What's the date of the e-mail again,

3    Mr. Levy?

4           MR. LEVY:  Your Honor, at the top, the date is

5    November 28, 2012.

6           THE COURT:  It will be admitted, 390.

7           (Exhibit 390 received in evidence)

8           MR. LEVY:  If we could pull that up, start at the

9    bottom, please, Preston.  Thank you.

10   Q.   This is from Kim Sinatra.  Mr. Gaquin, she is the general

11   counsel of Wynn?

12   A.   That's correct, Wynn Resorts.

13   Q.   Okay.  And she's writing to folks who are both at Mintz

14   and at Wynn in this e-mail?

15   A.   She is.

16   Q.   Okay.  And she's saying, "I understand folks want to have

17   a kickoff call tomorrow at 10 Pacific.  I'm okay with that."

18   And she writes, "Dustin, can you please send around a copy of

19   the fully executed LOI to this group."  She also included

20   Dustin DeNunzio in this e-mail, correct?

21   A.   Yes, she did.  It was to him.

22   Q.   And she wrote in there that, "We have until December 14 to

23   get to definitive docs."  Do you see that?

24   A.   I do.

25   Q.   And that's a reference to the option agreement?

1  A.   I believe so, yes.

2  Q.   And that was, you were shooting to try to get that option

3  agreement signed by December 14, correct?

4  A.   That's correct.

5  Q.   Ultimately, that got kicked by a week to December 21,

6  right?

7  A.   December 19, yes.

8  Q.   Excuse me.  December 19.  My apologies.  And then

9  Mr. DeNunzio sends -- excuse me.  Then Ms. Sinatra's assistant

10  sends around dial-in information in the e-mail above, correct?

11  A.   That's correct.

12  Q.   And do you remember participating in that call?

13  A.   I don't.

14  Q.   You don't remember that call?

15  A.   No.

16  Q.   Okay.  This was the call in order to sort of outline the

17  work that needed to be done.  Do you understand that that's --

18        MS. BARCLAY:  Objection.  He just said he didn't

19  recall the call.

20        THE COURT:  Sustained.

21  Q.   And Mr. Gaquin, your understanding of the transaction

22  being proposed, FBT was not going to be a partner with Wynn in

23  a resort, correct?

24  A.   That's correct.

25  Q.   And FBT was not going to share in the revenue from the

1   casino that they planned to build, correct?

2   A.   That's correct.

3   Q.   And FBT was not going to have any role in operating the

4   casino, correct?

5   A.   That's correct.

6   Q.   This was going to be a straight-out purchase of land,

7   correct?

8   A.   Yes.

9   Q.   And the FBT was going to have nothing to do with the

10  casino once they sold the land, correct?

11  A.   That's correct.

12  Q.   And you understand they would not have been a qualifier or

13  an applicant under the Mass. Gaming Act, correct, FBT?

14  A.   That's correct.  I did not think they would be an

15  applicant, yes.

16  Q.   That was a very poorly worded question.

17  A.   No problem.  I think I got it.

18  Q.   FBT was not going to be a qualifier or an applicant under

19  the Gaming Act, correct?

20  A.   I'm not understanding -- what are you saying, "qualifier"?

21  Q.   Did you understand, Mr. Gaquin, FBT was not going to need

22  to be qualified or go through the suitability findings under

23  the Gaming Act?

24          MS. BARCLAY:  Objection.  Basis for knowledge here.

25          THE COURT:  Sustained.

1   Q.   Okay.  In your conversations with Mr. Feldman, Mr. Gaquin,

2   did you have discussions about the property and what was going

3   on onsite?

4   A.   We did.

5   Q.   And you're familiar with the fact that the property was

6   contaminated, correct?

7   A.   Yes.

8   Q.   And it used to be a Monsanto chemical plant?

9   A.   That's correct.

10  Q.   And Mr. Feldman shared with you some of the ongoing costs

11  associated with the property?

12  A.   Yes.

13  Q.   There were significant taxes on the property, correct?

14  A.   When you say, "costs," I was thinking the environmental

15  costs they were incurring.  I don't remember the taxes.

16  Q.   Well, you're familiar with the fact that you have to pay

17  real estate taxes?

18  A.   Absolutely.

19  Q.   That's one expense, if you own 35 acres of land, you have

20  to pay ongoing real estate taxes, correct?

21  A.   Correct.

22  Q.   And another expense you mentioned is the environmental

23  costs?

24  A.   Correct.

25  Q.   And so the option agreement, Ms. Barclay was asking you

1    about the price in the drop -- the price was at 75 million,

2    correct?

3    A.    That's correct.

4    Q.    Okay.  And that price at 75 million, one of the

5    significant issues you had to work through with Mr. Feldman was

6    who is going to pay for the environmental costs, correct?

7    A.    That's correct.

8    Q.    And initially, how was it worked out under the 75 million?

9    A.    The initial -- well, it wasn't really under the 75

10   million.  The original deal was, if I remember it correctly,

11   that the seller would take responsibility for achieving what's

12   called a permanent solution.  That's a term, defined term under

13   the Mass. Contingency Plan, which is our environmental statute,

14   21E.  So they would achieve a certain level of cleanup, I guess

15   is the best way to put it, and that Wynn would pay for the

16   incremental costs of achieving the cleanup that was specific to

17   their -- actually, the parties would split the costs that were

18   necessary for -- the incremental costs related specifically to

19   Wynn's design.

20         The more important point is the parties agreed that that

21   would be determined later.  The actual split would be

22   determined later.  There was going to be a cap, actually.  So

23   it was seller responsible for the costs to clean up, sort of

24   the base cleanup.  They would split the incremental costs 50-50

25   with a cap, and the cap would be determined later.  I think

1  that's how it worked.

2  Q.   So fair to say that there was a significant concern on

3  both sides about how much the environmental cleanup was going

4  to end up costing?

5  A.   Absolutely, yes.

6  Q.   And there wasn't sufficient time between the kickoff call

7  in November and the option agreement on December 19 to work all

8  that out, right?

9  A.   No.  That wasn't contemplated at all, that would be worked

10 out then.  That's why we have an option period.

11 Q.   And fair to say that you have experience with

12 environmental cleanups in the past?

13 A.   Documenting how buyers and sellers deal with them, yes.

14 Q.   And with a 35-acre parcel that used to be a chemical

15 plant, those costs can be quite considerable, correct?

16 A.   Yes.  That was -- yes.

17 Q.   Do you think it was somewhere in the neighborhood of $10

18 million or more?

19 A.   Yes.

20 Q.   And fair to say, Mr. Gaquin, you were talking to Paul

21 Feldman quite frequently during the period of time when you

22 were negotiating the option agreement?

23 A.   Yes.

24 Q.   And I showed you earlier, your phone contact information

25 was up, but your office line was (617) 348-1874; is that right?

1    A.    That's correct.

2    Q.    And you cellphone is (617) 909-6666?

3    A.    That's correct.

4    Q.    And do you remember Mr. Feldman cellphone's number, (617)

5    947-3333?

6    A.    I do now that you say it, yes.

7    Q.    Easy number to remember, right?

8    A.    It is.

9    Q.    Okay.  And at some point when you're working through these

10   issues with Mr. Feldman, do you recall there was an article

11   that was published in the Boston Business Journal?

12   A.    I do.

13   Q.    And that article mentioned a prior owner of FBT named Gary

14   DeCicco.  Do you remember that?

15   A.    I do.

16   Q.    Mr. Gaquin, you first learned about that article when it

17   was published in the Boston Business Journal, right?

18   A.    Yes, around that time.

19   Q.    There were calls from the reporter initially to Wynn.  Are

20   you aware of that?

21   A.    I'm not aware of that.  I'm aware of that now.  I wasn't

22   aware of that then.

23   Q.    At the time you weren't looped in to responding to the

24   calls from the reporter, were you?

25   A.    No, I was not.

1    Q.    Okay.  And do you recall discussions with Mr. Feldman

2    about that article?

3    A.    Not specifically.  I know we had a conversation about it

4    when it came out.  It was right before the option agreement.

5    We were getting -- narrowing the issues.  We were getting close

6    to finishing the option agreement.

7    Q.    And in your mind, Mr. Gaquin, is it fair to say that if

8    there was a former owner of the property who had a criminal

9    record -- because the thrust of the article was Mr. DeCicco had

10   a criminal record, right?

11   A.    That's correct.

12   Q.    And in your mind, the fact that a former owner had a

13   criminal record, you didn't think that was a significant issue,

14   did you?

15   A.    That's correct.  I didn't see how a former owner -- that

16   that would be a significant issue, that's correct.

17   Q.    And whether that person got out in 2011 or 2012, as long

18   as they're out, you didn't think it was a significant issue?

19   A.    That's correct.

20   Q.    And you didn't think that would jeopardize Wynn's effort

21   to get the gaming license for Massachusetts, did you?

22   A.    No.  That's fair to say.

23   Q.    Okay.  So fair to say that if someone's not out of the

24   partnership, that could be an issue?

25   A.    Fair to say.

1  Q.   Okay.  But the fact that there was someone with a criminal

2  record that was out of the partnership, you didn't think that

3  was a significant issue?

4  A.   I did not.

5  Q.   Not a radioactive issue, was it?

6  A.   No.

7  Q.   Okay.  Do you recall Mr. Feldman calling you and telling

8  you before the option agreement was signed --

9          MS. BARCLAY:  Objection as to Mr. Feldman's statement.

10         THE COURT:  Sustained.

11         MS. BARCLAY:  And also testifying for the witness.

12         THE COURT:  Sustained.

13 Q.   Do you recall receiving a call from Mr. Feldman prior to

14 the option agreement being signed on a weekend?  I'll direct

15 your attention to December 16, it's a Sunday, 2012.

16 A.   I don't recall that specifically.  Paul and I did talk

17 quite a bit as we were trying to get the option agreement done.

18 So that wouldn't be surprising.

19 Q.   All right.  The phone records show a 33-minute call on a

20 Sunday morning, December 16.  Do you recall in the couple days

21 before the option agreement was signed working on the weekend

22 and talking to Mr. Feldman?

23         MS. BARCLAY:  Objection, Your Honor, to the phone

24 records that are not in evidence.

25         THE COURT:  He can testify to what he remembers about

```
1    the context without discussing what was said.
2          MS. BARCLAY:  My objection is the phone records are
3    not in evidence, Your Honor.
4          THE COURT:  He's being asked what he remembers.
5          MR. LEVY:  I'm sorry, Your Honor.
6          THE COURT:  Go ahead.
7          MR. LEVY:  I didn't hear your question, Your Honor.
8    I'm so sorry.
9          THE COURT:  I didn't have a question for you.
10   Q.   Do you recall speaking to Mr. Feldman on that weekend
11   before the option agreement was signed?
12   A.   I don't recall specifically, but Paul and I were working a
13   lot, a great deal, to get that done at the time.  So it
14   wouldn't be surprising that we had a conference call on the
15   weekend.
16   Q.   Okay.  And do you recall discussing with him the Boston
17   Business Journal article?
18   A.   Not specifically.  I think we did.
19   Q.   Okay.  And do you recall Mr. Feldman saying to you --
20         MS. BARCLAY:  Objection.
21         MR. LEVY:  Your Honor, this is not being offered for
22   hearsay purposes.  It's being offered for notice to the victim
23   and state of mind of the defendants here, Your Honor.  It's not
24   being offered for the truth.
25         MS. BARCLAY:  It is being offered for the truth, Your
```

```
 1   Honor.
 2            THE COURT:  The objection is sustained.  We'll talk
 3   about it later, if need be.
 4   Q.   Mr. Gaquin, do you recall hearing from Mr. Feldman about a
 5   second owner of FBT with a criminal record?
 6            MS. BARCLAY:  Objection.  Objection.
 7            THE COURT:  Sustained.
 8            MS. BARCLAY:  Move to strike.
 9   Q.   Do you recall learning about a second owner of FBT
10   during -- before the option agreement was signed?
11   A.   There were -- my knowledge is that there's three owners of
12   FBT, so I'm not sure.
13   Q.   Do you recall hearing that there was a fourth owner of
14   FBT?
15   A.   No.
16   Q.   You don't recall or you know you weren't told?
17   A.   I don't recall.
18   Q.   Okay.  Do you deny, Mr. Gaquin, that you might have been
19   told about a fourth owner of FBT?
20   A.   I don't recall, so I don't deny it.
21   Q.   So it's possible you were told about a fourth owner of
22   FBT?
23   A.   My understanding was that -- my only recollection is that
24   there has always been three owners.  So I don't recall a
25   time -- that's the base of my knowledge on FBT.
```

Q. Your best recollection is three owners, correct?
A. That's correct.
Q. But it's possible you were told there was a fourth owner?
A. I don't recall that, so it's possible.
Q. Do you recall ever saying to someone, I need to know who the owners are of FBT, before the option agreement was signed?
A. I missed the first part of your question.
Q. Do you recall before that option agreement was signed ever saying, I need to know -- to either Mr. Feldman or someone with FBT, I need to know who the owners are of FBT?
A. No.
Q. Did you ever ask the question before the option agreement was signed, Tell me who all the owners are of FBT?
A. I don't recall that.
Q. You didn't ask that question, did you?
A. I don't recall that.
Q. Are you aware that anyone at Mintz asked that question?
A. I am not aware of that.
Q. Was it important to you -- strike that.
Mr. Gaquin, based on your testimony on direct, the owners of FBT -- knowing the owners of FBT was not important to you prior to signing the option agreement, correct?
A. Well, it wasn't relevant to what I was doing.
Q. And you said that what was relevant was at some point knowing that whoever signed the documents had authority,

1   correct?

2   A.   It was -- what was relevant was knowing that the person

3   who was signing the option agreement had authority and then

4   ultimately, when we got to a closing, that authority -- they

5   would have to have authority as well to convey the property.

6   Q.   That's what would have been relevant about the ownership,

7   to make sure that person had authority to bind the LLC?

8   A.   For me, yes.

9   Q.   Ms. Barclay asked you about July 2013.  Do you recall

10  having discussions with Mr. Feldman in July 2013 about an

11  investigation that was being commenced by the IEB, the arm of

12  the Mass. Gaming Commission?

13  A.   I do, I remember a call with Paul.

14  Q.   And do you recall that Mr. Feldman was on vacation on the

15  Cape?

16  A.   I guess I'm not sure if that -- I don't recall with

17  specifically with respect to that call.  Now that you say that,

18  I know he has a place on the Cape, and we did talk when he was

19  down there at times.

20  Q.   And that was down in Truro -- do you remember it was down

21  in Truro, Mr. Gaquin?

22  A.   I don't remember the location of his home.

23  Q.   And do you recall speaking to him on July 9, Mr. Gaquin?

24  A.   Not specifically, no.

25           MR. LEVY:  Your Honor, may I approach?

```
 1            THE COURT:  Yes.
 2   Q.   I show you this document, Mr. Gaquin.  Flip to the right
 3   page here.  Take a look at that document and let me know if
 4   that refreshes your recollection.
 5   A.   What am I looking at?
 6   Q.   I'm sorry.  Look at the entry for July.
 7   A.   Right.  But what is this?
 8   Q.   Well, do you recognize this document, generally, what it
 9   is?
10   A.   I don't.
11   Q.   Do you recognize it as a phone record, sir?
12   A.   Okay, yeah.
13   Q.   And the phone number associated with the record is the
14   number you testified to that's Paul Feldman's cellphone number,
15   cellphone record?
16   A.   Yes.
17   Q.   And that shows on July 10 -- does that refresh your memory
18   of when you spoke to Mr. Feldman?
19   A.   Yes.  Looks like we had a call that day.
20   Q.   That's the morning of July 10?
21   A.   Right, 9:23 a.m.
22   Q.   That looks like it's for a minute, correct?
23   A.   Correct.
24   Q.   Then there's another minute call on July 10 to your
25   office, correct?
```

1          MS. BARCLAY:  Objection, Your Honor, to testifying.

2          THE COURT:  This is not in evidence.  If you're going

3    to show him something to refresh his memory, show him the

4    document and then take the document away and question him.

5    Q.   Do you remember having a longer call with Mr. Gaquin on

6    July 10?

7    A.   Mr. Feldman.

8    Q.   Excuse me.  Mr. Feldman.

9    A.   Would you repeat your question?

10   Q.   Excuse me.  My apologies.  Do you remember having a longer

11   call on July 10 with Mr. Feldman about the option agreement?

12   A.   I don't.  I mean, I don't remember the specific -- they

13   were one, two, three or the specific duration of any calls.

14   Q.   Let me direct your attention to another entry there, 11:24

15   a.m.  Does that refresh your memory that you had a call with

16   Mr. Feldman that morning?

17   A.   It does.

18   Q.   Okay.  And that call is about 16 minutes long?

19   A.   Yes.

20   Q.   And do you remember Mr. Feldman telling you about the IEB

21   investigation during that call?

22          MS. BARCLAY:  Objection.

23          THE COURT:  Sustained.

24   Q.   Do you remember discussing with Mr. Feldman --

25          MR. LEVY:  Your Honor, I'm not offering this

1    information for the truth of the discussion.  I'm offering it

2    for notice to Mintz Levin.

3           MS. BARCLAY:  Same as before, Your Honor.

4           THE COURT:  The objection is sustained.

5    Q.   Mr. Gaquin, were you notified about Charles Lightbody

6    being an owner of FBT in July 2013?

7    A.   Not to my knowledge or recollection.

8    Q.   Do you know for sure it didn't happen, or you don't

9    recall?

10   A.   I don't recall.

11   Q.   So it's possible you were told in July of 2013 about

12   Charles Lightbody?

13   A.   It's possible.

14   Q.   So I've asked you about December -- I've asked you about

15   December 2012, and I've asked you about July 2013.  I want to

16   make sure I have this right.  You can't deny that you were told

17   about Lightbody on those occasions, correct?

18   A.   Well, I was being -- I don't recall when the IEB

19   investigation -- I spoke to the IEB as well and was prepared

20   for that.  So I'm not sure of the timeframe.  That's why I'm --

21   Q.   You testified in the IEB August 1, 2013.  Do you remember

22   that?

23   A.   I do.

24   Q.   Okay.  And I'm asking you about prior to going in for your

25   testimony -- which I assume you were asked about Mr. Lightbody

1    in your testimony.  Prior to going in to your testimony, can

2    you deny under oath that you were told about Mr. Lightbody in

3    either December 2012 or July 2013?

4    A.   Can you ask separately -- you're conflating two time

5    frames there.

6    Q.   I'll break it up, Mr. Gaquin.

7    A.   Yeah.

8    Q.   Can you deny that you were told about Mr. Lightbody in

9    December 2012?

10   A.   I don't recall, so I can't deny.

11   Q.   Okay.  In July of 2013, can you deny that you were told

12   about Mr. Lightbody in July 2013?

13   A.   Same.  I don't deny that.

14   Q.   You don't deny that, okay.

15        Now, do you still have that option agreement in front of

16   you, Mr. Gaquin, that was admitted into evidence?

17   A.   The signed option agreement?

18   Q.   Yes, sir.

19   A.   Yes, I do.

20   Q.   And not to spend too much time on this, but section

21   13.13.1 is the section Ms. Barclay asked you about.  This is

22   under the Suitability of Licensure section.  Are you there?

23   A.   I am.

24   Q.   Page 26.

25   A.   Yes.

1    Q.   And that talks about -- you mentioned this is boilerplate

2    language you got from Wynn, correct?

3    A.   That's correct.

4    Q.   And it talks about if the purchaser deems the seller to be

5    engaged in activity which could adversely affect the purchaser;

6    that's what this section is about, right?

7    A.   Yes, its ability to get a license, yes.

8    Q.   It says, Purchaser shall provide notice of the

9    objectionable act."  Do you see that --

10   A.   Yes.

11   Q.   -- included in the paragraph?

12   A.   I do.

13        MR. LEVY:  Preston, could you blow that up, please?

14   Q.   Mr. Gaquin, did you ever provide notice to FBT that they

15   engaged in an objectionable act?

16   A.   No, I don't recall.

17   Q.   And no one from Wynn provided notice that FBT had engaged

18   in an objectionable act, did they?

19   A.   I don't know that.

20   Q.   Are you aware if anyone ever provided that notice?

21   A.   At what time?

22   Q.   At any time, notice that they engaged in an objectionable

23   act?

24   A.   I don't --

25        MS. BARCLAY:  Objection.

1          THE COURT:  Overruled.

2    A.    Would you repeat the question again for me.

3    Q.    Mr. Gaquin, no one from -- Wynn never notified FBT under

4    this provision that they had engaged in an objectionable act,

5    did they?

6          MS. BARCLAY:  Objection.  Basis of knowledge, Your

7    Honor.

8          MR. LEVY:  Your Honor, he's the lead lawyer for Wynn.

9    I'm not sure why we're fighting this.

10         MS. BARCLAY:  Objection to the characterization of

11   this witness as a lead lawyer for Wynn.

12         THE COURT:  Sustained.

13   Q.    So you didn't provide any notice of an objectionable act

14   to FBT, correct?

15   A.    I don't recall doing that.

16   Q.    And section 13.13.2 says, "If the seller meets threshold

17   requirements by purchaser and his compliance department, the

18   seller agrees to complete and submit a -- a business

19   information form."  Do you see that, at the top of 13.13.2?

20   A.    I do see that, yes.

21   Q.    To your knowledge, Mr. Gaquin, was FBT ever asked to

22   complete a business information form for Wynn?

23   A.    Not to my knowledge.

24   Q.    And 13.13.3, it says, "If any gaming regulatory agency

25   requires approval of this agreement or its terms, such approval

1    shall be obtained prior to the performance of any part of this

2    agreement."  Do you see that, sir?

3    A.    I do.

4    Q.    And to your knowledge, did Wynn seek gaming regulatory

5    agency approval prior to starting to pay the $100,000 a month?

6    A.    No, not to my knowledge.

7    Q.    Okay.  And under 13.13.5, "The seller agrees to file all

8    necessary applications to the gaming regulatory agencies."  Do

9    you see that?

10   A.    I'm not picking it up.  Sorry.

11   Q.    I'm sorry.  I was reading the middle of the paragraph.

12   "Seller represents and warrants to purchaser and seller -- that

13   to the best of seller's knowledge, all persons associated with

14   seller are willing to file all necessary applications to obtain

15   whatever approvals from the gaming regulatory agencies that may

16   be required."  Do you see that?

17   A.    I see that.  I see that now, yes.

18   Q.    And you're not aware of any situation in which Dustin

19   DeNunzio failed to file a necessary approval?

20   A.    I'm not aware of any.

21   Q.    Okay.  And it says, "To the best of seller's knowledge,

22   neither seller nor any person associated with seller has ever

23   engaged in any conduct or practices which any of the foregoing

24   persons should reasonably believe would cause such a person to

25   be denied any such approvals."

1    A.    I see that.

2    Q.    And Mr. Gaquin, you have no knowledge that FBT was in

3    violation of that provision, do you?

4    A.    No, I have no knowledge.

5    Q.    Now, Mr. Gaquin, you're familiar with Mr. Feldman's firm,

6    Davis, Malm, D'Agostine, correct?

7    A.    I am.

8    Q.    And you've worked with them on other matters over the

9    years?

10   A.    I have.

11   Q.    And fair to say they're a well-respected business law

12   firm?

13   A.    Yes, it is.

14   Q.    And you interacted a great deal with Mr. Feldman, correct?

15   A.    I did.

16   Q.    And you found him to be doing a good job for his client?

17          MS. BARCLAY:  Objection.

18          THE COURT:  Sustained.

19   Q.    What was your impression of Mr. Feldman?

20          MS. BARCLAY:  Objection.

21          THE COURT:  Sustained.

22   Q.    Mr. Gaquin, you also interacted with Dustin DeNunzio,

23   correct?

24   A.    I did.

25   Q.    And spoke to him on the phone?

```
 1    A.   Yes.

 2    Q.   Met him in person?

 3    A.   I did.

 4         MR. LEVY:  Okay.  May I approach, Your Honor?

 5         THE COURT:  Yes.

 6    Q.   All right.  Mr. Gaquin, I'm going to show you what's been

 7    marked as Exhibit 326 and ask you if you recognize that

 8    document.  Let me just pull these papers away.

 9    A.   Sure.

10    Q.   Excuse me.

11    A.   Thank you.  (Witness reviews document)  Yes.

12    Q.   This is an e-mail between you and Mr. DeNunzio, correct?

13    A.   It is, yes.

14    Q.   Copy to Paul Feldman dated March 29, 2013?

15    A.   Correct.

16         MR. LEVY:  Your Honor, we offer 326 in evidence.

17         MS. BARCLAY:  Your Honor, I'd object to the relevance,

18    and it's also hearsay.  It's a statement of Mr. DeNunzio.

19         THE COURT:  I don't have the document in front of me.

20    Where do I find it?

21         MR. LEVY:  My apologies, Your Honor.

22         THE COURT:  What's the grounds of the objection?

23         MS. BARCLAY:  Your Honor, the government -- it's March

24    2013, so the relevance with regard to Mr. Gaquin.  And also,

25    it's a statement of Mr. DeNunzio, which would be hearsay.
```

1          THE COURT:  I'll allow it to be admitted, 326.

2          (Exhibit 326 received in evidence)

3     Q.   Mr. Gaquin, this is about making arrangements for a site

4     survey at Everett, correct?

5     A.   Yes, it appears to be, yes.

6     Q.   And you reached out to Mr. DeNunzio and let him know that

7     you needed to have some of the environmental consultants come

8     to the property?

9     A.   That's correct.

10    Q.   And Mr. DeNunzio wrote back, "No problem.  Please have

11    someone e-mail the day or night before they plan to be onsite.

12    We want to keep track of who is doing what on the property.

13    Additionally, I want to make sure the gates are open and that

14    anyone else who may be onsite is aware that GZA will be there

15    as well."  That's the consultant, GZA?

16    A.   That's correct.

17    Q.   And is that fairly typical of the types of interactions

18    you had with Mr. DeNunzio?

19          MS. BARCLAY:  Objection.

20          THE COURT:  Sustained.

21          MR. LEVY:  May I approach the witness, Your Honor?

22          THE COURT:  Yes.

23          MR. LEVY:  Here is a copy of 358 for the Court and for

24    Ms. Barclay.

25    Q.   I put in front of you what's been marked for

1    identification as 358, Mr. Gaquin.

2    A.    Mm-hmm.

3    Q.    E-mail traffic between you and Paul Feldman and Dustin

4    DeNunzio on September 13, 2013.  Do you recognize that?

5    A.    I do.

6          MR. LEVY:  Okay.  Your Honor, I'd move for the

7    admission of Exhibit 358.

8          MS. BARCLAY:  Same objection, Your Honor.  This is

9    actually September of 2013, after the IEB investigation

10   started.

11         THE COURT:  What is the relevance?

12         MR. LEVY:  Your Honor, the relevance is it shows the

13   pattern of Mr. DeNunzio working with Mr. Gaquin.

14         MS. BARCLAY:  Objection.

15         THE COURT:  All right.  I'll allow it to be admitted,

16   358.

17         (Exhibit 358 received in evidence)

18   Q.    Flip the exhibit over.  The first e-mail at the bottom is

19   an e-mail from a guy named Jason Schwartz at Boston Magazine.

20   Do you see that, Mr. Gaquin?

21   A.    I do.

22   Q.    And he's making inquiry of Mr. DeNunzio about the Everett

23   site and the Monsanto chemical site.  Do you see that?

24   A.    Yes, I'm reading it now.  I see that.

25   Q.    Okay.  Mr. Gaquin, essentially the report is asking

1    questions about who is going to be responsible for the cost of

2    the cleanup.  Is that fair to say?

3    A.    That is, yes.

4    Q.    And Mr. DeNunzio takes the e-mail from the reporter, and

5    he forwards it to whom?

6    A.    To his counsel, Paul Feldman.

7    Q.    What does he say in the e-mail?

8    A.    "Can I answer this?"

9    Q.    Okay.  And what does Mr. Feldman do?

10   A.    Mr. Feldman, looks like he sends me an e-mail, copying

11   Dustin.  "Dan, I just got the below e-mail from Dustin.  I told

12   him he cannot answer the reporter because the terms of the

13   option agreement are confidential.  Can you remind your folks

14   about that obligation.  Thanks, Paul."

15   Q.    Okay.  And to your knowledge, Mr. DeNunzio did not talk to

16   the reporter?

17   A.    That's correct, to my knowledge.

18   Q.    In your dealings with Mr. DeNunzio, Mr. Gaquin, did you

19   find him to be hardworking?

20           MS. BARCLAY:  Objection.

21           THE COURT:  Sustained.

22   Q.    Mr. Gaquin, what were your impressions of Dustin DeNunzio?

23           MS. BARCLAY:  Objection.

24           THE COURT:  Sustained.

25           MR. LEVY:  Your Honor, may I be heard at sidebar?

1          THE COURT:  No.

2    Q.    Did Mr. DeNunzio do anything in your dealings with him to

3    cause you to question his integrity, Mr. Gaquin?

4          MS. BARCLAY:  Objection.

5          THE COURT:  You can have that question.  Overruled.

6    A.    Would you ask the question again?

7    Q.    Did Mr. DeNunzio, in your dealings with him, do anything

8    to cause you to question his integrity?

9    A.    No.

10   Q.    Did Mr. DeNunzio ever lie to you?

11         MS. BARCLAY:  Objection.

12         THE COURT:  Sustained.

13   Q.    Did Mr. DeNunzio ever say anything to you that was untrue?

14         MS. BARCLAY:  Objection.

15         THE COURT:  Sustained.

16         MR. LEVY:  Nothing further, Your Honor.

17         THE COURT:  Mr. Connolly?

18         MR. CONNOLLY:  Briefly, Your Honor.

19   CROSS-EXAMINATION BY MR. CONNOLLY:

20   Q.    Good morning, Mr. Gaquin.  I'm Michael Connolly, and I

21   represent Mr. Gattineri.

22   A.    Good morning.

23   Q.    Just a few questions, sir.  To your knowledge, nobody from

24   Mintz Levin ever worked directly with Anthony Gattineri in

25   connection with the contract negotiations which you've talked

1    about this morning, correct?

2    A.    That's correct.

3    Q.    You've never personally spoken to Mr. Gattineri, correct?

4    A.    I have not.

5    Q.    You've never asked anybody to reach out to Mr. Gattineri

6    for any information, correct?

7    A.    No.  You're talking about the time of the option

8    agreement?

9    Q.    Yeah.  At any point in time.

10   A.    I believe there was contact between the ML Strategies

11   people and Mr. Gattineri at some point, but I don't know if I

12   could --

13   Q.    Do you remember what that concerned?

14   A.    Certification of ownership --

15   Q.    Okay.

16   A.    -- when we were dealing with the Gaming Commission.

17   Q.    Right, right.  But during the period of time when the

18   option agreement was being negotiated, nobody reached out to

19   Mr. Gattineri either before, during or immediately after that

20   period, correct?

21   A.    No, not to my knowledge.

22   Q.    So to your knowledge, nobody from Mintz Levin has ever

23   reached out to Mr. Gattineri to inquire about ownership of FBT

24   LLC?

25   A.    That's correct.

1   Q.   To your knowledge, nobody from Wynn Resorts has ever

2   reached out to Mr. Gattineri about that issue, correct?

3   A.   You're talking -- what's the timeframe?

4   Q.   Around the time of the option agreement.

5   A.   To my knowledge, that's correct, yes.

6   Q.   Now, you gave some testimony earlier about the effective

7   date of an agreement?

8   A.   Yes.

9   Q.   And I believe what your testimony was, was that it's

10  appropriate for an agreement to be dated on an effective date

11  earlier in time than when the written document is actually

12  created and signed by the parties if the effective date is the

13  date that the parties reached the agreement, correct?

14  A.   I think I said that -- yes, that could be common practice.

15  I forget what the actual phrase was, but yes.

16  Q.   And what you're referring to, sir, is the date that the

17  parties agree, that has real legal significance to a lawyer,

18  correct?

19  A.   It does, yes.

20  Q.   And that's what lawyers learn in their first year of law

21  school in a course called contracts, correct?

22  A.   Yes, that would be right.

23  Q.   That's a year-long course, correct?

24  A.   It is.

25  Q.   And there's a lot of elements to what's required before an

1    agreement is actually a binding contract in the eyes of the

2    law, correct?

3    A.    That's correct.

4    Q.    And oftentimes lay people can think they have a deal, but

5    a lawyer may look at the terms and say, "You don't have a

6    deal," correct?

7    A.    I think that's fair, yes.

8    Q.    And the reason that a lawyer may reach that conclusion is

9    the parties haven't reached an agreement as to what are called

10   the material terms of the agreement, correct?

11   A.    Correct.

12   Q.    So if the parties have a loose understanding, the lawyer

13   might say that loose understanding is not a binding contract,

14   correct?

15   A.    Yes.  It doesn't contain all the material -- yes.

16   Q.    Okay.  So whether or not it's appropriate for a document

17   to have an effective date at an earlier point in time is

18   something that may very often require a legal determination,

19   correct?

20   A.    Yes.

21              MR. CONNOLLY:  Nothing further, Your Honor.

22              THE COURT:  Mr. Rankin?

23              MR. RANKIN:  No questions, Your Honor.

24              THE COURT:  Redirect?

25

1          MS. BARCLAY:  Briefly, Your Honor.

2     REDIRECT EXAMINATION BY MS. BARCLAY:

3     Q.   I think you were asked by Mr. Levy on cross-examination,

4     Mr. Gaquin, about how you would find out who the owners of an

5     LLC were, and he asked you, you'd asked for the option

6     agreement to find out the owners of the LLC?  And I think your

7     response was, if I remember correctly, or you'd ask them.

8     A.   That's correct.

9     Q.   Right.  So you can ask the managing partner of an LLC who

10    the other partners are and expect that person to tell you who

11    the owners are?

12    A.   That's correct.

13    Q.   Mr. Gaquin, you're a Boston real estate attorney for Wynn,

14    correct, for Wynn Resorts?

15    A.   That's correct.

16    Q.   And you're one of multiple lawyers that Wynn Resorts

17    employs?

18    A.   Yes, that's accurate.

19    Q.   In fact, they have in-house counsel and gaming counsel and

20    other attorneys that represent them?

21    A.   Yes.

22    Q.   So your testimony here today is based on your personal

23    knowledge of what you did and not what other lawyers for Wynn

24    may have done?

25    A.   That's correct.

```
 1   Q.   Before July of 2013, were you personally told that someone
 2   with a criminal record in organized crime associations was an
 3   owner of the Everett site?
 4           MR. RANKIN:  Objection, Your Honor.
 5           THE COURT:  Overruled.
 6   A.   No, I was not.
 7   Q.   On cross-examination you said that you did talk to Paul
 8   Feldman, FBT's attorney, and you did tell him that Wynn would
 9   need to know who the owners were of the property in the context
10   of suitability?
11           MR. CONNOLLY:  Objection.  Leading.
12           MR. LEVY:  Objection.
13           THE COURT:  Did you say "Sullivan"?
14           MS. BARCLAY:  No.  Feldman.
15           THE COURT:  Give me the question again.
16           MS. BARCLAY:  I'm asking Mr. Gaquin if on
17   cross-examination with Mr. Levy he said that he talked to
18   Mr. Feldman about the fact that they would need to know who the
19   owners were in the context of suitability.
20           MR. LEVY:  Objection.  The testimony stands for
21   itself.
22           THE COURT:  Overruled.  He can say what he thinks he
23   said.
24   A.   I'm sorry.  Would you repeat the question?
25   Q.   You did talk to Mr. Feldman about the fact that you'd need
```

1   to know the owners, who the owners were in the context of the

2   suitability?

3   A.   Yeah, we did talk about the owners, in general, the

4   concept of ownership in the context of the suitability

5   discussion.

6   Q.   I'm sorry?

7   A.   Yes.  In the context of discussing the suitability

8   provision in the agreement, we did talk about the ownership,

9   and I think there was a back and forth about what's the

10  relevance of that to the Gaming Commission.

11        MS. BARCLAY:  Your Honor, if we could play a portion

12  of Exhibit 8, please.

13        MR. RANKIN:  Objection, Your Honor.  We've heard this

14  several times.

15        THE COURT:  Overruled.

16        MS. BARCLAY:  If my co-counsel could please provide

17  Mr. Gaquin with a transcript binder.  It's behind Tab 8A.

18        I'm going to try to skip ahead here to about three

19  minutes into the call, and it's at the bottom of page 2 of the

20  transcript.

21        MS. BARCLAY:  I'm sorry.  Before I play that, just for

22  purposes of identification, this is a call that took place on

23  December 11, 2012.  It's Exhibit 8.

24  Q.   December 11, 2012, that's when the option agreement is

25  being negotiated?

```
 1    A.    That's correct.

 2              (CD played.)

 3    Q.    Mr. Gaquin, on December 11, 2012, Mr. Feldman represented

 4    FBT Everett Realty, LLC, correct?

 5    A.    To my knowledge, yes, of course.

 6              MS. BARCLAY:  No further questions.

 7              THE COURT:  Re-cross, Mr. Levy.

 8              MR. LEVY:  Thank you, Your Honor.

 9    RECROSS-EXAMINATION BY MR. LEVY:

10    Q.    Mr. Gaquin, you're the best law firm in the country,

11    according to that tape.  Free advertising.

12              Just to be clear about owners and questions and operating

13    agreements, let me just ask you this question, Mr. Gaquin, so

14    we're clear before we excuse you.

15              At any point prior to the option agreement being signed,

16    did you ask anyone from FBT who were the owners of FBT?

17    A.    I don't recall that.

18    Q.    And did you put into the option agreement a term listing

19    who the owners were of FBT?

20    A.    I don't believe so.

21    Q.    And you didn't ask Mr. Feldman in that discussion about

22    section 13, Paul, please tell me who the owners are of FBT?

23    You didn't ask him that question, did you?

24    A.    I don't recall that, no.

25    Q.    And Mr. Gaquin, do you recall testifying before the IEB?
```

1   A.   I do.

2   Q.   That was August 1, 2013?

3   A.   I'll take your word for it.

4   Q.   And do you recall you were asked -- discussions about

5   Mr. DeCicco and a partner who was getting out of FBT?

6   A.   Would you ask that question again?

7   Q.   Do you remember there were general questions about

8   Mr. DeCicco and the Boston Business Journal article?

9   A.   Yes.

10  Q.   And there was a question, you were asked about whether you

11  were aware of promissory notes between principals at FBT and

12  anyone related to the ownership.  Do you recall that question?

13       MS. BARCLAY:  Objection.  Outside the scope of

14  cross -- my redirect, Your Honor.

15       THE COURT:  Overruled.

16  Q.   Do you remember being asked that question, if you were

17  aware of promissory notes between principals at FBT and anyone

18  related to the ownership?

19  A.   Yes, I do recall that.

20  Q.   And you said you weren't aware, correct?

21  A.   That's correct.

22  Q.   And do you remember also testifying that you wouldn't

23  expect to be advised of information like that?

24  A.   I don't recall that specifically.

25       MR. LEVY:  Your Honor, may I approach?

1          THE COURT:  Yes.

2          MS. BARCLAY:  What page is that?

3          MR. LEVY:  This is -- excuse me -- 29.

4    Q.   I'm going to ask you to read this to yourself, please,

5    Mr. Gaquin.  It starts and goes to that and then flips to the

6    next page.

7    A.   (Witness reviews document)  I see that.

8    Q.   Does that refresh your recollection of being asked,

9    Mr. Gaquin, about whether you would expect to be advised of

10   promissory notes between principals of FBT and anyone related

11   to the ownership?

12   A.   No, I don't think it said that.

13   Q.   I'm sorry.  Just keep reading the page.

14   A.   Okay.  (Witness reviews document)  It does.

15   Q.   Okay.  What did you say when you were asked whether you

16   would expect to be advised by the attorney about whether or not

17   there were promissory notes between the principals of FBT and

18   anyone related to the ownership?

19   A.   I said I would not expect to be advised.

20          MR. LEVY:  Nothing further, Your Honor.

21          THE COURT:  Mr. Connolly?

22          MR. CONNOLLY:  Nothing further, Your Honor.

23          THE COURT:  Mr. Rankin?

24          MR. RANKIN:  No, Your Honor.

25          THE COURT:  Thank you, Mr. Gaquin.  You may step down.

1              We'll take the morning recess a little early today.

2     We'll be in recess for 15 minutes.

3     (Jury exits.)

4              THE COURT:  All right.  Be seated, counsel.  Are we in

5     the same order as we projected yesterday?

6              MS. BARCLAY:  Yes.  Ms. Cameron, then Mr. Simms,

7     Mr. Ciotti, and then if we need another witness, we have

8     Lieutenant Kevin Condon who we can start today.

9              THE COURT:  All right.  We'll be in recess for 15

10    minutes.

11              (Recess taken 10:56 a.m.)

12              (Resumed, 11:19 a.m.)

13              (Jury enters the courtroom.)

14              THE COURT:  Good morning again, Jurors.  We're ready

15    to resume.  The government will call its next witness.

16              MS. BARCLAY:  The government calls Gayle Cameron.

17                          GAYLE CAMERON

18    having been first duly sworn, was examined and testified as

19    follows:

20              THE CLERK:  And would you please state your name for

21    the record, spelling your last.

22              THE WITNESS:  Gayle Cameron, C-a-m-e-r-o-n.

23              MS. BARCLAY:  May I proceed, your Honor?

24              THE COURT:  Yes.

25    DIRECT EXAMINATION BY MS. BARCLAY:

1    Q.   Good morning, Ms. Cameron.

2    A.   Good morning.

3    Q.   How are you employed?

4    A.   Presently as a Gaming Commissioner with the Massachusetts

5    Gaming Commission.

6    Q.   And how long have you been a Commissioner with the

7    Massachusetts Gaming Commission?

8    A.   I served one term which was four years.  I was reappointed

9    last month, so I'm just beginning a second term.

10   Q.   And you said you were appointed?

11   A.   Yes, ma'am.

12   Q.   Who were you appointed by?

13   A.   The Governor, the Attorney General, and the Treasurer.

14   Q.   And could you just briefly describe your background before

15   you were appointed a Gaming Commissioner.

16   A.   Yes.  I spent 28 years after college with the New Jersey

17   State Police, many of those years investigating casino gaming

18   crimes as well as organized crime investigations.  Later in my

19   career, I was appointed as the Deputy Superintendent holding

20   the rank of lieutenant colonel, had responsibility for

21   statewide investigations, to include all casino gaming

22   investigations in the state of New Jersey.

23   Q.   And did you also participate in organized crime

24   investigations during your time with the New Jersey State

25   Police?

1    A.    I did, extensively.

2    Q.    How many Gaming Commissioners are there in Massachusetts?

3    A.    There are five appointed Commissioners.

4    Q.    And what are the duties and responsibilities of a

5    Commissioner in general?

6    A.    Well, the first thing we had responsibilities to do was

7    enact the law.  The legislation was passed.  It was our

8    responsibility to enact that law in a responsible manner with

9    integrity.  We built the Commission.  We built the staff.  It

10   was an important responsibility, and now we have policy

11   responsibilities and all of the final licensing

12   responsibilities.

13   Q.    And do you have any particular areas of responsibility?

14   A.    I do.  I have advisory role for investigations and

15   enforcement because certainly I have a background there, as

16   well as licensing and horse racing.

17   Q.    And when you say investigations in enforcement, is that

18   the Investigations and Enforcement Bureau of the Gaming

19   Commission?

20   A.    It is.

21   Q.    And is that sometimes referred to as the IEB?

22   A.    Correct.

23   Q.    Were you involved in the award of the Region A Category 1

24   casino license?

25   A.    Yes, I was.

1   Q.   How many applicants were there for that license?

2   A.   Initially there were several, a couple of whom were not

3   able to secure a positive vote in the community.  Another

4   applicant did not fulfill all the requirements, and for the

5   licensing decision, there were two applicants who had come

6   through the entire process.

7   Q.   And who were those applicants?

8   A.   That would have been Mohegan Sun and Wynn.

9   Q.   And when did applications, when were they submitted?

10  A.   The very -- well, the process was 2012 into 2013.

11  Q.   And after an application is submitted, what are the first

12  steps with regard to reviewing that application?

13  A.   Our licensing division will thoroughly review the entire

14  application for completeness, and once that process is done --

15  and that's a couple of weeks that process took -- and then it's

16  turned over to our Investigations and Enforcement Bureau for a

17  thorough investigation of the facts that are within the

18  application.

19  Q.   And does the IEB then -- what do they do with the

20  information that they gather?

21  A.   They prepare a report, commonly referred to as a

22  suitability report, which is the first -- you must pass that

23  phase before we can deal with the project itself, which is the

24  RFA-2, so they complete a suitability report.

25  Q.   And what is suitability as it's used by the Gaming

1    Commission?

2    A.   We're looking at the entire company, the principals, all

3    of the qualifiers.  We're looking at integrity, honesty, their

4    business practices around the world, wherever they're located.

5    So it's a very in-depth investigation that is conducted.

6    Q.   Where did Wynn Resorts propose to locate their casino?

7    A.    In Everett, Massachusetts.

8    Q.    At some point during 2013, did you become aware that the

9    IEB had concerns about the Everett land?

10   A.    I did.  I was first advised of the article in the

11   Boston Business Journal which I read, and I understood, I was

12   advised that our IEB was looking into the matter.  And later in

13   an executive session with the Commissioners, I, as one of the

14   Commissioners, was advised in detail of the investigation

15   surrounding the land itself in Everett.

16   Q.   And what specifically were you told by the IEB

17   investigators when you were first briefed?

18              MR. KATZ:  Objection.

19              THE COURT:  Sustained.

20   Q.   What information did you get during executive session

21   about the FBT issue?

22              MR. KATZ:  Objection.

23              MS. BARCLAY:  Your Honor, this goes to notice of the

24   Gaming Commission of this issue.

25              THE COURT:  Yes, we have the same issue we had

1    yesterday.  I'm going to allow her to testify as to that with

2    respect to what notice she had.  The objection is overruled.

3    Q.   So what information were you provided with in executive

4    session related to the FBT issue?

5    A.   Provided with information that stemmed from some tapes in

6    prison between two individuals, one of whom it was alleged had

7    hidden ownership in the property; and we listened to excerpts

8    from those prison tapes and had a better understanding of what

9    exactly the IEB was investigating at that point.

10   Q.   And were you told the names of those individuals?

11   A.   We were told the names of the individuals, correct.

12   Q.   And who were they?

13   A.   It was -- it was certainly Mr. Lightbody, who was a party

14   to the tape itself, Mr. Bufalino, who was incarcerated as the

15   other person there, Mr. Gattineri, Mr. DeNunzio.  Those are the

16   names that we were provided.  Mr. DeCicco was also spoken about

17   as a prior owner.  So we were given a general briefing of the

18   concerns, the additional investigation.  IEB thought it was

19   appropriate to let the Commission know at that time that this

20   matter required further investigation.

21   Q.   And you said you were told that Mr. Bufalino was in

22   prison.  Were you given any other information about his

23   background?

24            MR. KATZ:  Objection, your Honor.

25            THE COURT:  Overruled.  Go ahead.

1          THE WITNESS:  Thank you.  Thank you, your Honor.

2     A.   Yes, that Mr. Bufalino had organized crime associations,

3     we were advised of that.

4     Q.   And you said you listened to some prison tapes?

5     A.   We did, yes.

6          MS. BARCLAY:  Your Honor, with the Court's permission,

7     I'd like to play Exhibit 4, which is already in evidence.

8          THE COURT:  It can be played.

9          MS. BARCLAY:  This one hasn't actually been played

10    before.

11    Q.   Ms. Cameron, in your binder in front of you, if you go

12    behind Tab 4-A.

13         MS. BARCLAY:  Mr. Merritt, can you pull up Exhibit 4,

14    please.  I'm going to start this call at approximately 11

15    minutes and 27 seconds into it.

16         (CD played.)

17    Q.   Stopping the call right there, Ms. Cameron, is that one of

18    the calls that you listened to in executive session?

19    A.   Yes, it was.

20    Q.   This is a call between Darin Bufalino and Charles

21    Lightbody, as far as you know?

22    A.   Correct.

23    Q.   And the "chick from New Jersey," who did you think that

24    they were referring to?

25    A.   I believe they were referring to me.  I'm the only woman

1    on the Board, and I do have a background in New Jersey.

2    Q.    And there's a mention of Steve Wynn getting thrown out of

3    New Jersey.

4    A.    Yes.

5    Q.    To your knowledge, was Mr. Wynn thrown out of New Jersey?

6    A.    No.  I have no knowledge from my years of investigations

7    of that, as well as our independent investigation that was

8    conducted by members of our Investigations and Enforcement

9    Bureau.  They did a very thorough job reviewing everything in

10   New Jersey, and that information is not accurate.

11   Q.    These calls between Mr. Bufalino and Mr. Lightbody, were

12   they of concern to you when you first heard them?

13   A.    One of the reasons the members of our investigations team

14   wanted to have the executive session when they did is to advise

15   me, and it's standard operating procedure when an incarcerated

16   person speaks about a law enforcement person to let them know,

17   in particular for safety concerns.  I did not have safety

18   concerns in this particular concern.

19   Q.    Right, but did you have concerns about the nature of the

20   conversations and them relating to the casino?

21   A.    Certainly I did.  I was most concerned about the

22   conversation, the allegations, and certainly very supportive of

23   our team investigating the matter further.

24   Q.    And what, if anything, did you or any of the Commissioners

25   tell the IEB to do with the information?

1    A.    There was a consensus that this was of serious concern and

2    that the investigation should be continued.

3    Q.    And what was of serious concern?

4    A.    The allegations of hidden ownership, the information that

5    was not being -- the lack of honesty and truth worthiness to

6    the IEB, to the members of our team who had been conducting

7    interviews, that was of concern.

8    Q.    And was the hidden ownership of someone with a background,

9    a particular background, important?

10            MR. KATZ:  Objection, leading.

11            THE COURT:  Sustained.

12   Q.    What was it about the hidden ownership that was

13   concerning?

14   A.    That the ownership involved a convicted felon was of great

15   concern, considering our obligation to the integrity of the

16   licensing process.  That was a real concern of ours.

17   Q.    And what about the organized crime affiliation, was that

18   of concern as well?

19   A.    Absolutely.

20            MR. RANKIN:  Objection.

21            THE COURT:  The objection is sustained.

22   Q.    Was there another concern other than the convicted felon?

23            MR. RANKIN:  Objection, your Honor.

24            THE COURT:  Overruled.

25   A.    Yes.  I was absolutely concerned about the association

1  with organized crime.  I had had experience in New Jersey

2  dealing with that aspect, and that was of concern.

3          THE COURT:  Ms. Cameron, would you pull that

4  microphone just a little bit in front of you.  Thank you.

5          THE WITNESS:  Thank you, your Honor.

6  Q.  Ms. Cameron, was the Commission briefed more than once in

7  executive session about this issue?

8  A.  There were three briefings.  The first briefing was

9  certainly the details of what they had uncovered.  The second

10  and third briefings were updates about subsequent interviews,

11  subpoenas that they had issued.  So that first briefing was the

12  most detailed, and then there were two subsequent updates.

13  Q.  And then ultimately what did the Commission do with

14  respect to this FBT issue?

15  A.  We -- well, the other issue that was of grave concern was

16  what the principals of Wynn knew and how they handled the

17  matter after they learned the details.  That was of concern as

18  well.  Suitability is ongoing.  We had those decisions to make,

19  so at the request of Wynn, a hearing was scheduled in which we

20  heard about a cure for this issue.

21  Q.  And what was the proposed cure?

22  A.  Well, the original price of the property was $75 million,

23  and we heard testimony from a credible appraiser who talked

24  about -- who had done the appraisal, if that property were to

25  be used by something other than a casino developer, say, a big

1    box store, anything else, that price, the market price would be

2    $35,000 -- I'm sorry -- $35 million.  So that was what the

3    principals at Wynn were proposing because of the lack of

4    honesty.  That's part of the contract that they had with the

5    sellers was honesty during the investigation, and their

6    proposed cure was to not have a profit, an additional price

7    because of a casino, that it would be bought for the price that

8    anyone else would buy it for.

9    Q.   And was that ultimate solve or solution, was that

10   something that was voted on by the Commission at that hearing?

11   A.   We did.  We had the opportunity to question everyone that

12   testified, and after our questions were answered to our

13   satisfaction, we did vote in the affirmative to accept the

14   proposal and move on with the suitability hearing, which was

15   scheduled a few days later.

16   Q.   In addition to the price reduction, were there any other

17   requirements that the Board imposed on its approval?

18   A.   Yes, that the sellers of the property needed to affirm,

19   sign statements under oath that they were the only ones

20   profiting from that price of the land, the new land price, the

21   $35 million.

22   Q.   And was there anything else, any other recommendation

23   made?

24        MR. KATZ:  Objection, your Honor.  If we could have a

25   minute at sidebar.

1          MS. BARCLAY:  This was testified to by Ms. Wells
2     yesterday.  It's already in evidence.
3          THE COURT:  We don't need a sidebar on this.  The
4     objection is overruled.
5     Q.   Ms. Cameron, was there an additional instruction that the
6     Commission gave to the IEB with regard to this issue, the FBT
7     issue?
8     A.   Uhm, the price was reduced.  The statements had to be
9     signed.  I don't recall if there was anything else.  I know
10    those two items were part of the arrangement.
11         MS. BARCLAY:  Your Honor, may I approach?
12         THE COURT:  Yes.
13         MS. BARCLAY:  And this is Exhibit 58.
14    Q.   I'm going to ask you, first, Ms. Cameron, do you recognize
15    Exhibit 58?
16    A.   I do, the Phase 1 suitability decision.
17    Q.   And let me take it back for one minute.  I'm going to have
18    you read on Page 7, Section 3, to yourself.
19    A.   Oh, yes.  Yes, No. 3 is the --
20    Q.   Hold on a second.  Just read it to yourself.
21    A.   Okay, sorry.
22    Q.   And when you've read it, let me know.
23         (Witness examining document.)
24    Q.   Ms. Cameron, having seen that document, does that refresh
25    your memory as to the third condition that the Gaming

1   Commission imposed with respect to this FBT issue?

2           MR. KATZ:  Objection, relevance, your Honor.

3           THE COURT:  Overruled.

4   A.   It does.  Thank you.  Certainly the third piece of this

5   was that the entire file would be turned over to the

6   appropriate state and federal law enforcement agencies for

7   further investigation.

8           MS. BARCLAY:  Your Honor, I would move to admit

9   Exhibit 58 into evidence.

10          MR. KATZ:  I do have an objection.

11          THE COURT:  Why don't we -- are you intending to

12  inquire further of it?

13          MS. BARCLAY:  I was intending to read -- have

14  Ms. Cameron read a few sections of it, yes.

15          THE COURT:  All right, confer with Mr. Katz as to

16  whether the section that you are going to read has anything to

17  do with his problem.

18          (Discussion off the record between attorneys.)

19          THE COURT:  I'll see counsel at sidebar.

20  SIDEBAR CONFERENCE:

21          MR. KATZ:  Your Honor, we had objected to this

22  document on hearsay proffer grounds because everything past

23  this period is going to be very confusing and very prejudicial

24  and very --

25          THE COURT:  What is the document?  I don't have it in

```
 1    front of me.
 2             MS. BARCLAY:  It's a public document.  It's a public
 3    record.
 4             MR. KATZ:  This does not fit the public record --
 5             THE COURT:  Wait a minute.  Where did it come from?
 6             MS. BARCLAY:  It comes from the Gaming Commission.
 7             THE COURT:  And when was it published?
 8             MS. BARCLAY:  It was published --
 9             THE COURT:  This date?
10             MS. BARCLAY:  Yes.
11             THE COURT:  December 6 of '13?
12             MS. BARCLAY:  Yes, and it's signed by all the
13    Commissioners.
14             MR. KATZ:  I think it's a little later.  I think it's
15    December 29 actually.  I'll show you what part I think is both
16    hearsay and very prejudicial.  So they're going to forward the
17    file to the U.S. Attorney, the Attorney General, and the local
18    District Attorney for review and pursuit of any warranted
19    action.  Obviously an action has been brought.  It gives the
20    impression it was really the U.S. Attorney and, you know, this
21    Commission has decided that this prosecution is warranted.
22    It's very prejudicial.  You instructed the jury at the
23    beginning of the trial that the indictment is not evidence, and
24    they'd be putting this in as evidence.
25             THE COURT:  Was this presented as an exhibit before
```

1     the trial?

2              MR. KATZ:  And we objected to it.

3              THE COURT:  And what was the ruling on it?

4              MS. BARCLAY:  There was no ruling.  Actually, though,

5     your Honor, if that's Mr. Katz's objection, "the pursuit of any

6     warranted" and then on, we're happy to redact that part.

7              MR. KATZ:  Yes, that's going to be confusing.  They've

8     heard it from the witnesses that this part is in and then this

9     part is in.  They've already heard that from witnesses.  They

10    don't need the document.

11             MS. BARCLAY:  For review and then --

12             MR. KATZ:  But then the redaction is going to be, the

13    jury is going to say, what is under that redaction?

14             THE COURT:  All right, are you planning to ask the

15    witness about this particular paragraph?

16             MS. BARCLAY:  I was going to have her read it, yes.

17             MR. KATZ:  She's already testified to it.

18             THE COURT:  I'm not going to let you read it, but for

19    the time being, the document can be admitted subject to a

20    potential redaction of Paragraph C on Page 7, and we'll talk

21    about this at a break.  I'm not going to hold the jury --

22             MR. KATZ:  So the jury is not going to see it right

23    now?

24             THE COURT:  The jury is not going to hear about

25    Paragraph C.

1          MR. KATZ:  But they're not going to blow it up on the

2     screen for the jury right now?

3          THE COURT:  The jury is not going to see Paragraph C.

4          MR. KATZ:  Okay, thank you, your Honor.

5          (End of sidebar conference.)

6          (Exhibit 58 received in evidence.)

7          MS. BARCLAY:  Your Honor, if I could have one minute?

8          THE COURT:  Yes.

9          (Discussion between government attorneys.)

10          MS. BARCLAY:  No further questions for Ms. Cameron,

11     your Honor.

12          THE COURT:  Cross-examination, Mr. Katz?

13     CROSS-EXAMINATION BY MR. KATZ:

14     Q.    Good afternoon, Ms. Cameron.

15     A.    Good afternoon, sir.

16     Q.    My name is Aaron Katz.  I represent Dustin DeNunzio.

17     We've never met before, have we?

18     A.    No, we have not.

19     Q.    We've never spoken before?

20     A.    No, sir.

21     Q.    There was a tape played between Mr. Bufalino and

22     Mr. Lightbody.  You recall hearing those tapes, correct?

23     A.    I do.

24     Q.    Do you ever recall hearing a tape where Dustin DeNunzio

25     was talking to Darin Bufalino?

1    A.    No, I do not.

2    Q.    Was there any evidence developed during your investigation

3    or the IEB's investigation that Dustin DeNunzio knows Darin

4    Bufalino?

5    A.    I wasn't privy to any information that would lead me to

6    believe that was the case.  I don't have all the details of

7    their investigation, but I have no information that way.

8    Q.    Let me ask it this way:  If evidence had been developed by

9    the IEB that Dustin DeNunzio knew Darin Bufalino, you would

10   expect that that would have been presented to you, correct?

11   A.    I do, yes.

12   Q.    And it wasn't presented to you, correct?

13   A.    That's correct.

14   Q.    How about evidence that Dustin DeNunzio has ever spoken to

15   Mr. Bufalino, was there any evidence presented to you about

16   that?

17   A.    No, sir.

18   Q.    Okay.  Was there any evidence presented to you that Dustin

19   DeNunzio is a member of organized crime?

20   A.    None.

21   Q.    Was there any evidence presented to you that Dustin

22   DeNunzio has ever committed a crime in his life?

23   A.    I -- I don't have any information.  None was presented to

24   the Commission.

25   Q.    And you have a law enforcement background, correct?

1  A.   I do.

2  Q.   Do you still have affiliations in law enforcement,

3  friends, people that can run CORI checks, things of that

4  nature?

5  A.   That would be -- that would be illegal for me to utilize a

6  friend to do that, so I do not have that access.

7  Q.   Okay, fair enough, fair enough.  But you're not aware of

8  Dustin DeNunzio having a criminal conviction in his past,

9  correct?

10        MS. BARCLAY:  Objection.

11        THE COURT:  Overruled, to her awareness.

12  A.   I do not have knowledge of that.

13  Q.   Ms. Cameron, I think you said you were appointed to the

14  Commission in 2011; is that correct?

15  A.   2012, sir.

16  Q.   2012, I'm sorry.  And originally you were actually

17  appointed by Attorney General Coakley; is that correct?

18  A.   That's correct.

19  Q.   And then can you tell the jury what happened with the

20  nomination.

21  A.   Originally I was the appointee of the Attorney General,

22  which requires executive criminal background experience.  There

23  is another position of the five on the Commission that requires

24  a gaming background.  In making decisions -- and the gaming

25  position is an appointee of all three appointing officers, the

1  Treasurer, the Governor, and the Attorney General.  So there

2  was a request made of me to just basically move from the slot

3  that required criminal investigations to the gaming background,

4  since I had both.

5  Q.   It was sort of a paperwork change basically; is that fair

6  to say?

7  A.   I think the appointing officials thought that that would

8  be best for the Commission, and I had no problem moving to that

9  position.

10  Q.   Right.  So now you say you were nominated or appointed by

11  the Attorney General, the Treasurer, and the Governor jointly,

12  correct?

13  A.   That's correct.

14  Q.   Even though that's originally not where the nomination

15  came from?

16  A.   Correct.

17  Q.   So you said on direct examination that one of your duties

18  was, I think you said to enact or implement the Expanded Gaming

19  Act?

20  A.   Yes.

21  Q.   So you're bound by the Gaming Act, correct, as a

22  Commissioner?  You're bound by those laws?

23  A.   Yes, we are.

24  Q.   And you implement regulations?  The Commission has drafted

25  regulations?

1    A.    We have, numerous.

2    Q.    And those are sort of to fill the gaps in the statute

3    where the statute might be ambiguous or doesn't speak to the

4    issue, correct?

5    A.    It's more of a -- the regulations speak to specifically

6    how we will go about complying with the law; more specific,

7    those documents.

8    Q.    So you familiarized yourself with the Expanded Gaming Act

9    and the regulations, correct?

10   A.    Yes.  I've read all of those documents.

11   Q.    You've read the Act front to back?

12   A.    Early on when we first put the Commission together, I did

13   read the document, yes.

14   Q.    Okay, when was the last time you read part of the Expanded

15   Gaming Act?

16   A.    You know, we're briefed on parts when we put together

17   regulations, so I've -- I've been, you know, familiar and will

18   see pieces of it as we fulfill our regulatory responsibilities.

19   So I've looked at portions of it depending on -- depending on

20   what issue we're working on, what regulations we're

21   promulgating.

22   Q.    And you're aware that the Act is actually on the Gaming

23   Commission's website, correct?

24   A.    I am, correct.

25   Q.    So if you're a member of the public and you're interested

1    in what the statute says, you can jump on the Gaming Commission

2    website and read the statute, correct?

3    A.    Yes.  We have a very robust website.

4    Q.    Yes, you do, and the statute is up on the website because

5    the Commissioners think it's important for the public to know

6    what the statute says, correct?

7    A.    Uhm, I think transparency and, uhm -- yes, it's important

8    that -- you know, it's an important document.

9    Q.    Well, you believe it's important.  I mean, as a Gaming

10    Commissioner, you believe it's important for people like Dustin

11    DeNunzio to have notice about what the law requires of them,

12    correct?

13    A.    I'm not sure what you're referring to, sir.

14    Q.    Do you think it is important -- I mean, you're a member of

15    the Gaming Commission, correct?

16    A.    Uh-huh.

17    Q.    In your role as Gaming Commissioner, do you think it's

18    important for persons like Dustin DeNunzio to have notice of

19    what the law says, what the Expanded Gaming Act says?

20    A.    When you say "have notice," are you referring to someone

21    from the Commission actually explaining the law?  I'm just --

22    I'm having trouble answering your question yes or no.

23    Q.    Yes, so if the law says something is required, you

24    believe -- you agree it's important for people to have notice

25    of what the law requires, correct?

1  A.   I would think that anyone that would be getting involved

2  with casinos in the Commonwealth would want notice, would want

3  to understand the law.

4  Q.   So that actually wasn't my question, though.  My question

5  to you is, in your role as Gaming Commissioner, do you think

6  it's important for the Gaming Commission to give people like

7  Dustin DeNunzio notice about what the Expanded Gaming Act

8  requires?

9  A.   The law is very complex, and, you know, there are many,

10  many sections.  I'm not sure how it would be possible for

11  someone in the Gaming Commission to explain the entire law to

12  your client.

13  Q.   So is it your testimony that you don't see how it's

14  possible for someone like my client to know what the law

15  requires?

16  A.   I'm not saying that at all.  I'm just saying, I don't see

17  how that's the responsibility of someone in the Gaming

18  Commission to explain the entire law.

19  Q.   So you provide advisory opinions, correct?  Is there an

20  advisory opinion process for the Gaming Commission?

21  A.   Advisory opinions.

22  Q.   Yes.

23  A.   Regarding the law?

24  Q.   Can't people submit requests for advisory opinions to the

25  Gaming Commission?

1    A.    Our legal staff does assist with those who may want some

2    clarification, that's correct.

3    Q.    And you also put out press releases, correct?

4    A.    We do.

5    Q.    On the website, correct?

6    A.    We do.

7    Q.    And there's also a notice and comment period for proposed

8    regulations, correct?

9    A.    Yes, sir.

10   Q.    And you have public hearings where the members of the

11   public are invited, correct?

12   A.    That's correct.

13   Q.    And you've had hearings where you actually have walked

14   through certain parts of the statute, correct?

15   A.    Uhm...

16   Q.    Let me ask you this:  When you were developing regulations

17   under the statute, you held public hearings to talk about the

18   regulations you were considering, correct?

19   A.    That's correct.

20   Q.    And you actually invited members of the public to come

21   speak about what made sense and what didn't make sense in their

22   view, correct?

23   A.    That's correct.

24   Q.    Okay.  If I were to go onto the gaming Commission's

25   website and look at the statute, is there a section of the

1    statute directed to landowners that are looking to sell their
2    land to a casino company?
3    A.   No, sir, you would not find that.
4    Q.   So I just want to sort of go back in time to November of
5    2012, okay?  And let's say I'm a member of an LLC, and my LLC
6    owns a piece of land, and we'll say it's a 35-acre piece of
7    land in Everett, and casino companies really love the land,
8    they want to buy the land, I want to sell the land outright to
9    a casino company --
10             MS. BARCLAY:  Objection, your Honor, to the
11   hypothetical.  She's not an expert.
12             THE COURT:  I haven't heard the question yet.
13   Q.   We just want to sell the land outright to a casino
14   company, okay, and I'm trying to figure out what the law says,
15   is there a place in the statute where I can go and get
16   information about whether the law requires me as the landowner
17   to fill out an application?
18   A.   No, there would not be.
19   Q.   And there's actually no application for a landowner to
20   fill out if they're just selling their land to a casino
21   company, correct?
22   A.   That's correct.
23   Q.   And there's nothing in the statute that would tell me, if
24   I'm a landowner and I have a criminal record in my past and I
25   sell my land outright to a casino company, that that's going to

1   be a problem to the Gaming Commission?  I can't find that in

2   the statute, correct?

3   A.    Not in the statute.

4   Q.    How about the regulations?

5   A.    Not in the regulations.

6   Q.    Where would I find that?

7   A.    Well, it speaks to the very beginning of the law which

8   talks about the public confidence in the integrity of the

9   licensing process, as well as a prospective casino developer

10  who has a contract that speaks to being honest with the IEB

11  investigations.

12  Q.    Okay, and I can't find that on the Gaming Commission's

13  website?

14  A.    Well, the piece about integrity in the licensing

15  process --

16          MR. KATZ:  May I approach, your Honor?

17          THE COURT:  Yes.

18  Q.    Ms. Cameron, I'm just going to ask you to find the

19  provision in the statute that you are talking about in terms of

20  integrity of the process.

21  A.    I'm referring to the first page, but I guess this is a --

22  which talks about the overall document, and it does speak to

23  the integrity.  Now, what you're giving me --

24          THE COURT:  Speak into the microphone.

25          THE WITNESS:  I'm sorry.

1    A.    What you're giving me here I guess is the LexisNexis

2    search, which just talks specifically to the -- to the specific

3    section, so there's a chapter at the very beginning which

4    speaks to what I'm talking about, frankly.

5    Q.    But that portion of the statute does not say, if you have

6    a criminal conviction, you cannot sell your land to a casino

7    company?

8    A.    It does not say that, sir.

9    Q.    And it doesn't say, if I have a criminal conviction and I

10   sell my land to a casino company, the Gaming Commission is

11   going to get really mad and really upset and really concerned?

12   A.    It does not say that, sir.

13   Q.    Okay.  And you agree, you had an opportunity to actually

14   draft a regulation that could have said that, correct?

15   A.    I don't think we would have drafted a regulation that

16   speaks to something that's not specifically outlined here.

17   Q.    Okay, so your testimony is that the landowners and

18   criminal convictions in their past and that being a concern to

19   the Gaming Commission, that is not something specifically laid

20   out in the statute anywhere?

21   A.    That's correct.

22              MR. KATZ:  May I approach just to take the binder?

23              THE COURT:  Yes.

24   Q.    Ms. Cameron, you testified earlier that there were a

25   number of applicants in Region A, correct?

1    A.    Yes.

2    Q.    And there are other regions as well, correct?

3    A.    Two other regions, yes.

4    Q.    What is the region where the Springfield casino is?

5    A.    That's Region B.

6    Q.    Okay, Region B.  I want to talk to you about the Region B

7    suitability investigations, and I want to talk to you in

8    specific detail about the MGM suitability decision.  Do you

9    recall reading the IEB's suitability report for the MGM

10   Springfield applicant?

11   A.    Yes.  I've read them all, so I --

12   Q.    Okay, you read them cover to cover?

13   A.    Yes, I do.  Yes, I do.

14   Q.    It's a lot of reading, correct?

15   A.    There's quite a bit of reading entailed, yes.

16   Q.    Do you recall in the MGM Springfield application something

17   that was referred to as the Terry Christensen matter?

18   A.    I do.

19   Q.    MGM was deemed suitable, correct?

20   A.    They were.

21   Q.    And they currently have a casino license, correct?

22   A.    They do.

23   Q.    Their construction is underway?

24   A.    Yes, sir.

25   Q.    And it was a unanimous vote on suitability?

1    A.   You know, I would have to check.  I believe it was.  They

2    were not all unanimous, so I want to be careful.

3    Q.   Fair enough, fair enough.  So the Terry Christensen

4    matter, you're familiar with the name Terry Christensen,

5    correct?

6    A.   I am.

7    Q.   And he was a director of MGM Resorts, Inc., or whatever

8    the company name is, correct?

9    A.   If that was his title, I -- it's been several years, and I

10   did not review that, that report.  If you're telling me that

11   was his title, I can't swear to that because I haven't reviewed

12   that file in a number of years.

13   Q.   Well, I'll see if I can refresh your recollection.

14            MR. KATZ:  May I approach, your Honor?

15            THE COURT:  Yes.

16   Q.   See if that refreshes your recollection, Ms. Cameron.

17   A.   Thank you.

18            (Witness examining document.)

19   A.   Yes, so he was a board of director for MGM, yes.

20   Q.   Ms. Cameron, if you're a director of a company, that means

21   you're on sort of, like, the executive level of the company,

22   correct?

23   A.   Yes.

24   Q.   And you help make major decisions for the company?

25   A.   I believe that's correct.

1    Q.   Okay.  And you learned, didn't you, from the IEB that

2    Mr. Christensen at some point in 2006 resigned from the MGM

3    board of directors, correct?

4    A.   That's correct.

5    Q.   And that is because at that time he was actually indicted

6    by a federal grand jury on conspiracy to commit wiretapping and

7    aiding and abetting charges, correct?

8    A.   Yes.

9    Q.   And you also learned that Mr. Christensen was actually

10   found guilty of those charges in 2008, correct?

11   A.   You're giving me the details.  I -- I believe that -- I

12   couldn't swear to the year, but the facts are -- I do recall

13   the investigation and a guilty finding.

14   Q.   And do you recall learning in the IEB report that he was

15   actually sentenced to three years in prison and a $250,000

16   fine?

17   A.   I wouldn't have recalled those exact figures.

18        MR. KATZ:  May I approach, your Honor?

19        THE COURT:  Yes.

20        (Witness examining document.)

21   A.   Yes.

22   Q.   Okay, did that refresh your recollection?

23   A.   It did, sir.

24   Q.   Okay.  And did you also learn that he got bail pending his

25   appeal?

1    A.   I -- I -- I read the entire report, and all the

2    information in front of me, yes, sir, I did read and was

3    informed about.

4    Q.   Okay.  And you're aware that because he had been convicted

5    of a felony and MGM has casino licenses, he was supposed to

6    cease having any involvement with MGM Springfield, correct?

7    A.   My recollection is such that, yes, I believe that's

8    accurate.

9    Q.   And that it was actually something that was required by

10   the gaming authorities in the jurisdictions where MGM had

11   licenses?

12   A.   I can't speak to every jurisdiction and what their

13   requirements are, but if --

14   Q.   Fair enough.  Let me ask you this:  In Massachusetts, if

15   you're a casino company, if you have a casino license and

16   you're operating a casino, can one of your directors of the

17   company be someone who was recently convicted of two federal

18   felonies and sentenced to three years in prison?

19   A.   That would be a qualifier, and, no, that would be grounds

20   for unsuitability.

21   Q.   And you became aware, correct, from the IEB report that

22   although Mr. Christensen had formally resigned from the board

23   of directors, he continued to have involvement in MGM

24   Springfield's corporate decision-making?

25   A.   We did learn that information, yes.

1    Q.   Is it fair to say he was acting as a secret or hidden

2    director?

3    A.   Uhm, I don't know how hidden it was.  I do know that we

4    did learn that he did continue to attend some Board meetings

5    after the fact and have involvement, which he shouldn't have.

6    Q.   Okay.  And you learned, correct, that his involvement was

7    actually against what the company's lawyer had told them was

8    required, correct?

9    A.   Again, I don't have the report in front of me, sir, but

10   I'm -- I did read all of that, and if those are the facts

11   you're reading from the report, then I did have access to all

12   of that information.

13   Q.   Okay, so you learned that he would do things like being an

14   unannounced member of a conference call between the board of

15   directors, correct?  Did you learn that he did that?

16   A.   I don't recall those specific facts, but if it's in the

17   report, then I did have knowledge.

18        MR. KATZ:  Okay, your Honor, can I refresh the

19   witness, please?

20        THE COURT:  Yes.

21        (Witness examining document.)

22   A.   Thank you, sir.

23   Q.   Okay, Ms. Cameron, did that refresh your recollection?

24   A.   It did, sir.

25   Q.   Okay, so you're aware and you became aware through the IEB

1    report that, among other things, Mr. Christensen would make

2    unannounced telephonic presence in select 2009 MGM Resorts

3    International Board meetings with the knowledge of Tracinda

4    executives Kirk Kerkorian, Daniel Taylor, and Anthony Mandekic?

5         MS. BARCLAY:  I'm going to object to reading this into

6    evidence.

7         THE COURT:  Sustained.  You can't read from that

8    document.

9         MR. KATZ:  Your Honor, I'm happy to admit this

10   document into evidence.

11        MS. BARCLAY:  No.  We would object.  It's irrelevant.

12        THE COURT:  Sustained.

13   Q.   Ms. Cameron, did you become aware that MGM commenced an

14   internal investigation regarding this matter?

15   A.   Yes.

16   Q.   And are you aware that that internal investigation

17   revealed wrongdoing at the corporate level?

18   A.   That's correct.

19   Q.   And that was raised in the IEB report, correct?

20   A.   It was.

21   Q.   And nevertheless the Gaming Commission voted unanimously

22   that MGM was going to be suitable to hold a casino license in

23   Massachusetts, correct?

24   A.   Well, there were many more circumstances that were

25   involved in that decision-making; in particular, what they had

1   done to rectify those actions with the new Board, the new

2   president of the company.  So in totality of all the

3   circumstances, we did approve that license.

4   Q.   Okay.  In other words, once they got caught, they said

5   they would finally really kick Mr. Christensen out of the

6   company, and that was satisfactory to the Gaming Commission?

7   A.   Those are your words, sir.  I'm talking about the -- they

8   admitted wrongdoing.  They put procedures, policies in place to

9   rectify, and had evidence to a new corporate business model.

10  Q.   Ms. Cameron, I asked you about the name Anthony Mandekic.

11  Do you recall that name?

12  A.   I recall you just saying it.  I don't recall the name

13  independently.

14  Q.   Okay, you recall -- I'll approach and refresh your

15  recollection, if that's okay, your Honor.

16          THE COURT:  You may approach.

17          (Witness examining document.)

18  Q.   Ms. Cameron, does that refresh your recollection that

19  Anthony Mandekic was a member of the MGM Board of Directors?

20  A.   Yes, sir.

21  Q.   And that he was the CEO, president, and secretary/

22  treasurer of Tracinda Corporation?

23  A.   Yes, sir.

24  Q.   And that meant that he was a qualifier, correct, for the

25  MGM application?

```
 1    A.    I believe so.  There are -- when a different company is
 2    involved, there are certain stipulations as to how much control
 3    they would have over the parent company, so I -- there are lots
 4    of factors that go into deciding who's a qualifier.
 5              MR. KATZ:  May I approach, your Honor?
 6              THE COURT:  Yes.
 7              (Witness examining document.)
 8    A.    Got it.
 9    Q.    Ms. Cameron, does that refresh your recollection that he
10    was a qualifier?
11    A.    It does.  It does, sir.
12    Q.    So he had to go through the full suitability process,
13    correct?
14    A.    He did.
15    Q.    And he had to fill out a personal history form, correct?
16    A.    Correct.
17    Q.    And be interviewed by members of the IEB?
18    A.    Correct.
19    Q.    Okay.  And do you recall learning that there was an issue
20    with the interviews that he submitted to at the IEB?
21    A.    I don't have any recollection of that.
22    Q.    Do you recall that there was a portion of the report on
23    Mr. Mandekic entitled "Significant investigative issues"?
24    A.    That's a -- that's a term used by IEB, and I've read
25    several of those of the hundreds of qualifiers we've looked at
```

1     in the last couple of years, so I'm familiar with the term.

2     I'm not familiar with the circumstance with this particular

3     individual.

4              MR. KATZ:  May I approach, your Honor?

5              THE COURT:  Yes.

6              (Witness examining document.)

7     Q.   Ms. Cameron, does that refresh your recollection that the

8     IEB report said that there was a significant investigative

9     issue with Mr. Mandekic?

10    A.   Yes, that there was a discrepancy, yes.

11    Q.   And the issue is that he gave an interview initially with

12    IEB investigators where he said that he had no recollection

13    about the Terry Christensen matter, correct?

14    A.   Correct.

15    Q.   And then there was a follow-up interview because

16    investigators were puzzled that Mr. Mandekic had not recalled

17    the Terry Christensen matter, correct?

18    A.   That's correct.

19    Q.   And the reason they were puzzled is because he had

20    actually been interviewed extensively in the MGM Resorts

21    internal investigation regarding the Terry Christensen matter,

22    correct?

23    A.   Correct.  You're adding a little more information that's

24    in the report I just read, sir.

25              MS. BARCLAY:  Your Honor, I'd object to this line of

1    questioning.  Ms. Cameron, she just read a report, and to go

2    back and forth like this --

3            THE COURT:  It's cross-examination.

4    Q.   Do you recall learning from the IEB report that in the

5    second interview, Mr. Mandekic explained to the investigators

6    that he had been uncomfortable in the first interview, was

7    unfamiliar with the interview format, in the sense that he was

8    not allowed to consult with counsel during the course of the

9    interview, felt at times that he was being attacked by some of

10   the questioning, and that he hesitated in some of his answers

11   because he did not want to make a mistake?  Do you recall that?

12   A.   I just read that, sir, yes.

13   Q.   Okay.  So fair to say that Mr. Mandekic admitted to the

14   IEB investigators that he had just flat out lied to them during

15   his first interview?

16   A.   That's not what he said, and I wouldn't characterize it

17   that way by reading what I just read.

18   Q.   Okay.  And Mr. Mandekic was deemed suitable, correct?

19   A.   The entire -- the entire -- all the qualifiers and the

20   company were deemed suitable, correct.

21   Q.   And he is being paid by MGM Resorts as we speak right now

22   to be a director of their company, correct?

23   A.   I don't know if there's been a change in directorship

24   since we looked at that matter several years ago.

25   Q.   Okay, fair enough, fair enough.  Ms. Cameron, do you

1    recall an October -- I believe it was October 17, 2013 hearing

2    regarding Macau in front of the Gaming Commission?

3    A.   Yes.  I couldn't have given you the exact date, but I do

4    recall the hearing.

5    Q.   Good, because I don't know if that's the exact date I just

6    gave you, but it was in October of 2012, correct?

7    A.   (No response.)

8    Q.   Okay.  And that hearing was actually called at the request

9    of the license applicants, correct?

10   A.   I'd have to review exactly who called the hearing.  I do

11   recall having the hearing.  I don't know who called for the

12   hearing.

13   Q.   And do you recall during that hearing that there was

14   discussions about what are called triads (long "e") or triads?

15   A.   I believe it's pronounced triads (long "i").

16   Q.   Oh, triads, thank you.  What are triads?

17   A.   It's China's version of organized crime.

18   Q.   And do you recall during that hearing that Steve Wynn

19   testified regarding triads in Macau?

20   A.   I do recall --

21   Q.   And do you --

22   A.   -- Mr. Wynn testifying.

23   Q.   Sorry to interrupt you.  And do you recall that Mr. Wynn

24   during the hearings said that --

25           MS. BARCLAY:  Objection as to what Mr. Wynn said.

1          THE COURT:  Sustained, sustained.

2     Q.    Ms. Cameron, is it your belief that triads are synonymous

3     with organized crime in China?

4     A.    I wouldn't use the word "synonymous" because I think every

5     culture is different, but it's been my understanding of triads

6     and knowledge since we've conducted these investigations is,

7     it's a form of organized crime.

8     Q.    And was that a concern to the Commission that applicants

9     were doing business with triads in Macau?

10    A.    Uhm, all of the business practices for every applicant is

11    a concern, and thus a thorough investigation was conducted,

12    multiple trips by our investigators to Macau.

13    Q.    And would it have been a concern of the Commission if one

14    of the applicants didn't think that triads were necessarily

15    organized crime, Chinese organized crime institutions?

16    A.    I'm personally much more concerned with the facts and the

17    results of the investigation than maybe an offhanded statement

18    by someone.

19    Q.    Okay.  Now, Ms. Cameron, being a Gaming Commissioner, it's

20    a little bit unusual because you're bound by something called

21    the Open Meeting Laws, correct?

22    A.    That's correct.

23    Q.    And what are the Open Meeting Laws?  Can you describe that

24    to the jury?

25    A.    Yes.  So we as Commissioners, three Commissioners

```
 1    constitutes a quorum, so we do not operate in a way that -- we
 2    try very, very hard to adhere to the Open Meeting Laws, and we
 3    conduct our business in public.
 4    Q.   That makes it sometimes difficult to be a Gaming
 5    Commissioner, correct?
 6    A.   Well, we work full time and share an office, so we just --
 7    we're just very aware of that, and that's how we conduct our
 8    business in the public.
 9    Q.   And actually they're videotaped hearings, correct?
10    A.   They are, yes.
11    Q.   You don't have the luxury of having, with the exception of
12    executive sessions, right, which are very limited by statute,
13    correct?
14    A.   That's correct.
15    Q.   With the exception of those limited executive sessions,
16    it's actually not allowed for you to get behind closed doors to
17    deliberate with one another, correct?
18    A.   That's correct.
19    Q.   So if you're discussing an issue, you know, you're doing
20    it in front of the public in front of television cameras,
21    correct?
22    A.   That's correct.
23    Q.   And the Gaming Commission is aware that the public is
24    watching, correct?
25    A.   Yes, that's correct.
```

1    Q.   And the Gaming Commission has a press secretary or press

2    person?

3    A.   We have a director of communications, yes.

4    Q.   And do you receive e-mails on a daily or semi-daily

5    business regarding, you know, press reports, newspaper articles

6    that have come out regarding the Gaming Commission?

7    A.   Correct, we do.

8    Q.   And there were actually many issues in the press that you

9    were sensitive to from a sort of public relations perspective

10   in the fall of 2013, correct?

11   A.   We were aware of press coverage certainly.  Sensitive?  I

12   mean, it's our responsibility to do our job, so I don't know

13   that sensitivity played a part in our jobs, but we certainly

14   were aware of issues that were written about.

15   Q.   Okay.  And some of those issues were about whether the

16   Gaming Commission was giving equal treatment to various

17   applicants, correct?

18   A.   I believe there were articles that opined about that

19   subject.

20   Q.   Now, Ms. Cameron -- actually, let me ask this:  If you

21   recall, how many public meetings have you spoken at as a Gaming

22   Commission member?

23   A.   Uhm, have I spoken or have I attended?

24   Q.   Okay, let's say attended.

25   A.   I don't know the exact number of meetings we've had to

1    this date.  We have them every two weeks, and then sometimes

2    more often than that if there's a special issue or a hearing

3    that may occur that's a public meeting, so I think we're well

4    into over a hundred meetings.

5    Q.   And as you stated before, you're sensitive to the fact

6    that the cameras are rolling during those meetings, correct?

7    A.   I wouldn't say sensitive.  We are aware that they're

8    being -- the meetings are being recorded, yes.

9    Q.   But you want to look good to the public, correct?

10   A.   I've never thought about looking good.  I've never looked

11   at it that way.  I think about being attentive and listening

12   and making good decisions.

13   Q.   Okay.  Do you ever recall saying anything during one of

14   these televised public meetings or videotaped public meetings

15   that wasn't a hundred percent accurate?

16   A.   I'm sure I've said things that were not a hundred percent

17   accurate that maybe required a technical correction or the

18   facts weren't exactly correct, I'm sure.

19   Q.   Do you ever remember making any statements at any of these

20   meetings where you knew that it was going to give a misleading

21   impression to the public?

22   A.   No.

23   Q.   Do you ever recall any meetings where one of your fellow

24   Gaming Commissioners said something that you knew was going to

25   be giving a misleading impression to the public?

1  A.   I don't know that I'm specifically aware of a statement.

2  I know that there have been statements made by various

3  Commissioners in which there was a reaction that may not have

4  been intended.  I don't know that I knew in advance of what the

5  reaction would be.

6  Q.   Well, what I'm asking you is, as you were sitting there

7  listening to your fellow Gaming Commissioners, do you ever

8  recall a time when you were sitting in a meeting, one of these

9  public meetings, and one of your fellow Commissioners said

10  something that you knew to be misleading?

11  A.   I think we try to correct one another.  If I heard a

12  fellow Commissioner say something that wasn't clear to me what

13  the meaning was, I would ask that person to clarify and explain

14  what they meant.

15  Q.   What about if they made a statement that in your view was

16  going to give a misleading impression of the facts to the

17  public, would you have stepped in to correct them?

18  A.   It wouldn't have been about the public.  It would have

19  been about the statement and what was accurate.  So certainly

20  we don't want the public to be misled, nor do we want to

21  mislead one another, so I think we always make an attempt to

22  clarify if we're not sure about a statement that one of us

23  makes.

24  Q.   Do you recall a public meeting that took place on May 1,

25  2012?

1    A.    I would not recall a specific public meeting.  You have to

2    give me more details.

3    Q.    Does the name C. Stanley McGee ring a bell?

4    A.    It does.

5    Q.    And do you recall that the Gaming Commission was going to

6    hire him as its first interim Executive Director?

7    A.    I do.

8    Q.    And do you recall that that decision was addressed at a

9    public hearing?

10   A.    The decision probably announced at a public hearing.

11   Q.    And do you recall that that was May 1, 2012?

12   A.    I would not have recalled the date.

13          MR. KATZ:  May I approach, your Honor?

14          THE COURT:  Yes.

15          (Witness examining document.)

16   Q.    Ms. Cameron, does that refresh your recollection?

17   A.    It does, sir.

18   Q.    All right, so at the May 1, 2012 public meeting, you

19   discussed the hiring of C. Stanley McGee, correct?

20   A.    We did.

21   Q.    And do you recall that during the hearing, Chairman Crosby

22   said some words about C. Stanley McGee?

23   A.    That's correct.

24   Q.    And do you recall that he talked about what he said was an

25   elephant in the room with Stan?

```
1    A.    I just read a copy of that, so I -- I'm aware he said that
2    on that date.
3    Q.    And what you read, does it refresh your recollection that
4    Chairman Crosby said that --
5               MS. BARCLAY:  Objection, objection.
6               THE COURT:  Sustained.
7               MR. KATZ:  I'm not offering this for the truth, your
8    Honor.
9               THE COURT:  Overruled.  The original objection is
10   still sustained.
11   Q.    Ms. Cameron, did you look into C. Stanley McGee's
12   background in the process of the hiring process?
13   A.    He was going to be an interim -- it was going to be an
14   interim position.  We had not completed a background
15   investigation when Chairman Crosby made that announcement.
16   Q.    Ms. Cameron, at the time of this public meeting, were you
17   aware that C. Stanley McGee had been arrested in Florida on
18   allegations of child rape?
19   A.    I was made aware that morning.
20   Q.    You were made aware that morning?  And what steps did you
21   take after you were made aware of that that morning?
22   A.    I asked that we not proceed until we could complete an
23   investigation.
24   Q.    Was your recommendation followed?
25   A.    It was not.
```

1    Q.   And you made statements at that public meeting, correct,

2    about C. Stanley McGee?

3    A.   Uhm, I don't recall exactly what I said.  What I was

4    advised was that the matter had been completely investigated.

5    Q.   Who had advised you of that?

6    A.    It could have been -- I'm not sure.  I don't want to say

7    because I'm not sure.  I was advised that the matter had

8    completely been investigated.  When we found out that that was

9    not the case, we took steps as a Commission.  We put a policy

10   in place that there would be no hiring without a completed

11   background investigation.

12   Q.   Okay, do you recall that that morning you read a newspaper

13   article about the charges against C. Stanley McGee?

14            MS. BARCLAY:  Objection.

15            THE COURT:  Sustained.

16            MS. BARCLAY:  Ms. Cameron is just --

17            THE COURT:  Yes, I feel it's irrelevant to this.

18            MR. KATZ:  Can I offer her own statements, your Honor?

19            THE COURT:  No.

20            MR. KATZ:  May I approach, your Honor?

21            MS. BARCLAY:  Are you approaching the witness?

22            THE COURT:  You're approaching the witness?

23            MR. KATZ:  Well, I would like to address this with

24   your Honor.

25            THE COURT:  No.

1        MS. BARCLAY:  Your Honor, again, there's no question

2   where he needs to show her this now.  I'm not sure what the

3   procedure is.

4        MR. KATZ:  Your Honor, I'm going to impeach the

5   testimony she just gave in court, your Honor.

6        THE COURT:  You can show her something if you want to

7   refresh her memory.

8        (Witness examining document.)

9   Q.   Ms. Cameron, I asked you a few minutes ago whether you

10  ever recall saying something in a public meeting that wasn't a

11  hundred percent accurate, correct?

12  A.   You did sir, yes.

13  Q.   And I asked you whether you recall saying something in a

14  public meeting that, in your view, may be giving a misleading

15  impression to the public that was watching the hearing,

16  correct?

17  A.   You asked me that, that's correct.

18  Q.   And you said you did not recall ever doing such a thing,

19  correct?

20       MS. BARCLAY:  Objection.

21       THE COURT:  Sustained.

22  Q.   Ms. Cameron, at the May 1, 2012 hearing, it's correct,

23  isn't it, that you said that every document you had looked at

24  regarding the C. Stanley McGee matter showed you that there was

25  no merit behind the child rape allegation, correct?

1    A.   I just read my statement from then, and I had just

2    explained to you earlier that I had been made aware of that

3    issue that morning, that pending matter, that that had never

4    been disclosed before; and what we had access to look at were,

5    I believe, some kind of newspaper accounts of the matter.

6    Q.   Ms. Cameron, you don't recall receiving an e-mail on

7    April 29 regarding this matter, April 29, 2012, so two days

8    before?

9    A.   I don't recall that.  I believed it to be that morning.

10   Q.   But what you said during the hearing was that every

11   document that you had seen -- those were your words, correct?

12   A.   Yes.

13   Q.   And then you said there's no shred of evidence, correct?

14   But you had not talked to the police officer who arrested C.

15   Stanley McGee, correct?

16   A.   Very much correct.

17   Q.   That you had not read the police report, correct?

18   A.   Correct.

19   Q.   You had not read the civil lawsuit that had been filed in

20   Massachusetts against C. Stanley McGee, correct?

21   A.   Correct.

22   Q.   Okay.  Did you think it was misleading to the public to

23   say that every document that you had seen, that you had looked

24   at with regards to this matter, there's no shred of evidence to

25   support the allegations?

1   A.   At the time I did not think that was misleading, but I

2   certainly, as I just stated, thought that the process was

3   rushed.  We as a Commission made a mistake in rushing through

4   with that interim hire, and that a procedure was put in place

5   immediately at my suggestion that a full background

6   investigation -- and I wouldn't have been person to complete

7   that, but certainly members of the IEB would -- would be

8   completed before we hired any employee.

9   Q.   Okay, so you thought it was a mistake to go forward with

10  the hearing, correct?  You just testified to that.

11  A.   Well, I had just -- I had requested that we take some more

12  time.

13  Q.   Okay, and did you put that on the record in the public

14  hearing?  Did you say that during the public hearing, that you

15  thought you should take some more time before hiring him?

16  A.   I did not.

17  Q.   No.  In fact what you said was that you were very

18  sensitive from a law enforcement standpoint from evidence

19  versus an unsubstantiated allegation, correct?

20        MS. BARCLAY:  Objection.

21        THE COURT:  She can say whether that's what she said.

22  A.   I made the statement and I have just clarified to you,

23  sir, that I believe that the correct policy is to complete a

24  background investigation before we make any hires, even on an

25  interim basis.

1    Q.    Okay.  But you said --

2    A.    I understand what I said, sir, and the limited document

3    review I conducted was certainly not enough due diligence.

4    Q.    So you stated, though -- isn't it true, Ms. Cameron, that

5    you stated, "That does not enter into my decision at all in

6    moving with this individual.  In fact, we do the individual a

7    disservice if we took this into consideration"?  Is that what

8    you said?

9    A.    Yes.  And what I meant by that, sir, was denying a hire

10   without evidence would be doing him a disservice.  The fact

11   that we didn't complete that background investigation before

12   hiring certainly was a decision that we -- we changed our

13   policies.

14   Q.    Ms. Cameron, do you think that someone watching that

15   public hearing took away from your statement that you were

16   going to do additional background diligence on C. Stanley

17   McGee?

18            MS. BARCLAY:  Objection.

19            THE COURT:  Sustained.

20   Q.    Ms. Cameron, let me circle back to the Bufalino/Lightbody

21   tapes you testified about earlier.  After you had heard those

22   tapes, do you recall Chairman Crosby saying to Ms. Wells, "Run

23   it to ground, run the investigation to ground"?

24   A.    I -- I don't recall him saying that, no.

25   Q.    Do you recall having executive sessions where the

1    Commissioners were giving directions to Ms. Wells about

2    continuing the investigation?

3    A.    I know that there was a -- there wasn't direction.    There

4    was a consensus that this was a serious matter, and that we

5    were in agreement that IEB continue the investigation into this

6    matter.

7    Q.    Did you ever suggest to Ms. Wells that she should go out,

8    for example, to the Revere community to see if Charles

9    Lightbody is someone who has a reputation for telling tall

10   tales?

11              MS. BARCLAY:   Objection.

12              THE COURT:   If she recalls that, she can answer

13   whether she recalls.

14   A.    No recollection of that, sir.

15   Q.    Do you think it would have been important to assess

16   whether Charles Lightbody has a reputation for telling tall

17   tales?

18   A.    I wasn't part of the actual investigation, so I'm not

19   going to speak to their investigative measures.   I think that

20   they did a very thorough review of this matter.

21   Q.    Ms. Cameron, you're a former police officer, correct?

22   A.    Yes, sir.

23   Q.    Twenty-eight years of law enforcement experience, correct?

24   A.    Yes, sir.

25   Q.    And as a matter of investigative procedure, if you have a

1    way to determine whether one of the declarants has a reputation

2    for telling tall tales, wouldn't that be something you would

3    want to know as a law enforcement investigator?

4    A.   Not necessarily.  What's important here are the facts for

5    this particular item, this particular issue that came to light,

6    what are the facts surrounding that?  And that's what's

7    important when you're conducting an investigation.

8    Q.   And when you're assessing whether Mr. Lightbody and

9    Mr. Bufalino are telling a hundred percent the truth on their

10   prison tapes, you don't think it's an important fact to know

11   whether Mr. Lightbody has a reputation for telling tall tales?

12   A.   I think what's important is to take that information and

13   investigate it thoroughly and find out what's accurate and what

14   may not be accurate.

15   Q.   Well, in doing a thorough investigation, wouldn't that

16   include going out to his community and seeing if he has a

17   reputation as someone who tells tall tales?

18            MS. BARCLAY:  Objection.

19            THE COURT:  Overruled.

20   A.   I have never heard of, I'll be honest with you, going to a

21   neighborhood and inquiring about someone's tales, no.  I've

22   never heard of that as part of an investigation.

23   Q.   Really.  Okay, that's fair enough.

24            MR. KATZ:  If I could approach, your Honor, with the

25   transcript from Exhibit 4, the tape that we played, so the

1    witness can follow along?

2            THE COURT:  Yes.

3    Q.   So, Ms. Cameron, on that phone call that Ms. Barclay

4    played for you, one of the things that Mr. Bufalino told

5    Mr. Lightbody was that Steve Wynn had gotten kicked out of

6    New Jersey, and was that accurate?

7    A.   No, sir, it was not.

8    Q.   Was it accurate when he described you as -- that you were

9    the head -- that you ran New Jersey?  Was that accurate?

10   A.   Well, I had oversight at the end of my career, I had

11   oversight for statewide investigations, which do include all of

12   casino investigations.

13   Q.   Okay, fair enough.  And then Mr. Lightbody, he was talking

14   about someone saying something about the casino that they want

15   to put down in Springfield, one of the guys who owns the land

16   was involved with the Chinese Mafia, and they're looking into

17   that, "They're F'ing breaking their balls."  So was that an

18   accurate statement?

19   A.   Uhm, this matter was not brought to the attention of the

20   Commission.  Again, I think, you know, when information is

21   developed during an investigation, you follow up on it.  So I

22   have no knowledge that this was information that was developed

23   or what the follow-up was.  I know that we were not advised of

24   this.

25   Q.   Oh, right.  No, so that's my question.  You have no reason

1    to believe that Mr. Lightbody, that this is even accurate, that

2    a landowner in Springfield was involved with the Chinese Mafia?

3    There's no evidence of that, right?

4    A.    I have no evidence of that.

5    Q.    Okay.  Do you have any evidence of the Gaming Commission

6    F'ing breaking the landowner's balls in Springfield because of

7    Chinese Mafia associations?

8    A.    I have no evidence of that.

9    Q.    So you would agree that Mr. Lightbody was just making

10   something up right here?

11   A.    I can't speak to his thought process or what he was

12   referring to there.

13   Q.    Okay, fair enough.

14         MR. KATZ:  No further questions.

15         THE COURT:  Mr. Connolly?

16   CROSS-EXAMINATION BY MR. CONNOLLY:

17   Q.    Good afternoon, Ms. Cameron.  I'm Michael Connolly.  I

18   represent Anthony Gattineri.

19   A.    Good afternoon.

20   Q.    And I want to go to your testimony where you talked about

21   your background with organized crime.

22   A.    Yes, sir.

23   Q.    And the concerns that you had when you learned that a

24   person who was claiming to be involved in FBT was speaking on

25   the telephone to somebody who is associated with organized

1    crime.  Do you recall that?

2    A.    I do.

3    Q.    And that person who is associated with organized crime,

4    according to your testimony, is Darin Bufalino, correct?

5    A.    That's what I've been advised by our investigators.

6    Q.    Okay.  And you were concerned about that because of your

7    background, as you said, right?

8    A.    Well, I was very much concerned about the integrity of the

9    process.  And, of course, casino gaming has a reputation for

10   there being some organized crime affiliates, so certainly

11   learning about this did cause me concern, correct.

12   Q.    All right.  And so part of your concern was whether or not

13   these other individuals in FBT might have been covering up some

14   type of organized crime connection, correct?

15   A.    I didn't assume anything.  I just -- I just knew that the

16   matter warranted further investigation.

17   Q.    But was that a concern, though, of the IEB, whether or not

18   the members of FBT were hiding somebody with an organized crime

19   connection?

20   A.    I'm sure that they tracked down whether or not there was a

21   connection after listening to this information.

22   Q.    Do you know whether the IEB investigators asked

23   Mr. Gattineri when they interviewed him on July 10 of 2013

24   whether or not he was aware of Mr. Lightbody's relationship

25   with Darin Bufalino?

1   A.   I'm not aware of that.

2   Q.   Do you know if the IEB investigators on July 10 played the

3   tapes between Mr. Lightbody and Mr. Bufalino and said, "Hey,

4   Mr. Gattineri, are you familiar with the fact that Mr. Lightbody

5   is calling this guy Darin Bufalino"?

6   A.   I have no knowledge of the individual interviews.  I was

7   as a Commissioner presented with summary facts of the

8   investigation.

9   Q.   Okay, so as far as you know, all the information that was

10  brought to your attention, you're not aware of any evidence

11  that Mr. Gattineri has ever had any connection with organized

12  crime; is that correct?

13  A.   I have no knowledge, sir, of that.

14  Q.   And in fact you're not aware of whether Mr. Gattineri had

15  any idea on earth that Mr. Lightbody was speaking to

16  Mr. Bufalino outside of this case?

17  A.   Correct, no knowledge of that, sir.

18  Q.   And you're not aware of whether or not Mr. Gattineri has

19  any criminal record whatsoever; isn't that true?

20          MS. BARCLAY:  Objection.

21          THE COURT:  Overruled.  If she knows.

22  A.   I -- I have -- I have no knowledge of that.

23          MR. CONNOLLY:  Nothing further, your Honor.

24          THE COURT:  Mr. Rankin?

25          MR. RANKIN:  Thank you, your Honor.

1    CROSS-EXAMINATION BY MR. RANKIN:

2    Q.    Good afternoon, Ms. Cameron.

3    A.    Good afternoon, sir.

4    Q.    One of your duties as a Commissioner is to attend

5    hearings; is that right?

6    A.    That's correct.

7    Q.    And so in the process of the Wynn suitability process, the

8    Commission held more than one hearing; is that right?

9    A.    That's correct.

10   Q.    And there was a hearing devoted to the IEB's investigation

11   of FBT, correct?

12   A.    There was a hearing to talk about the land dealings and

13   what the proposed cure for that was and a separate hearing that

14   dealt with the overall suitability of the applicant.

15   Q.    So I want to focus on the hearing that concerned the land,

16   what the IEB had unearthed and what Wynn was proposing to solve

17   the problem.

18   A.    Yes, sir.

19   Q.    Do you recall that hearing?

20   A.    Yes, sir, I do.

21   Q.    You attended that hearing?

22   A.    I did, sir.

23   Q.    And Ms. Wells testified at that hearing?

24   A.    She did.

25   Q.    And she summarized the concerns that the IEB had

1  unearthed, correct?

2  A.    That's correct.

3  Q.    And then others testified at the hearing as well?

4  A.    Yes, that's correct.

5  Q.    And the Commission was presented with Wynn's proposal to

6  adjust the purchase price, transfer responsibility of the

7  environmental cost, et cetera?

8  A.    That's correct.

9  Q.    Now, during the portion of Ms. Wells's testimony -- she

10  was the head of the IEB, right?

11  A.    That's correct.

12  Q.    She had a lot of experience as a law enforcement and

13  attorney for law enforcement?

14  A.    Yes, that's correct.

15  Q.    And I think you said, during that time period, you were

16  the Commissioner who filled the slot for a person with a law

17  enforcement background, correct?

18  A.    That's correct.

19  Q.    And you had attended, I think, three executive sessions in

20  which Ms. Wells and others reported on their IEB investigation?

21  A.    I did, one telephonically and two in person.

22  Q.    And I'm correct, am I not, that during Ms. Wells's

23  testimony at that hearing, there was not one mention of

24  organized crime?

25  A.    Uhm, I would have to review her entire statement before

1    answering that question.  It was a lengthy review summary of

2    the facts.

3    Q.   If you don't mind reviewing that.

4    A.   I don't.

5            (Witness examining document.)

6    A.   Yes, she does mention criminal history and not organized

7    crime.

8    Q.   So Ms. Wells testified at some length at the hearing,

9    correct?

10   A.   She did.

11   Q.   And she mentioned Mr. Lightbody's criminal history?

12   A.   She does, sir.

13   Q.   But there was no mention at all of any organized crime

14   connection, correct?

15   A.   There was none in her testimony.

16   Q.   Now, the IEB completed a lengthy investigation with

17   respect to Wynn's application; is that right?

18   A.   They did, yes.

19   Q.   And they identified three issues that were appropriate for

20   the Commission's consideration, correct?  Let me help you with

21   that.  One being FBT, right?

22   A.   Yes.

23   Q.   One being Macau?

24   A.   Correct.

25   Q.   And another being a former owner of Wynn?

1    A.    Yes.  Yes, sir.

2    Q.    What was that person's name?

3    A.    Okada.

4    Q.    Okada.  Now, the Macau investigation did concern organized

5    crime; is that right?

6    A.    Well, again --

7    Q.    Can you answer my question without --

8    A.    Triads who are -- it's been explained --

9    Q.    Let me try it again.

10   A.    Okay.

11   Q.    It involved concerns that triads were involved in the

12   promoter system in the Macau casinos; is that fair?

13   A.    Yes, sir.

14   Q.    And you had information that the triads were Chinese

15   organized crime, a type of Chinese organized crime, right?

16   A.    Yes.  That's fair to say.

17   Q.    You had information that they had at times introduced

18   violence into the casino industry in Macau?

19   A.    There was a past history of that, yes, sir.

20   Q.    And there was a concern about present instances of

21   violence that had decreased but were still of concern?

22   A.    There was a concern about all of the business dealings,

23   and that's why the investigation transpired.

24   Q.    And there was concern that in Macau, promoters were

25   allowed to operate separate rooms in the casinos?

1    A.    When you say there was concern --

2    Q.    Did the IEB raise concerns for the Commission's

3    consideration about the promoters in Macau?

4    A.    They gave us a full briefing on their interviews with

5    promoters and their business dealings, yes.

6    Q.    And one of the concerns or issues was that the promoters

7    or junket operators extended credit to gamblers; is that

8    correct?

9    A.    That's correct.

10   Q.    And that Wynn had no control over that, correct?

11   A.    The investigation looked into those matters, yes.

12   Q.    And of concern was that Wynn didn't have any control over

13   that.  Was that an issue that the IEB looked at?

14   A.    I get back to the totality.  They looked at every single

15   issue around -- they looked at credit, yes, and how business is

16   done.

17   Q.    Extensions of credit?

18   A.    Correct.

19   Q.    And collections of credit, right?

20   A.    Correct.

21   Q.    They were concerned that the promoters might be using

22   strong-arm tactics to collect on extensions of credit in China?

23   A.    That's your statement, sir.  I didn't read language like

24   that in the report.  They looked at the --

25   Q.    What do you remember about the collection of credit in the

1  report?

2  A.   That it's not a common practice in China to -- for those

3  matters to be collected.  In other words, it's not something --

4  it's a totally different way of doing business, so it was --

5  Q.   In fact, there's not a process to legally collect on

6  credit debt; is that right?

7  A.   That's correct.

8  Q.   And so the concern that the Commission had was these

9  promoters that were affiliated with Wynn using unlawful methods

10  to collect on credit?  That was the issue, right?

11  A.   All of the business practices were at issue.

12  Q.   Well, that was one of the business practices --

13  A.   That's one of the things that they looked at was what the

14  business practices were, what the evidence stated about the way

15  Wynn did business in Macau.

16  Q.   And one of those issues was whether the promoters were

17  using unlawful ways of collecting debt from the gamblers?

18  A.   I think they did a thorough investigation of all of the

19  promoters and how they did business.

20  Q.   Let me try to ask you a yes or no question, okay?  Was one

21  of the issues that the IEB highlighted for the Commission a

22  concern about whether the promoters were using unlawful means

23  to collect debt from gamblers?

24  A.   Yes, along with many other things, yes.

25  Q.   Okay.  So one of the issues was the collection of debt,

1    correct?

2    A.    One of the issues investigated, yes.

3    Q.    All right.  Now, do you recall that the IEB reported to

4    the Commission about an interview with one of the promoters

5    that talked about a big boss?  Do you remember that?

6    A.    I do, yes.

7    Q.    And do you remember that an IEB investigator took part in

8    that investigation?

9    A.    Correct.

10   Q.    And the IEB investigator asked Wynn -- well, let me back

11   up.  What the person that was being interviewed said

12   essentially is -- she was asked about a person that was thought

13   to be a triad leader, correct?

14   A.    I would have to review that interview to know the

15   specifics.  I am aware that one promoter made statements that

16   caused concern and needed to be clarified.

17   Q.    And the concern was that she was asked about a person that

18   was thought to be a triad person, and she described him as the

19   "big boss"?

20   A.    That term was used, yes.

21   Q.    And the IEB asked Wynn if they were going to follow that

22   up, correct?

23   A.    They did, yes.

24   Q.    And Wynn said, "No, we're not going to follow that up"?

25   A.    Well, it wasn't that simple, sir.  It was a cultural issue

1  that was explained, and how that they knew exactly who the

2  promoters and who they did business with, so it was much

3  more -- it was a much longer answer than, no, they were not

4  going to follow that up.

5  Q.    Who is Mr. Stern?

6  A.    Mr. Stern is their corporate vice president in charge of

7  security investigations, former FBI agent for Wynn.

8  Q.    And he sent an e-mail to the investigators about the

9  "big boss" interview?

10 A.    I believe that he did.  I'd have to look at that e-mail as

11 well.

12 Q.    And he said the term "big boss" could have multiple

13 meanings, correct?

14 A.    He had -- he had great experience in the Asian culture,

15 Asian organized crime, so he was -- he was explaining his --

16 his understanding of the culture and what those things could

17 mean, yes.

18 Q.    And he said that prior investigations suggest that that

19 person may somehow be affiliated with this junket, but it

20 hasn't been substantiated, even though the person interviewed

21 said he was the big boss, correct?

22 A.    Mr. Stern did advise that information had not been

23 substantiated.

24 Q.    And did Mr. Stern say, "Well, we're going to get right on

25 this and investigate it"?

1    A.    He did not.

2    Q.    And Wynn continued doing business with that promoter?

3    A.    They did for a time, that's correct.

4    Q.    And the Commission voted that Wynn was suitable and that

5    its processes of monitoring the promoters was adequate?

6    A.    We did, but we looked at much more information to make

7    that determination, sir.

8    Q.    But one of the things you looked at and left as we've just

9    described it was the "big boss" question, correct?

10   A.    And the fact that there was no substantiated information

11   around that, yes, sir, that was part of the investigation.

12   Q.    Just the promoter who was interviewed, that wasn't

13   substantiated?

14   A.    The fact that they had said that or the fact that they --

15   Q.    Yes.  Wynn gets information in front of you, or your

16   investigator, from an employee from the promoter, and Wynn

17   says, "It's not substantiated.  We're not going to do anything

18   with it"?

19   A.    Well, Wynn also explained that they had much more

20   knowledge about the situation, and they thought they clearly

21   understood who was in charge and who the players were.  So they

22   provided kind of a lengthy -- there's more information that

23   they provided than just they weren't going to look into it.

24   Q.    Wynn's basic response was, "We're not doing anything

25   further unless we are asked to do so by some law enforcement

1   agency," is that fair?

2   A.   I -- I don't think there was any mention of being asked by

3   a law enforcement agency.

4   Q.   "We received no request for action regarding this junket

5   from either regulators or other law enforcement agency."  Does

6   that sound like Wynn's response?

7   A.   If you're reading from some document, sir.  Certainly that

8   was a long investigation.

9        (Witness examining document.)

10  Q.   So is it correct that Wynn's response to the "big boss"

11  issue is that "We've received no request for action regarding

12  this junket from either regulators or other law enforcement

13  agency"?

14  A.   Before that statement, it says that they provide all of

15  that information to the appropriate law enforcement agencies,

16  and then if someone would like them to follow up, they would do

17  that.  But I think what they're saying is, initially we provide

18  everything we come up with to the appropriate law enforcement

19  agencies, whether that be in China or regulators here, and --

20  Q.   And is that sufficient for the Massachusetts Gaming

21  Commission?

22  A.   In totality of this entire investigation, all the due

23  diligence that was done with all of the promoters, the

24  information was sufficient to be suitable, yes.  We believe

25  that --

1    Q.   Well, let me ask you specifically.  Wynn is a licensee

2    now, right?

3    A.   Correct.

4    Q.   So if they become aware of a Chinese organized crime

5    figure promoting junkets to the Wynn casino in Las Vegas, is it

6    sufficient for your purposes and the Massachusetts Gaming

7    Commission that they merely turn that information over to a

8    regulatory or law enforcement agency, or would you expect Wynn

9    to take some action on their own to show that they are a good

10   corporate citizen?

11   A.   I would look at the facts or IEB would look at the facts.

12   And IEB had followed up with a number of issues to date.  They

13   self-report, and there is further conversation, further action

14   taken in many instances.

15   Q.   So you don't expect a licensee to take action on its own?

16   A.   In some cases we do, depending on a fact-specific

17   information.

18        MR. RANKIN:  Thank you, your Honor.  No further

19   questions.

20        THE COURT:  Will there be redirect?

21        MS. BARCLAY:  There will be.

22        THE COURT:  All right, we're going to take the lunch

23   recess at this point for one hour.  We'll be back at 2:00

24   o'clock.  See you back here at that time.

25        THE CLERK:  All rise for the jury.

```
 1              (Jury excused.)

 2              THE COURT:  You may step down, Ms. Cameron.

 3              THE WITNESS:  Thank you, sir.

 4              THE COURT:  Please be seated, Counsel.  Am I correct

 5    that this is the day you need to leave early, Mr. Rankin?

 6              MR. RANKIN:  Yes, your Honor, if we could break at

 7    3:00 o'clock, that would --

 8              THE COURT:  We will break at 3:00 o'clock.  What will

 9    the length of the redirect be, approximately?

10              MS. BARCLAY:  Five minutes.

11              THE COURT:  All right, and then the next witness will

12    be Mr. Simms?

13              MR. MERRITT:  Paul Simms, yes, your Honor.

14              THE COURT:  All right, and we will not complete his

15    testimony today, I take it?

16              MR. MERRITT:  We have about a half an hour on direct.

17              THE COURT:  All right.  Anything else that needs to

18    come to my attention before we recess?

19              MS. BARCLAY:  No, your Honor.

20              THE COURT:  We're in recess.

21              THE CLERK:  All rise.

22              (Noon Recess, 1:02 p.m.)

23              (Resumes, 2:03 p.m.)

24              (The jury is present for the following)

25              THE COURT:  Good afternoon, Jurors.  We're ready to
```

1    resume.

2           Ms. Cameron will retake the witness stand, please.

3           Good afternoon, Ms. Cameron.  You're reminded that you

4    remain under oath.  Please be seated.

5           THE WITNESS: Yes, Your Honor.

6           THE COURT:  And Ms. Barclay may conduct redirect

7    examination.

8           MS. BARCLAY:  Thank you, Your Honor.

9           **REDIRECT EXAMINATION BY MS. BARCLAY**

10   Q.   Good afternoon, Ms. Cameron.

11   A.   Good afternoon.

12   Q.   Ms. Cameron, you were asked on cross-examination a number

13   of questions about the jail calls between Bufalino and

14   Lightbody; do you remember that?

15   A.   I do.

16   Q.   The jail calls weren't the only evidence -- let me ask you

17   this way:  Were the jail calls the only evidence that the IEB

18   gathered during their investigation in to FBT?

19   A.   No, it was not.

20   Q.   Okay.  Was that at the start of the investigation, at end

21   of the investigation?  How did it work?

22   A.   I believe the calls may have been which caused them to

23   look deeper in to the transactions around the land and the

24   alleged hidden ownership, but there were also documents,

25   allegedly forged documents, that were of great concern to the

1    IEB as well.

2    Q.   And did the IEB also conduct interviews?

3    A.   They did, interviews in which some of the individuals

4    chose not to testify.

5              MR. KATZ:  Objection.

6              MR. RANKIN:  Objection.

7              MR. KATZ:  Objection, you're your Honor.

8              Move to strike.

9              MR. RANKIN:  Can we be seen at sidebar, please, Your

10   Honor?

11             THE COURT:  No.  That is stricken.

12   Q.   Ms. Cameron, you were asked some questions about a report

13   that the IEB prepared on the MGM suitability issues.

14   A.   Yes.

15   Q.   Did they also prepare a report for the Gaming Commission

16   on the Wynn suitability?

17   A.   They did, yes.

18   Q.   And did -- the FBT issue, was that covered in that report?

19   A.   Yes, it was.

20   Q.   And was it a significant part of that report?

21   A.   It was a significant part of that report, yes.

22   Q.   And was there a separate hearing on that issue?

23   A.   There was.

24   Q.   Okay.  I think you were asked about -- you read through

25   Karen Wells's testimony before the Gaming Commission, and you

1    were asked if there was any mention of organized crime; do you

2    remember that?  I think Mr. Rankin asked you that.

3    A.    He did, yes.

4    Q.    Do you remember if her report mentioned organized crime?

5    A.    I believe it did.  I believe it was a more comprehensive

6    report than just the testimony earlier in the hearing.

7    Q.    And that's a report that went to the Commissioners?

8    A.    It is.

9    Q.    And something you took in to consideration when making

10   decisions?

11   A.    It was, yes.

12   Q.    You were asked also a number of questions, specific

13   questions about specific sections of gaming law, Chapter 23(k);

14   do you remember those questions?

15   A.    I do.

16   Q.    And you were asked -- I think you were asked whether

17   anything in it specifically prohibits a convicted felon from

18   selling their land to a casino developer; do you remember that?

19   A.    I do remember that, yes.

20   Q.    Is there anything in the statute that specifically

21   prohibits an organized crime associate from selling their land

22   --

23            MR. KATZ:  Objection.

24   Q.    -- for purposes of a casino?

25            THE COURT:  Overruled.

1   A.   The statute speaks to the kinds of -- the kinds of

2   activities and -- I can't speak to a particular section, but I

3   always --

4        MR. RANKIN:  Well, I object, Your Honor.

5        THE COURT:  Yeah.

6        MR. RANKIN:  She's answered the question.

7        THE COURT:  I think that's correct.  Ask another

8   question.

9        MS. BARCLAY:  Sure.

10  Q.   When Mr. Katz was showing you Section 2 of the statute,

11  you kept saying, "But Section 1" --

12  A.   Yes, correct.

13  Q.   Okay.  So, would you like to take a -- could you tell the

14  jury what Section 1 is, please?

15  A.   I would.  Section 1 is certainly the beginning and speaks

16  to the top priority for the legislation, which is public

17  confidence in the integrity of the licensing process, and I did

18  refer to that earlier, and that's the piece that I believe is

19  most relevant to these issues.

20  Q.   Does the statute also provide that, if the IEB, during its

21  investigation, determines that an applicant has not overcome --

22        MR. KATZ:  Objection.  Leading.

23        THE COURT:  Sustained.

24  Q.   Does the statute have anything in it about an application

25  or an applicant and their behavior being injurious to the

1    Commonwealth?

2    A.    I don't know the exact language, but yes, there is

3    language to that effect in the -- in that portion, yes.

4    Q.    And so, if Wynn, or an applicant, doesn't overcome an

5    issue that the Commission provides to it, does the statute --

6              MR. KATZ:    Objection.    Leading.

7    Q.    Does the statute give the Commission the authority to deny

8    an application?

9    A.    We have broad authority on both suitability and licensing,

10   yes.

11   Q.    And in fact is a casino license a right?    Does a casino

12   operator have a right to a license?

13   A.    Absolutely not.    It's a privilege, and it's not something

14   we have to issue in any one particular region if we don't think

15   it's in the best interests of the Commonwealth.

16   Q.    You were asked a number of questions about other

17   suitability investigations, including the MGM -- with regard to

18   the MGM, the Terry Christiansen matter; do you remember being

19   asked questions about that?

20   A.    I do, yes.

21   Q.    Do you remember when that issue, the Christiansen issue,

22   was resolved by MGM?

23   A.    I know in '08, there were partial resolutions and new

24   procedures put in place.    By the time we looked at this matter,

25   the information was dated and that they had in fact, as a

1   company, had stricter compliance and regulations around this

2   matter.

3   Q.   So, by the time they applied, it was over?

4   A.   Yes, correct, other than, as we do with every applicant,

5   how did they deal with an issue was an important piece.

6   Q.   Again, you were asked about other suitability

7   investigations, a number of questions about those.

8        The one connected to Wynn, the suitability investigation

9   conducted by the IEB with regard to Wynn, were you satisfied

10  with the thoroughness of that investigation?

11            MR. KATZ:  Objection.  Relevance.

12            THE COURT:  Overruled.

13  A.   I was satisfied with the -- I thought it was an extremely

14  thorough report.

15  Q.   And did you accept the IEB's findings that nobody at Wynn

16  knew about Lightbody's interest?

17            MR. KATZ:  Objection.  Hearsay.

18            THE COURT:  Overruled.

19  A.   I -- that was of great concern to me, a really important

20  factor, and I actually asked Director Wells to reach out to --

21  knowing that, since the time we turned it over to other law

22  enforcement agencies, some time had passed and investigations

23  were continuing, I asked Director Wells to reach out to those

24  agencies, State and Federal, to find out if anything more had

25  been developed that would lead us to think that Wynn had

1    knowledge of hidden interests.

2         And I was advised that there was no information that was

3    developed.  Our IEB did not develop information, nor did

4    another law enforcement agency investigating develop

5    information that Wynn had previous knowledge of those hidden --

6    alleged hidden ownership piece.

7    Q.   And did you believe, as a Commissioner, that the Gaming

8    Commission was fair and impartial when dealing with the Wynn

9    suitability decision?

10             MR. KATZ:  Objection.

11             THE COURT:  Overruled.

12   A.   I do believe we were fair and impartial in dealing with

13   that matter.

14             MS. BARCLAY:  No further questions.

15             THE COURT:  Recross, Mr. Katz.

16             MR. KATZ:  A couple of questions, Your Honor.

17             **RECROSS-EXAMINATION BY MR. KATZ**

18   Q.   Ms. Cameron, do you know who Steve Tocco is?

19   A.   I do.

20   Q.   He's the President of ML Strategies; is that correct?

21   A.   I know he's with ML Strategies.  If his title is

22   President, then I -- then yes.  I know he's affiliated with ML

23   Strategies and a consultant to the Wynn team.

24   Q.   Okay.  Have you read any transcripts from IEB

25   investigation interviews that he gave?

 1    A.   I may very well have.  It wasn't recently.  I may have

 2    read transcripts.  They may have provided that as part of their

 3    investigative material.

 4    Q.   But you're not sure?

 5    A.   I am not sure.

 6    Q.   Ms. Cameron, have you ever met Dustin DeNunzio in your

 7    entire life?

 8    A.   I have not.

 9    Q.   Have you ever spoken to him in your entire life?

10    A.   Not to my --

11    Q.   How about Anthony Gattineri?  Ever met him?

12    A.   Not to my knowledge have I spoken to either of these two

13    Defendants.

14    Q.   What about Lightbody?  Ever spoken with him?

15    A.   I have not.

16              MR. KATZ:  No further questions.

17              THE WITNESS:  Thank you.

18              THE COURT:  Mr. Connolly.

19              MR. CONNOLLY:  Yes, Your Honor.

20              **RECROSS EXAMINATION BY MR. CONNOLLY**

21    Q.   Ms. Cameron, when Ms. Barclay said to you that there was

22    more to this investigation than just the tapes, you said,

23    "Yeah, there was the allegedly forged documents"?

24    A.   I did say that, yes.

25    Q.   So, are you suggesting that somebody's signature was

1   forged on to a document?

2   A.   Dates, to the best of my knowledge.

3   Q.   So, you're referring to the fact that the promissory note

4   and memorandum of transfer, the first versions of which were

5   dated December 14, 2012, there were subsequent versions created

6   that were re-dated to August 15, 2012; correct?

7   A.   That's what I'm referring to.

8   Q.   And you're aware of the fact that, that re-dating of the

9   documents was done after Mr. DeNunzio consulted with Attorney

10  Paul Feldman about whether or not he should do that?

11           MS. BARCLAY:   Objection.   That's not the entire

12  conversation.

13           THE COURT:   Yeah.   Sustained.

14  Q.   Do you know whether Mr. DeNunzio had that second set of

15  documents done after he consulted with an attorney from a

16  prominent law firm in Boston?

17  A.   I don't know that.

18  Q.   You don't know if that was part of the IEB investigation

19  in this case?

20  A.   I have a vague knowledge.   I am not privy to all of their

21  investigative interviews, nor am I -- I'm receiving a summary.

22  Q.   Are you aware of the fact that, when Mr. Gattineri was

23  interviewed on July 10 of 2013, that he told your investigators

24  exactly where to find those documents?

25  A.   I'm not aware of that.   I did not read those interviews.

1   Q.   And that that's exactly where they found them, in a

2   lawyer's office?

3   A.   No, I'm not aware of that.

4   Q.   Are you aware that the signatures on those documents in

5   the name of Mr. Gattineri are in fact his signatures?

6   A.   I have no knowledge of handwriting exemplaries, so I -- I

7   did not hear any information to the contrary.

8   Q.   Well, you just testified in this courtroom that you were

9   made aware of evidence of forgery.  What forgery are you

10  talking about?

11  A.   I'm talking about alleged documents, which were produced,

12  and then the dates were changed.  That's what I'm talking

13  about.

14  Q.   The dates that were changed after Mr. DeNunzio spoke to an

15  attorney; correct?

16       MS. BARCLAY:  Objection.

17  A.   I would have no knowledge of that.

18            THE COURT:  Sustained.

19            MR. CONNOLLY:  Nothing further.

20            THE COURT:  Mr. Rankin.

21            MR. RANKIN:  No questions, Your Honor.

22            THE COURT:  Thank you, Ms. Cameron.  You may step

23  down.

24            THE WITNESS:  Thank you, Your Honor.

25            MR. MERRITT:  The Government calls Paul Simms.

1          (The Witness Was Sworn)

2          THE CLERK:  Thank you.  You may be seated.

3          And would you please state your name for the record,

4    spelling your last.

5          THE WITNESS:  Paul Simms, S-i-m-m-s.

6          **DIRECT EXAMINATION BY MR. MERRITT**

7    Q.   Mr. Simms, could you tell us what town you live in?

8    A.   Hampton, New Hampshire.

9    Q.   And are you currently employed?

10   A.   Yes, I am.

11   Q.   Where do you work?

12   A.   First Ipswich Bank in Ipswich, Mass.

13   Q.   And what do you do at the Bank?

14   A.   I'm a Senior Vice-President in charge of commercial

15   lending.

16   Q.   And how long have you worked for First Ipswich?

17   A.   Nearly four years.

18   Q.   And have you always been in that position?

19   A.   I've been in commercial lending all that time, yes.

20   Q.   Did you work somewhere before First Ipswich?

21   A.   Several places.

22   Q.   Can you just give us a quick rundown on where you worked?

23   A.   Essex Bank from 1979 through 1990; Beverly National Bank

24   from '90 through '97; I was out of banking for a short time,

25   came back, worked at Northern Bank & Trust from 2003 until

1  2005; Stoneham Savings Bank from 2005 until 2010; Northeast

2  Community Bank from July of 2011 to March of 2012; First

3  Ipswich Bank from April, 2012, to present.

4  Q.   Do you know Charles Lightbody?

5  A.   Yes, I do.

6  Q.   And do you recall when you first met him?

7  A.   I would say back either -- late 2011.

8  Q.   And were you at the --

9  A.   Northeast Community Bank.

10  Q.   -- Northeast Community Bank at that time?

11  A.   Right.

12  Q.   And did you meet him in the context of a potential loan?

13  A.   Yes, I did.

14  Q.   Do you know a Jamy Russo?

15  A.   Yes, I do.

16  Q.   And how do you know him?

17  A.   Jamy was a customer of mine at Stoneham Savings Bank

18  previously.

19  Q.   And did you know him to be a business partner with

20  Mr. Lightbody on some projects?

21  A.   Yes.

22  Q.   In fact did Mr. Russo introduce Mr. Lightbody to you; do

23  you recall?

24  A.   He may have.

25  Q.   Now, did Mr. Lightbody apply for loans at the Northeast

1  Community Bank?

2  A.   Yes, he did.

3  Q.   You don't have to go in to all the details, but were there

4  more than one?

5  A.   There were two.  There was one for roughly    1.25

6  million and another for about 350,000.

7  Q.   And were those secured loans by properties?

8  A.   Secured by real estate, yes.

9  Q.   And the loans closed?

10  A.   Yes, they did.

11  Q.   Now, when you went to First Ipswich, did you recruit him

12  as a customer?

13  A.   I'm not sure recruit is the best word, but we did speak,

14  and I ultimately entertained some loan requests, yes.

15  Q.   And did he -- so, he called you about a loan?  Do you

16  remember when that was, approximately?

17  A.   Probably sometime in the fall of 2012, I'm guessing.

18  Q.   And what was he looking to do?

19  A.   There were two separate properties that he was looking to

20  refinance.  I don't remember the particulars.  I remember one

21  was Argyle Road in Winthrop, which housed his business; and

22  there was another one, and I don't remember the address.

23  Q.   And do you remember the approximate amounts of the loans?

24  A.   I think they were both 300,000.

25  Q.   And did he come in and meet with you about that?

1   A.   Yes, he did.

2   Q.   And did he provide you a personal financial statement?

3   A.   Yes, he did.

4   Q.   Now, I've put in front of you a folder that's marked

5   Exhibit 59.

6   A.   Okay.

7   Q.   Do you recognize that as a personal financial statement

8   given to you by Mr. Lightbody?

9   A.   Yes, it is.

10          MR. MERRITT:   Your Honor, I'd move in Exhibit 59.

11          THE COURT:   It will be admitted.

12          (Exhibit No. 59 was admitted in full)

13          MR. MERRITT:   And may we have it on the --

14   Q.   Now, you can either look at the document or the screen

15   next to you there, Mr. Simms.

16   A.   Oh, okay.

17   Q.   Just to get a little bit closer, this is the personal

18   financial statement?

19   A.   Correct.

20   Q.   And the date -- can you tell us what the date is,

21   Mr. Simms?

22   A.   The date is September 24th of 2012.

23   Q.   All right.   And in this particular Exhibit, if I can go to

24   the next page, the second page of the Exhibit, there's a

25   section -- I'm trying to blow it up here -- "Personal or

```
 1   investment real estate;" do you see that on the second page?
 2   A.   Yes, I do.
 3   Q.   All right.  And Mr. Lightbody lists just -- there's no
 4   address there, but there is one particular item listed; do you
 5   see that?
 6   A.   Yes, I do.
 7   Q.   And the title's in the name of Charles Lightbody?
 8   A.   Correct.
 9   Q.   Now, based on your conversations with him and such, did
10   you believe that he had more properties that he also might have
11   had an interest in?
12   A.   Well, I knew he had other properties that were under
13   different entities because I had some of those back at the
14   other bank.
15   Q.   And did you ask him to give a list of those other
16   properties that he had some kind of ownership interest in?
17   A.   Yes, I did.
18   Q.   And did he provide you with a list?
19   A.   Yes, he did.
20   Q.   And in what form was that?
21   A.   He had a handwritten list where he listed all the
22   properties with mortgages that they might have had, payment
23   structure, probably who financed them.
24   Q.   And did you do something with the handwritten list?
25   A.   I put it in to an Excel spreadsheet so I could read it and
```

1    format it better.

2    Q.   All right.  Now, I'd ask you to look at what's marked as

3    Exhibit 60 in the next envelope.

4    A.   That's what I made.

5    Q.   That's an Excel spreadsheet?

6    A.   That's correct.

7    Q.   And is that what you made from the handwritten list

8    Mr. Lightbody provided you?

9    A.   Yes, it is.

10            MR. MERRITT:  Your Honor, I move in Exhibit 60.

11            THE COURT:  It will be admitted.

12            (Exhibit No. 60 was admitted in full)

13            MR. MERRITT:  Would you put in, Ms. Barclay, 60.

14   Q.   And this is a spreadsheet that you created, you said?

15   A.   Yes, it is.

16   Q.   All right.  If I can just try to blow up, I guess, one of

17   these properties down here, do you see one that's listed as 90

18   Alford Street in Everett, Mass.?

19   A.   Yes, I do.

20   Q.   And what was the percentage of interest that he told you

21   he had?

22   A.   13.5 percent.

23   Q.   And the next column is the -- well, you tell me.  What's

24   the next column?

25   A.   The next column is the cost of the property.

1    Q.   All right.  And that was 1.5 million?

2    A.   1.5 million.

3    Q.   Now, is that -- did you understand that to be his interest

4    or the entire property?

5    A.   I -- I figured it was the entire property, but I wasn't

6    really sure.

7    Q.   All right.  And then you have a fair market value?

8    A.   I have a fair market value that indicates "to be

9    determined," and I think that was based on his discussion with

10   me that they really didn't know what the value was.

11   Q.   All right.  But then, in the next column, you have, I

12   think, "CAL," C-A-L, Jr., portion"?  Am I reading that right?

13   A.   Yeah.  And the way I would read this, this would be his

14   portion, which would mean that the cost would be what he

15   invested.

16   Q.   All right.  And his portion was $1.5 million?

17   A.   1.5 million.

18   Q.   Now, this particular property, did Mr. Lightbody tell you

19   the names of any of his partners in the Everett property?

20   A.   I think he had disclosed to me that          Dustin

21   DeNunzio was a partner, mentioned that he had other partners.

22   I don't recall hearing who they were.

23   Q.   And did you eventually meet Dustin DeNunzio?

24   A.   Yes, I did.

25   Q.   And did Mr. Lightbody basically introduce you to him?

1    A.    Yes, he did.

2    Q.    All right.  Let me bring up or ask you to look at

3    Exhibit 61, if I could.

4         That's an e-mail; is that right?

5    A.    That is correct.

6              MR. MERRITT:  Your Honor, I'd move in Government

7    Exhibit 61.

8              THE COURT:  The date of the e-mail is --

9              MR. MERRITT:  October 12th, 2012.

10             THE COURT:  It will be admitted.

11             (Exhibit No. 61 was admitted in full)

12   Q.    I'm just going to focus on the top part of the e-mail.

13   This is, as I said, October 12th, 2012, and that's to you from

14   Mr. DeNunzio?

15   A.    That's correct.

16   Q.    And a blind CC to Lightbody?

17   A.    Correct.

18   Q.    Do you recognize his e-mail address?

19   A.    Yes, I do.

20   Q.    If you could just read the second paragraph?

21   A.    "As you may know from Charlie Lightbody, I work with him

22   and many various partners on real estate projects in

23   Massachusetts, Illinois, and Florida.  He passed along your

24   information and asked that I follow up with you directly

25   regarding a permitted 40B project that the Bank currently has

1    ownership of."

2    Q.   And did you end up doing some business with Mr. DeNunzio?

3    A.   Yes, I did.

4    Q.   And what -- I don't need to go in to details, but was that

5    a different property altogether?

6    A.   Yeah.  I had a parcel of land in Norton, Mass., that was

7    an approved 40B project.  The Bank had bought it back at a

8    foreclosure and was trying to liquidate that property.

9        Because of the 40B nature associated with the project, he

10   was interested in buying that, and we ultimately struck up a

11   deal and sold the property to him.

12   Q.   Now, do you recall having a conversation with

13   Mr. Lightbody about the potential sale of the Everett property

14   for a casino?

15   A.   Well, he had talked at different times about they were

16   working on some sort of a deal that would bring a casino in

17   there.  I'm not sure about specifics of selling it and so

18   forth.

19   Q.   And do you remember when it was that he told you about

20   that?

21   A.   I would think in the fall of 2012.

22   Q.   Well, Mr. Simms, did you testify in the Grand Jury on

23   October 2nd, 2013?

24   A.   Yes, I did.

25   Q.   And did you tell the Grand Jury that he provided you -- on

1   Page 19 -- information about selling the property to Wynn

2   around the end of December?

3   A.   I recall that.

4   Q.   All right.  And is that when he told you about selling the

5   property to Wynn?

6   A.   I would assume so based on the date that you're telling

7   me, yes.

8   Q.   Now, let me ask you to look at Exhibit 63.  Do you

9   recognize that?

10  A.   Yes, I do.

11       MR. MERRITT:  And if there's no objection --

12  Q.   That's an e-mail dated January 4th, 2013?

13  A.   That is correct.

14       MR. MERRITT:  I'd move in Exhibit 63, Your Honor.

15       THE COURT:  It will be admitted.

16       (Exhibit No. 63 was admitted in full)

17  Q.   Now, if I can just look at the top part, this is an e-mail

18  from you to Mr. DeNunzio?

19  A.   That is correct.

20  Q.   And it's dated January 4th, 2013?

21  A.   Uh-huh (affirmative).

22  Q.   And what do you say to Mr. DeNunzio?

23  A.   I said, "Good afternoon, Dustin.  Happy New Year.  Charlie

24  mentioned that Wynn is moving ahead with your Everett deal.

25  Congratulations."

1   Q.   Now, by the time that you sent this e-mail to

2   Mr. DeNunzio, had Charlie Lightbody told you about the deal,

3   potential deal, with the Wynn casino?

4   A.   He had mentioned it before, that they were working back

5   and forth, no particulars, just said that there was stuff

6   happening in that respect.

7   Q.   All right.   Now, you later recorded that kind of -- what

8   he told you in to a Loan Offering Sheet; is that right?

9   A.   Correct.

10   Q.   Could you first tell us what the approval process is for a

11   loan at First Ipswich Bank?

12   A.   Well, the approval process would be, once I gathered all

13   of my information from the borrower with respect to particulars

14   on the property, the financial information, the personal

15   financial statement that you saw earlier, I go through an

16   evaluation process where I look at the loan-to-value of the

17   property, look at the cash flow particulars and put together a

18   write-up that indicates the favorability of doing the loan and

19   bring it either to a committee setting for a vote or to the

20   President of the Bank up to a certain level.   So, I had

21   performed all of that and put it in to a written analysis

22   format for approval.

23   Q.   Okay.   And did you do -- follow that process for the two

24   loans that Mr. Lightbody was seeking at your Bank?

25   A.   Yeah, I believe I did them both in the same write-up.

1   Q.   And was the information about the sale of the Everett

2   property to Wynn something that you recorded in the Loan

3   Offering Sheet?

4   A.   I made a comment to the effect that he had an interest in

5   that property and he was doing something with it, yes.

6   Q.   All right.  Could you look at Exhibit 64 that's in front

7   of you.

8   A.   Okay.

9   Q.   Okay.  Can you just identify what Exhibit 64 is?

10  A.   Exhibit 64 is the Loan Offering Sheet, the analysis that I

11  mentioned that I write up.

12          MR. MERRITT:  Your Honor, I move in Exhibit 64.

13          THE COURT:  It will be admitted.

14          (Exhibit No. 64 was admitted in full)

15  Q.   All right.  And I might as well ask you to look at

16  Exhibit 65 at the same time for a second.

17          Is that -- can you just tell us what that is?

18  A.   That's the same document for the second loan.

19          MR. MERRITT:  All right.  I move in Exhibit 65.

20          THE COURT:  It will be admitted too.

21          (Exhibit No. 65 was admitted in full)

22  Q.   Now, going back to Exhibit 64, what is the date of the

23  Loan Offering Sheet?

24  A.   January 11th, 2013.

25  Q.   All right.  And there were -- there was more than one

1   borrower, potential borrower, for this loan?

2   A.   There was -- I have -- you want me just to stick to 64 for

3   a second?

4   Q.   Yes, if you could.

5   A.   Okay.  I have it listed down as            Charles A.

6   Lightbody, Jr., or nominee LLC in the   event that he chose to

7   take it under a different name. And I also have the principals

8   being Charlie and his brothers John and David.

9   Q.   And when you say principals, what does that mean?

10  A.   They're guarantors of the loan.

11  Q.   All right.  And this loan was for 300,000?

12  A.   That is correct.

13  Q.   And the aggregate amount was 600,000?

14  A.   Correct.

15  Q.   All right.  And on -- if I scroll down to the second page

16  of this Loan Offering Sheet, there is a thing called "loan

17  approval"?

18  A.   Correct.

19  Q.   And are you the lending officer?

20  A.   I am the lending officer.

21  Q.   And what is the date that you approved it?

22  A.   It looks like February 4th, 2013.

23  Q.   And scrolling down to Page 3, the officer's recommendation

24  and risk rating, could you just explain what that is?

25  A.   The recommendation and risk rating is, if all the

1    parameters of the loan request are met, then I'm recommending

2    this for an approval by the Bank.  And I'm stating here that,

3    based upon the loan-to-value being sufficient, the debt-service

4    coverage, the payment capability being sufficient, and the

5    support provided by the three guarantors, the loan meets a

6    risk-rating standard of three, which is acceptable to the Bank

7    and making a recommendation to approve it.

8    Q.   All right.  And when you talk about the guarantors'

9    support, let me -- did you do analysis of the guarantor --

10   A.   Yes.

11   Q.   -- two guarantors?

12   A.   Yes.

13   Q.   All right.  I'm going to scroll down to I guess it's the

14   last page.  And with respect to Mr. Lightbody, Charles

15   Lightbody I should say, here is where he's recorded the

16   information that he provided to you about the Wynn deal for the

17   land?

18   A.   Correct, yes.

19   Q.   All right.  Can you just read what you wrote about that?

20   A.   Let's see.  "He and his partners just signed     an

21   agreement with Steve Wynn to sell the property   with Wynn

22   applying for a casino license.  Mr. Lightbody 's investment in

23   the property is       1.5 million but may be worth in excess

24   of 10 million  in a year."

25   Q.   And that was information provided to you by Mr. Lightbody?

1    A.    Correct.

2    Q.    Sometime in late December?

3    A.    I would think so.

4    Q.    And just looking at, quickly, Exhibit 65, this is the Loan

5    Offering Sheet for the other loan?

6    A.    Uh-huh (affirmative).

7    Q.    And did you essentially put down the same information for

8    this as well?

9    A.    I mirrored what I had on the other one, yes.

10   Q.    All right.  So, you had the same guarantor analysis about

11   the --

12   A.    Correct.

13   Q.    -- the Wynn deal?

14   A.    Correct.

15   Q.    And were the loans approved?

16   A.    Yes, they were.

17   Q.    And do you remember when that was?

18   A.    It would have been, like, February, January or February of

19   2013.

20   Q.    All right.  And how about -- were the loans -- once

21   they're approved, they actually have to close?

22   A.    Yes, they do.

23   Q.    And do you remember when those -- when the loans closed?

24   A.    I want to say it was May of '13.  It was little bit later

25   because we had to get appraisals done, and we had a delay.  It

1    normally doesn't take that long, but it took a little longer in

2    this case.

3    Q.   Now, at the time of the closing of the loan in May of

4    2013, had Mr. Lightbody made any statements to you that

5    indicated that he had no longer any financial interest in the

6    property?

7    A.   I don't believe so.

8    Q.   Sometime thereafter did he make such a statement to you?

9    A.   He may have, yes.

10        MR. MERRITT:  No further questions, Your Honor.

11        THE COURT:  Cross-examination, Mr. Katz.

12        **CROSS-EXAMINATION BY MR. KATZ**

13   Q.   Good afternoon, Mr. Simms.

14   A.   Good afternoon.

15   Q.   Thank you for coming down from New Hampshire today.

16        I'm just going to start by asking your title at the Bank.

17   What's your current title?

18   A.   Senior Vice-President.

19   Q.   Okay.  And how long have you held that position?

20   A.   Approximately a year.

21   Q.   And then, before that, what was your title?

22   A.   Vice-President.

23   Q.   How long had you been Vice-President?

24   A.   Three years.

25   Q.   And then what about the prior bank?  What was your

1    position there?

2    A.    Vice-President.

3    Q.    And how long had you held that title?

4    A.    The duration of my time there.

5    Q.    Okay.  What is your education?

6    A.    I have a Bachelors Degree in business management from

7    UMass Amherst.

8    Q.    And you've been in banking for how long?

9    A.    37 years.

10   Q.    Is it accurate to say that the banks you've worked with

11   are mostly smaller local banks?

12   A.    That is correct.

13   Q.    These are not banks that just loan money to anybody;

14   correct?

15   A.    Correct.

16   Q.    You want your customers to pay their loans back on time;

17   correct?

18   A.    Yes.

19   Q.    And all else being equal, you like it when your customers

20   are decent people as well; is that correct?

21   A.    Yes.

22   Q.    And sometimes you even do background checks on them;

23   correct?

24   A.    Yes, we do.

25   Q.    And in fact it's fairly standard, when someone's applying

1   for a loan, to do a background check; correct?

2   A.   It's become the standard to do now, yes.

3   Q.   Now, when Mr. Lightbody first became one of your

4   customers, was that back in 2012?  Is that your recollection?

5   A.   I would say yes.

6   Q.   It was at Northeast Community Bank?

7   A.   Correct.

8   Q.   And did the Bank look in to his background --

9   A.   Yes, it did.

10   Q.   -- when he applied for a loan?

11   A.   Yes.

12   Q.   They did, okay.

13      And you learned from that background check, didn't you,

14   that Mr. Lightbody had a prior conviction in his background;

15   correct?

16   A.   Yes, we did.

17   Q.   And, like any good banker, you followed up with him,

18   didn't you?

19   A.   Yes.

20   Q.   And you even did your own Google search on  Charlie

21   Lightbody?

22   A.   Well, the Google search is actually what brought up the

23   conviction.

24   Q.   Okay.  And you asked him about it, didn't you?

25   A.   Yes, I did.

1    Q.   And isn't it true that Mr. Lightbody told you he had made

2    some bad decisions in his past?

3              MR. MERRITT:  Objection, Your Honor.

4              THE COURT:  Sustained.

5    Q.   Did Mr. Lightbody offer to put you in touch with his

6    lawyer, the lawyer who had dealt with that matter?

7    A.   Yes, he did.

8    Q.   And did you speak with that lawyer?

9    A.   I received a letter from the lawyer.

10   Q.   Now, after taking all the information in to account that

11   you had about Mr. Lightbody, you decided he was a -- someone

12   you would take on as a bank customer; correct?

13   A.   We decided to entertain the loans, yes.

14   Q.   You were comfortable with having your bank loan him money;

15   correct?

16   A.   Correct.

17   Q.   And you were comfortable being the sponsoring loan

18   officer; correct?

19   A.   Correct.

20   Q.   And when you went to First Ipswich Bank, you were

21   comfortable taking him on as a customer there too; correct?

22   A.   Correct.

23   Q.   And one of the things that you took comfort from was the

24   fact that he had been working with other local banks around

25   here as well; correct?

1   A.    That is correct.

2   Q.    And true to your hopes, Mr. Lightbody has been an

3   excellent customer over the years; correct?

4   A.    He's paid everything he's agreed.

5   Q.    He's paid on time, never defaulted on a loan, and he's

6   also a friendly guy, a regular friendly guy?

7   A.    Uh-huh (affirmative).

8   Q.    Are you friends with Mr. Lightbody?  Would you consider

9   him a close friend of yours?

10  A.    No.  I consider him a business associate, customer, you

11  know, customer-bank relationship.

12  Q.    But some customers are less friendly than others; do you

13  agree with that?

14  A.    I'm sure they are.

15  Q.    You have customers who you don't talk about anything other

16  than business with?

17  A.    Sure.

18  Q.    Okay.  And Mr. Lightbody, was he someone that you would

19  occasionally engage in chit-chat with about non-business

20  things?

21  A.    Sure.

22  Q.    Have you seen him outside of your Bank office before?

23  A.    I've been at his office before, yes.

24  Q.    And one of the things that you have chatted with

25  Mr. Lightbody about in the past is the Everett casino issue;

1    correct?

2    A.    Correct.

3    Q.    And you were engaging in chit-chat about that not because

4    it was relevant to the loan -- correct? --

5    A.    Correct.

6    Q.    -- but because it was an issue that was in the news;

7    correct?

8    A.    I would say that's accurate.

9    Q.    Do you recall that, in the fall and winter of 2012 and

10   2013, so let's start, you know, maybe November of 2012 to

11   January or February, 2013, do you recall the Wynn Everett news

12   being in the newspapers?

13   A.    Yes.

14   Q.    And on television?

15   A.    Yes.

16   Q.    And there was a lot of talk about the casino license race;

17   do you recall that being a topic of conversation on the news

18   pretty regularly?

19   A.    Sure.

20   Q.    Okay.  And you talked with Mr. Lightbody about that;

21   correct?

22   A.    Yes, I did.

23   Q.    And, again, that's friendly -- would you describe that as

24   friendly chit-chat?

25   A.    I would call it that, sure.

1          MR. KATZ:  If we could pull up Exhibit 59, already

2     admitted.  And if we go down to Page 4.

3     Q.    Okay.  So, the date on that is September 24, 2012?

4     A.    That is correct.

5     Q.    And then, if we back out of that, above that, you see it

6     says, "I have read carefully the foregoing personal financial

7     statement.  The figures and amounts shown on the statement are

8     true and complete and give an accurate showing of my personal

9     financial condition as of this date."

10         Did I read that correctly?

11    A.    Yes, you did.

12    Q.    Now, in this form that Mr. Merritt showed you,

13    Mr. Lightbody doesn't list any assets related to FBT or the

14    Everett parcel; correct?

15    A.    Correct.

16    Q.    It was only later, after you asked him to provide more

17    information about his assets, that he hand-wrote a list of

18    assets that he says he owns?

19    A.    Yes.

20         MR. KATZ:  And if we could pull up Exhibit 60, please.

21    Q.    So, again, this is the spreadsheet that you created;

22    correct?

23    A.    Yes.

24    Q.    And you'll see in the fourth column from the left, the

25    top, it says "FMV."  Does that stand for fair market value?

1   A.   Correct.

2   Q.   And if you go down to the 90 Alford Street, you put in

3   "TBD"?

4   A.   Correct.

5   Q.   And that means to be determined; correct?

6   A.   That is right.

7   Q.   And you put TBD because you didn't know what the Everett

8   parcel was worth; correct?

9   A.   That's true.

10  Q.   Did Mr. Lightbody put in a value when he hand-wrote his

11  list for you?

12  A.   I don't believe he did.

13  Q.   Okay.  Did you ever show the handwritten list that

14  Mr. Lightbody provided to you to Dustin DeNunzio?  Did you ever

15  show it to Dustin DeNunzio?

16  A.   I don't believe so.

17  Q.   What about this spreadsheet that you created, did you ever

18  show that to Dustin DeNunzio?

19  A.   Not that I remember.

20  Q.   Okay.  What about to Anthony Gattineri?

21  A.   I've never met him.

22  Q.   What about to Paul Lohnes, the majority owner of FBT?

23  A.   I don't even know him.

24        MR. KATZ:  Can we pull up Exhibit 64, please.

25  Q.   So, Exhibit 64 and 65, they're essentially mirror images

1    of one another?

2    A.    That is correct.

3    Q.    And you wrote this entire document; correct?

4    A.    Yes, I did.

5    Q.    Did you show it to Dustin DeNunzio before you submitted it

6    to your senior officer?

7    A.    I don't show it to any customer.

8    Q.    You didn't even show it to Mr. Lightbody, did you?

9    A.    No.

10    Q.    Okay.  So, Dustin DeNunzio hadn't signed off on the

11    accuracy of this document; correct?

12    A.    It's not his business.

13    Q.    Okay.  Now, when you were talking to Mr. Lightbody about

14    the Wynn-Everett news, did you tell him that, that was

15    necessary to close the loan?  Did you tell him that, that was

16    essential information in closing your loan?

17    A.    No.

18    Q.    Why not?

19    A.    Quite frankly, the Everett property, in my mind, has

20    nothing to do with my loans.

21    Q.    And why is that?

22    A.    Because, when I'm looking at a loan request, I'm looking,

23    first of all, to the property I'm financing.  I'm trying to

24    determine if the loan-to-value, the debt-service coverage, all

25    the aspects that I'm looking for stand on its own.

1      The only reason that I go in to looking at other

2  properties is to see whether or not there's any deficiencies

3  with cash flow or value and whether or not there's a need for

4  money coming from one property to another to have to cover that

5  deficiency.  Everett was not a consideration for my loan.

6  Q.   Okay.  So, when you were vetting this loan and deciding

7  whether to approve it, you didn't go to  Dustin DeNunzio and

8  say, Hey, you know, is Mr. Lightbody still really a partner in

9  FBT?

10  A.   I didn't talk to Dustin DeNunzio about this loan.

11  Q.   So, you did talk to Dustin DeNunzio, though, about

12  something called Turtle Crossing; is that correct?

13  A.   Yeah, but that was the property that I was selling for the

14  Bank.

15  Q.   That was the 40B property?

16  A.   Down in Norton.

17  Q.   Okay.  And Mr. Lightbody introduced          Dustin

18  DeNunzio to you; correct?

19  A.   Correct.

20  Q.   And is that something Mr. Lightbody did on occasion, he

21  would refer you to customers or give your name out to people he

22  knew?

23  A.   It happens with a lot of customers.

24  Q.   Those are the customers you like to have; right?

25  A.   That's how I get my business.

1  Q.   Okay.  And all else equal, you prefer to have customers

2  that do that for you, that refer business to you; right?

3  A.   Correct.

4  Q.   That's something that makes a customer a good customer?

5  A.   Well, I wouldn't say it makes him a good customer, but it

6  certainly helps.

7  Q.   One of the things -- it helps.  It helps.

8       So, Mr. DeNunzio pursued the 40B property in Norton, and

9  that went through, that deal; is that correct?

10 A.   Yes, it did.

11 Q.   And so, you've had some experience dealing with

12 Mr. DeNunzio; correct?

13 A.   Yes, I have.

14 Q.   Have you found him to be an honest Bank customer?

15 A.   Yes.

16 Q.   High integrity?

17 A.   Sure.

18 Q.   Has he always paid on time?

19 A.   Well, he bought the property; he didn't finance it.

20 Q.   Okay.  So, he did pay on time?

21 A.   The transaction that we did for the property in Norton was

22 a simple purchase and sale from the Bank to Mr. DeNunzio, and

23 that went smoothly.

24 Q.   Oh, it was on outright sale of land?

25 A.   Outright sale of land, correct.

1   Q.   Okay.  Mr. Merritt asked you about, at some point, you

2   learned from Mr. Lightbody that he did not continue to have an

3   ownership stake in FBT; correct?

4   A.   I didn't know the names of the entities, so that doesn't

5   even ring a bell to me.

6   Q.   Okay.  But he informed you that he no longer had any sort

7   of indirect ownership share in the Everett parcel?

8   A.   At some point, sure.

9   Q.   Okay.  And it may have been as early as May of 2013 when

10  he told you that; correct?

11  A.   It could have been.

12  Q.   Okay.  You just don't have a recollection?

13  A.   I do not.

14       MR. KATZ:  Okay, no further questions.

15       THE COURT:  Any cross-examination, Mr. Rankin?

16       MR. RANKIN:  Yes, Your Honor.

17                  **CROSS-EXAMINATION BY MR. RANKIN**

18  Q.   You testified a few minutes ago that you had done some due

19  diligence after learning that Mr. Lightbody had a record?

20  A.   Correct.

21  Q.   And part of the due diligence was looking in to his loan

22  activity and creditworthiness, those sorts of things?

23  A.   That is correct.

24  Q.   And you found that he had a good credit score?

25  A.   He had a good credit score, and he had dealt with probably

1    five or six different banks in the area.

2    Q.   And you learned that he had been in good standing with all

3    of those banks?

4    A.   That is correct.

5    Q.   And he had a good cash flow?

6    A.   Yes, he did.

7    Q.   And he seemed like a low-risk borrower?

8    A.   Yes.

9    Q.   And based on all the information you gathered, the Bank

10   decided to go ahead with the transactions --

11   A.   Correct.

12   Q.   -- that he was proposing; correct?

13   A.   That is correct.

14   Q.   And you were shown Exhibit 59, which is the handwritten

15   personal financial statement; is that correct?

16   A.   Yes, sir.

17        MR. RANKIN:   And could you throw up the signature page,

18   the last page, and just enlarge that so we can see the date.

19   Q.   So, that's Mr. Lightbody's signature?

20   A.   Yes, it is.

21   Q.   And the date that he signed it is September 24, 2012?

22   A.   That is correct.

23   Q.   And then, if you could turn to Exhibit 60, that's the

24   schedule of his real estate?

25   A.   Yes.

1   Q.    This is not something that he prepared?

2   A.    That's correct.

3   Q.    He gave you -- you had requested a list of his properties;

4   correct?

5   A.    Yes, I did.

6   Q.    And you knew from prior experience at Northeast that he

7   had a number of properties?

8   A.    That is correct.

9   Q.    And so, you asked him to give you a list of those; is that

10  right?

11  A.    Yes, I did.

12  Q.    And he came in a couple of days later and gave you that

13  handwritten list?

14  A.    Yes, he did.

15  Q.    Would it be fair to say that sometimes he's a little bit

16  disorganized?

17  A.    Yes, sir.

18  Q.    Maybe a little sloppy?

19  A.    You could characterize it that way, sure.

20  Q.    And so, this handwritten list wasn't useful for your

21  files, so you created the spreadsheet that we see in

22  Exhibit 60; correct?

23  A.    More -- it's not so much for my file as it is for my

24  presentation because the people who are asking me what real

25  estate interests he has, I like to have it in a format that

1    people can read, and this was my way of transferring his

2    knowledge to something that I could read.

3    Q.   So, if you could highlight the date towards the top so we

4    can see what date this was.

5    A.   September 26th, 2012.

6    Q.   We're just trying to highlight it so -- okay.  So, that's

7    the date that he brought in the handwritten list?

8    A.   That was the date that I prepared all this, everything

9    from his handwritten list and put it on this.

10   Q.   Okay.  Now, you told us something about doing calculations

11   of cash flow and loan-to-value?

12   A.   Yes.

13   Q.   Could you explain to us a little bit what that means, what

14   those terms or processes mean for your purposes?

15   A.   Loan-to-value is simply, if a property is valued at

16   $100,000 and I'm lending $50,000, loan-to-value is 50 percent.

17        Cash flow, simply put, is, What is the property throwing

18   off and generating in revenues, versus what my loan amount or

19   loan payment is, and making sure that it meets the criteria of

20   what the Bank is looking for, and we're looking at a margin of

21   1.2 times the coverage.

22        So that, if your property is throwing off $100,000 in cash

23   flow -- no.  I'm sorry.  If my loan payment is $100,000 per

24   year, let's say, I need him to show cash flow of 120,000 to

25   meet that ratio.

1   Q.   And you performed the calculation, both the cash flow and

2   the loan-to-value, on both of these properties?

3   A.   That's correct.

4   Q.   And you concluded that the proposed transaction, $300,000

5   on each property, met both the loan-to-value and the cash flow

6   required by the Bank?

7   A.   That's correct.

8   Q.   And am I correct in understanding that the reason that you

9   asked for a schedule of real estate owned was not to back up

10  the loan so much as it was to see if he had some huge

11  indebtedness that might affect his ability to re-pay your

12  loans?

13  A.   Yeah.  I think I had mentioned that earlier, that, in some

14  instances, you have customers that have properties where cash

15  flow doesn't work on one property and, therefore, they're

16  relying on the cash flow of another property to cover that.

17       It's a common practice in the banking world to take a look

18  at all the properties and make that determination on a, what we

19  call, a global cash flow to make sure that it all meets.

20  Q.   Now -- so that -- and I think you said that the -- in

21  response to Mr. Merritt's questions, the Alford Street property

22  wasn't a factor in your consideration of these two loans?

23  A.   No, it was not.

24  Q.   And it wasn't being used to secure either of these two

25  loans?

1   A.   No.

2   Q.   And it wasn't incurring debt service; correct?

3   A.   Based on what he gave to me, it had no debt.

4   Q.   And it wasn't generating any cash?

5   A.   Correct.

6   Q.   Now, I think you told us that, at some point, and you're

7   not sure when, he told you that he had sold his interest in the

8   land in Everett?

9   A.   I would say at some point, he did.  I just -- I don't

10  remember when.

11  Q.   Now, Mr. Merritt asked you whether it was before or after

12  May of 2013 when this loan closed; is that right?  You remember

13  that question?

14  A.   Yes, I do.

15  Q.   And you weren't at the closing; is that right?

16  A.   I don't remember if I was at the closing or not.

17  Q.   Okay.  But you can't place the conversation exactly when

18  you had this conversation about Charlie having sold his

19  interest?

20  A.   No.

21  Q.   And I'm correct in understanding he didn't tell you, Oh, I

22  sold it on a certain date; is that right?

23  A.   I don't remember that being the case, no.

24  Q.   Okay.  And do you recall testifying in the    Grand Jury

25  that, at some time between September 26, 2012, and May 13 --

1    May of 2013, he in fact told you that he had transferred his

2    ownership interest?

3    A.    I remember the question at the Grand Jury, yes.  And I

4    think there were a couple of questions there, but I do remember

5    that, yes.

6    Q.    And you told the Grand Jury, yes, that you had in fact

7    learned it in between those dates?

8    A.    I did say that, yes.

9    Q.    And then the prosecutor asked you another question

10   following that, "So, as far as you know, when it closed, he was

11   an owner still?"  Do you remember that?

12   A.    Yes, and I know I answered yes to that.

13   Q.    So, you gave seemingly different answers one after

14   another?

15   A.    Correct.

16   Q.    And there was no clarification in the Grand Jury as to

17   where -- you weren't asked to clarify that?

18   A.    No.

19   Q.    And, as you sit here today, you're just not sure when

20   Mr. Lightbody told you he had sold his interest; correct?

21   A.    Correct.

22   Q.    And you're not sure whether he told you when the interest

23   was transferred; fair?

24   A.    That's fair.

25   Q.    And do you still have a banking relation ship with

1    Mr. Lightbody?

2    A.    Yes, I do.

3    Q.    Is he still in good standing?

4    A.    Yes, he is.

5    Q.    His loans are paid in a timely fashion?

6    A.    Yes, they are.

7    Q.    No issues with him as a customer?

8    A.    No.

9         MR. RANKIN:  Thank you.  No further questions,

10   Your Honor.

11        THE COURT:  Mr. Connolly.

12        MR. CONNOLLY:  Nothing, Your Honor.

13        THE COURT:  Redirect.

14        MR. MERRITT:  Brief, Your Honor.

15        **REDIRECT EXAMINATION BY MR. MERRITT**

16   Q.    Just so we get this clear, Mr. Simms, when you wrote up

17   the Loan Offering Sheet, Exhibit 64 and 65, and that was on

18   January 11th, 2013, Mr. Lightbody had not told you that he had

19   sold his interest; is that right?

20   A.    I think I said that, yes.

21   Q.    And when you approved the loan on February 4th, 2013, he

22   had also not yet told you he had sold his interest?

23   A.    To the best of my knowledge, yes.

24   Q.    All right.  So, is your best memory that it was sometime

25   after May, 2013, when the loans closed that he told you that?

1    A.    I'd only speculate at this stage.  I don't know when.

2    Q.    But it was after at least February?

3    A.    Yeah, I'd say that's accurate, sure.

4    Q.    All right.  And you were asked some questions about

5    Mr. Lightbody as a customer, and you've done a lot of banking

6    with him over the years; right?

7    A.    Correct.

8    Q.    And you found him to be reliable in the information he

9    provided you; is that right?

10    A.    Correct.

11    Q.    You had no reason to doubt the truth of the things he was

12    telling you; is that right?

13    A.    True.

14    Q.    And so, when he told you that he stood to make perhaps $10

15    million from the sale of the property to Wynn in late December,

16    when he told you that, you had no reason to doubt that, did

17    you?

18    A.    No.

19    Q.    And you were asked some questions whether that was

20    important.  Well, you weren't the final person to approve the

21    loan, were you?

22    A.    No, I wasn't.

23    Q.    Who's that, the President?

24    A.    The President.

25    Q.    And you did put that information in your guarantor

1    analysis, did you not?

2    A.   I did.

3    Q.   And that was going to be read by the President of your

4    Bank?

5    A.   Correct.

6    Q.   And you believed that to be true, didn't you?

7    A.   Sure.

8              MR. MERRITT:  No further questions, Your Honor.

9              THE COURT:  Recross.

10             MR. RANKIN:  No, Your Honor.

11             MR. KATZ:  Nothing, Your Honor.

12             THE COURT:  Thank you, Mr. Simms.  You may step down.

13             May I see counsel at sidebar?

14             (Discussion at sidebar)

15             THE COURT:  I want to ask Government's counsel, are we

16   going apace, or are we behind your planned schedule or ahead,

17   or where are we?

18             MS. BARCLAY:  We're definitely going apace.  I think

19   we're ahead of our planned schedule.

20             THE COURT:  All right.  I'm inclined to give the jury

21   tomorrow afternoon off, unless there is a big objection.

22             MS. BARCLAY:  We actually have -- the witnesses that

23   we have planned for tomorrow are right now on the plane from

24   Nevada.

25             THE COURT:  Well, I'm going to have a session till

```
 1    1:00, but what I'm saying is not after 1:00.
 2              MS. BARCLAY:  Right.  But there are three witnesses
 3    coming in from out of State.
 4              THE COURT:  Okay.
 5              MS. BARCLAY:  So, you know, I don't know if my
 6    co-counsel --
 7              MR. MERRITT:  Well, if we had our druthers,
 8    Your Honor, we'd like to have the full day tomorrow.
 9              MS. BARCLAY:  Yeah, I think we --
10              THE COURT:  All right.  I won't suggest that we're
11    going to have the afternoon off, but it may still be that we
12    will.
13              MS. BARCLAY:  Okay.  Thank you.
14              THE COURT:  Okay?  Good.
15              (End of discussion at sidebar)
16              THE COURT:  All right.  Jurors, as I mentioned, we're
17    going to break a little early today for other commitments by
18    both some of the counsel and the Court, so we'll see you
19    tomorrow morning at 9:00 a.m.  We'll resume the testimony at
20    that time.  Please leave your notebooks in the jury room and
21    have a pleasant rest of the day.  See you tomorrow morning at
22    9:00 a.m.
23              (The jury is not present for the following)
24              THE COURT:  Be seated, counsel.  May I have an outline
25    of tomorrow 's testimony?
```

1           MS. BARCLAY:  Kim Sinatra.

2           THE COURT:  And the length of her direct?

3           MR. MERRITT:  Her direct is about 45 minutes,

4    Your Honor.

5           THE COURT:  All right.  And after Ms. Sinatra?

6           MR. MERRITT:  I believe Mr. Stern --

7           THE COURT:  Stern?

8           MR. MERRITT:  -- James Stern.

9           THE COURT:  And the length of his direct?

10          MR. MERRITT:  20 minutes.

11          THE COURT:  And after him?

12          MR. MERRITT:  Matthew Maddox, about a half an hour,

13   direct.

14          THE COURT:  And those are the three out-of-town

15   witnesses?

16          MR. MERRITT:  Yes, Your Honor.

17          THE COURT:  And the cross-examinations, roughly,

18   counsel for the defense?

19          MR. LEVY:  Your Honor, I think Ms. Sinatra and

20   Mr. Stern will be -- can measure it with the directs.  I think

21   Mr. Maddox may be a little bit longer, Your Honor.

22          THE COURT:  All right.  As I look at it, we might be

23   able to get this done in the morning but maybe not.

24          MR. LEVY:  May I just inquire of the Government?  I

25   assume that Mr. Condon, who was on today's schedule, is not on

1    tomorrow's schedule; is that right?

2           THE COURT:  Is that right?

3           MS. BARCLAY:  Yes.

4           THE COURT:  And I had Mr. Ciotti on the list.

5           MR. MERRITT:  Well, I think we're going to try to

6    accommodate the out-of-town witnesses, and we can --

7           THE COURT:  That's fine.

8           MR. MERRITT:  -- ask Mr. Ciotti to come back.

9           THE COURT:  We will see what the morning brings, and

10   if we can, we still may have a shortened day.  Whether it be

11   the full afternoon or not, we'll determine in the morning.

12           Anything else that needs to come to my attention

13   before we recess for the day?

14           MR. LEVY:  No, Your Honor.

15           THE COURT:  If not, we are adjourned until tomorrow

16   morning at 9:00 a.m.

17           THE CLERK:  All rise.

18           (Adjourned, 3:07 p.m.)

1

2                    C E R T I F I C A T I O N

3

4

5

6

7          We, Debra D. Lajoie, RMR, FCRR; Kelly Mortellite, RMR,

8    CRR; and Lee A. Marzilli, RMR, CRR, do hereby certify that the

9    foregoing pages are a true and accurate transcription of our

10   stenographic notes in the above-entitled case.

11

12

13

14

15                 /s/ Debra D. Lajoie

16                 /s/ Kelly Mortellite

17                 /s/ Lee A. Marzilli

18                       4/14/16

19

20

21

22

23

24

25